# Exhibit A

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,    )
    )
                Petitioner,   )
    )
vs.    )     Case No. 09-CIV-105-JHP
    )
UNITED STATES OF AMERICA,    )
    )
                Respondent. )

## ORDER

This post-conviction federal death penalty case, in which a motion under 28 U.S.C. § 2255 has been filed, comes before the Court on Petitioner's Motion to Disqualify and Recuse the undersigned judge from further participation in this matter (Doc. 45). The pending motion is brought pursuant to 28 U.S.C. §§ 144 and 455 and alleges that the actions and/or rulings of the undersigned judge during the pendency of the federal death penalty case and immediately prior to the filing of the § 2255 motion indicate a judicial bias which should disqualify said judge from presiding over this post-conviction proceeding. Petitioner asserts three grounds for disqualification of the undersigned judge: (1) violations of rules of judicial conduct; (2) judge will be a material witness to many of the facts and circumstances that comprise the basis of his motion to vacate; and (3) violations of canons of judicial ethics by conducting independent investigation on the internet during the course of ruling on Petitioner's motion to toll the statute of limitations in this matter. On July 13, 2009, the Government filed its Response to Petitioner's Motion to Disqualify (Doc. 51), in which it

urges this Court to deny the Motion because "[n]one of the grounds relied upon are timely presented or would lead a reasonable person to question the impartiality of this Court." Petitioner did not file a Reply.

A. Request to disqualify pursuant to 28 U.S.C. § 144

Title 28 U.S.C. § 144 provides as follows:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

In a § 144 motion, a court is not called upon to decide the truth of any allegations of bias. The only question before the Court under this section is whether a "party" has filed a "timely and sufficient affidavit" and a "certificate of counsel of record stating that it is made in good faith." *United States v. Battle*, 235 F.Supp.2d 1301, 1340 (N.D. Ga. 2001). Not one, but two declarations[1] are attached to the motion as well as a certificate of counsel that the motion is made in good faith. Neither of the declarations, however, were made or filed by a "party" as required by § 144. Furthermore, "conclusions, rumors, beliefs and opinions are not sufficient to form a basis for disqualification." *United States v. Burger*, 964 F.2d 1065,

---

[1]Pursuant to 28 U.S.C. § 1746, unsworn declarations signed under penalty of perjury are permitted whenever any law requires a sworn affidavit.

1070 (10th Cir. 1992).  Finally, "[t]he doctrine of incorporation by reference has no place in a § 144 affidavit."  *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987).

Although Petitioner's Motion to Disqualify indicates it is incorporating "by specific reference the averments made on pages 17 through 42 of his Motion to Vacate and all exhibits cited therein"[2] and "all allegations of Claim 5 and all exhibits cited therein"[3] and "the averments made on pages 17 through 247 of his Motion to Vacate (Doc. 2) and all exhibits cited therein,"[4] the Court is aware that the voluminous § 2255 motion (397 pages plus 195 multi-page exhibits) contains numerous allegations that the trial court violated Petitioner's due process rights during the course of the trial proceedings.  *See*, Doc. No. 2 at pp. 2-3; 17-43; 238-249; 305-308; 309-311; 345.  Despite the fact Petitioner's Motion to Disqualify states that his motion "stems from [this Court's] administrative and *ex parte* conduct, not his judicial rulings,"[5] most of the allegations of bias center around the Court's decisions (1) regarding appointment of counsel; (2) relating to the approval of an initial budget, (3) relating to the treatment of, at most, two CJA[6] vouchers submitted by John Echols, who subsequently requested leave to withdraw from this case; and (4) other rulings made during the course of the proceedings.  The Petitioner/Defendant did not personally sign

---

[2]*See*, Doc. 45 at p. 6.

[3]*Id.*, at p. 8.

[4]*Id.*, at p. 14.

[5]*See*, Doc. 45 at p. 6.

[6]CJA refers to the Criminal Justice Act, 18 U.S.C. § 3006A.

a verification with respect to the § 2255 motion; rather, it was signed by his attorney on his

behalf and it recites, in pertinent part, the following:

> I am authorized by Kenneth Eugene Barrett to file the foregoing motion to vacate, set aside, or correct the sentence, and for a new trial made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure. I am filing the motion on Mr. Barrett's behalf. . . .
> . . . . . I declare that the contents of the foregoing Motion are true except for those matters based upon information and belief, and I believe the latter matters to be true. . . . . I make this verification pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's knowledge.
> I declare, under penalty of perjury, that the foregoing is true and correct.

> /s/ Tivon Schardl

*Id.*, at p. 396-397.

To the extent that § 144 is explicit that only one affidavit is allowed, this Court finds

neither the declarations attached to the Motion to Disqualify or to the Motion to Vacate are

sufficient to satisfy the statutory requirements of a single affidavit by a "party." Further,

adverse rulings of the court are not legal grounds, under § 144, for disqualification. *Martin

v. United States*, 285 F.2d 150, 151 (10th Cir. 1960). Because a sufficient affidavit has not

been filed by a "party" stating facts showing bias against the Petitioner as required by § 144,

Petitioner's Motion to Disqualify based on 28 U.S.C. § 144 is denied.

B. Request to disqualify pursuant to 28 U.S.C. § 455

Title 28 U.S.C. § 455 provides, in relevant part:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

4

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

* * * * * *

(3) Where he has served in a governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy; . . . . . . .

28 U.S.C. § 455. Additionally, a judge shall disqualify if he knows it is likely that he will be a material witness in the proceeding. 28 U.S.C. § 455(5)(iv).

In *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994), the United States Supreme Court made it clear that judicial rulings almost never constitute a valid basis for a bias or partiality motion and opinions formed by the judge on the basis of events occurring in the course of judicial proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Rather, "[a] judge's ordinary efforts at courtroom administration" are immune from attack for judicial bias or partiality. *Id.*, U.S. at 556. A court called upon to consider a request to disqualify under § 455 must decide "whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *United States v. Burger*, *supra*. Under this section, the court does not have to presume the factual allegations are true nor is the judge limited to the facts presented by the challenging party. *Hinman v. Rogers*, *supra*. The court may consider all the circumstances, both public and non-public to rebut an inference of partiality. *Id.* See also, *State of Idaho v.*

5

*Freeman*, 507 F.Supp. 706 (D.C. Ida. 1981) in which the court stated when considering a claim of bias under § 455:

> Hidden facts indicating partiality may at any time come into public view and therefore are legitimate elements of an appearance test; and hidden facts tending to rebut an inference of partiality are presumably in the judge's power to reveal once public suspicion of his partiality in a given instance has been aroused.

*Id.*, at 721.

In addition to the general grounds asserted for disqualification of the undersigned judge, Petitioner asserts three specific actions taken in this case which he claims are "individually or collectively sufficient" to require this Court to recuse. First, Petitioner alleges the Court engaged in improper *ex parte* communications with the prosecutors. Second, Petitioner asserts administrative decisions made by the Court in approving a budget can not be separated from the claims raised in his § 2255 motion. Finally, Petitioner argues the Court's ruling denying his request to toll the statute of limitations was improper and, therefore, when added to the first two claims of judicial misconduct establish the court's bias or lack of impartiality. The Court will consider each of these allegations individually.

1. *Allegations of ex parte communications*

Petitioner claims that the Court's conduct during and after a September 13, 2005 *ex parte* hearing "violated" the American Bar Association's Model Code of Judicial Conduct (hereinafter "Model Code") Canon 2, Rule 2.9 because it was held despite the lack of an emergency, involved matters of substance and did not result in full disclosure to the defense.

The Government argues a court is not bound by the Model Code and that Petitioner has failed to establish that the challenged *ex parte* hearing was not authorized by law.

On September 9, 2005, the Government filed a Sealed Motion for Delaying the Production of Witness Names.[7] This motion requested permission to delay the disclosure of the names and addresses of certain witnesses until the Friday prior to their scheduled testimony. *Id.*, at p. 1. The motion asserted the Court could, pursuant to 18 U.S.C. § 3432, "make a finding by a preponderance of the evidence that the list of veniremen and witnesses need not be provided to the defendant in a capital case where the life or safety of any person may be jeopardized." *Id.*, at pp. 1-2. Despite the fact the defendant was in custody, the Government's motion alleged, in pertinent part:

> Defendant's actions which underlay (sic) the crimes for which he is charged, were lethally violent. He intentionally shot and killed one officer and wounded another. He also created substantial risk of injury to additional officers as well as citizens in the immediate area, including his own son. He displayed little regard to his own safety as well.
> Various of defendant's know (sic) associates in the drug business likewise have displayed violent tendencies and are commonly associated with firearms. In communications with some of these associates, Barrett threatened potential witnesses. He was heard to advise one person that the informant for his search warrant need (sic) to be "taken care of." He advised other persons that he intended or expected to be involved in a shoot-out with law enforcement officers. He willingly pursued that course of action despite his admitted expectation that he may die doing so.
> On several occasions before September 24, 1999,k (sic) defendant threatened or committed acts of violence towards law enforcement officers. On one occasion, defendant ran a roadblock with a vehicle and nearly hit two law enforcement officers. On another occasion, an officer approached defendant's residence. Defendant, confronted the officer, holding a firearm in a ready

---

[7]Doc. 186 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP. This document was unsealed by minute order entered on May 30, 2006.

position. Defendant also threatened to burn the residences of his neighbors and threatened to shoot their animals. Defendant's violent tendencies were so substantial that the sheriff of Sequoyah County had directed his officers not to answer calls at defendant's residence without backup. Defendant's known threats of violence were the basis for the no-knock search warrant herein and the decision to call the Oklahoma Highway Patrol tactical team for service of the warrant.

*Id.*, at p. 5. The government's motion also implied that the Court's actions deciding to utilize an anonymous jury selection process as well as authorizing the use by the United States Marshal of a stun belt on the defendant during the trial proceedings, added support to the government's "articulable concern that defendant poses a current and credible threat to others." *Id.*, at p. 3.

Based solely upon the government's allegations that Petitioner/Defendant had suggested that the informant on the search warrant needed "to be taken care of," the Court was obligated to hold an *ex parte* hearing to ascertain the basis for the government's safety concerns and to determine whether the government could prove "by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." 18 U.S.C. § 3432. *See also, United States v. Napue*, 834 F.2d 1311, 1318 (10th Cir. 1988) (recognizing *ex parte* hearing between the court and the government is appropriate to determine whether or not the government will be required to provide a witness list where government has raised concerns regarding disclosure). Although *ex parte* hearings should be avoided whenever possible, *id.*, one must question how a court would ever be able to consider a government claim that disclosure of a witness's identity would jeopardize that witness's life without holding an *ex parte* hearing.

8

A reading of the entire *ex parte* hearing reveals that the Court had not prejudged anything. At most, the transcript reveals the Court's frustration that the Government was just now disclosing a problem that the Court felt should have been addressed much sooner in the course of the proceedings. Specifically, the Court began the proceedings by noting that the Government's motion was filed late the day before, after the Court had just finished a full day of juror death qualification proceedings, by inquiring:

> . . . . why this motion was not filed much, much earlier. We have had at least two, maybe three pretrials. Every time the Court has inquired about the status of discovery, I have been told it's moving along fine without problem. This issue is a - - my research suggests it is of utmost importance for several reasons. One, as pointed out by the government's motion, they are concerned about the safety of potential witnesses.

*See*, Vol. I of Transcript of Hearing held on 9/13/05 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, at p. 3.[8] The Court did, however, ask the government to address when the trial started in light of its filing a list of witnesses on the prior Friday. The Court emphasized, however, that it was

---

[8]In preparing this Order, the Court became aware that the transcript contained within the Court files for September 13, 2005, only contained the first sealed hearing held on that day. The cover page for that transcript identified the transcript as "Transcript of Sealed Hearing on Government's Motion Before the Honorable James H. Payne United States District Judge, September 13, 2005." This transcript was filed on April 25, 2006 in *Unites States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

When the court reporter was asked to provide the Court with a copy of the transcript for the second sealed hearing held on September 13, 2005, the Court was advised that the two sealed hearings held on September 13, 2005 were contained in two separate volumes, labeled on the cover pages as "Transcript of Hearing on Government's Motion for Order Delaying the Production of Witness Names and Request for Protective Order Before the Honorable James H. Payne United States District Judge September 13, 2005 Volume I of II" and "Transcript of Hearing on Government's Motion for Order Delaying the Production of Witness Names and Request for Protective Order Before the Honorable James H. Payne United States District Judge September 13, 2005 Volume II of II." Volume I of II appears to be identical to the transcript filed with the Court Clerk on April 25, 2006 with the exception of the cover page. Volume II of II was apparently never filed with the Court Clerk. Accordingly, in order to ensure the entire transcript of both of the sealed hearings held on September 13, 2005 are on file in this case, the Court hereby directs the Court Clerk to file these two transcripts in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP simultaneously with the filing of this Order. Finally, the Court would note that the minutes for September 13, 2005 indicate the Court unsealed these hearings by agreement of counsel at the conclusion of the second hearing.

. . . . . concerned, at the very least, about the government's requirements to put on a preponderance of the evidence to demonstrate the concerns outlined in the motion for order delaying the production of witness names. I would advise the government that it's - - the Court has some concerns as to why this did not happen at a time when it could have been addressed more leisurely and comfortably. We are now here a few minutes before nine with the jurors coming in with only a few minutes to address this issue. So, I'm interested, first, in knowing from the government when does the trial start. I'm not so interested in excuses why it hasn't been done before, although that troubles me that we couldn't - - because if we had only had one pretrial, I would understand it, but I have had status conferences and pretrials. You could have filed this under seal weeks ago. As I say, I'm - - I don't want to waste time about what we could have done. I want to address where you think we are now and what evidence you have to support the delay in producing the names of these witnesses.

*Id*., at pp. 5-6.

After the government advised the Court that it had been in contact with defense counsel regarding it's witness list and the names of those persons deleted from the filed list, the Court indicated it was reassured that there had been discussions with defense counsel. The Court did, however, advise the government it was still concerned if the government failed in establishing by a preponderance of the evidence that revealing these witnesses' names would put their lives in jeopardy, what problems would arise with those witnesses' testimony. *Id.*, at p. 7. At that point, the government advised the Court that all counsel had been "operating under the inference that the trial begins on or after the 26th." *Id.* Furthermore, government counsel advised the Court that defense counsel was aware of "essence of the testimony of the witnesses"; that the witnesses were "all associates of Mr. Barrett's, associates or family." The government then proceeded to argue the merits of their motion. *Id.*, at pp. 12-20. After hearing the government's evidence, the Court said ". . . what you are telling me is nothing - -

you have no evidence of anyone being threatened that is on your witness list now.  You are

saying if we list them, we are afraid they will be threatened?" *Id.*, at p. 21.  Additionally, the

Court asked why the government had not addressed whether the witnesses could be protected

if their names were revealed.  *Id.*, at p. 22.  After hearing the government's response, the

Court indicated it would take the matter under advisement since it needed to proceed with

juror qualification proceedings. *Id.* at p. 24. Once in the courtroom, the Court indicated it was

"continuing with the individual juror qualification for purposes of Stage I proceedings."  Tr.

of Individual Juror Qualification for Purposes of Stage One Proceedings held on September

13, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, at p. 252.

Before starting, however, the Court gave both sides an opportunity to address any issues they

felt the Court needed to address.  At that time, the following record was made:

> MR. SPERLING:  Briefly, Your Honor.  As we have noted, we have informed defense counsel of the nature of the proceeding that was the subject of the hearing this morning.  We're working in the direction of an agreement by which we will make witnesses available to defense counsel and/or their investigator.  I anticipate that that will be done next week.  And we have talked very candidly, I think, without - - although we have not specific names, we've talked very candidly about the substance of testimony.  We have also indicated to both Mr. Hilfiger and Mr. Smith that we will make a proffer - -

> THE COURT: Well, let me - - before we proceed with much further discussion of that matter, that was a sealed hearing.  Is that what you're speaking of?

> MR. SPERLING: Yes, Your Honor.

> THE COURT: And, of course, we're not - - this is a public proceeding, although there's no one in the courtroom that I detect.  The sound system is on.  And I think that further discussion of that matter should be - - I'm obviously interested in hearing about it, but I think it should be a sealed proceeding.

11

MR. SPERLING: I appreciate your caution, Your Honor.

THE COURT: I'll make time for that during the day.

*Id.*, at pp. 252-253. After this colloquy, the jury panel entered the courtroom and the Court continued with death qualification of the jury. At the end of the day's proceedings, the Court took a five minute recess, sealed the courtroom and proceeded to deal with the issues raised at the beginning of the day. *Id.*, at p. 535. Specifically, the following record was made:

> THE COURT: Let the record reflect the Court is in session again in U.S.A. versus Kenneth Eugene Barrett, CR-04-115. The record should reflect that the defendant is present with counsel and the Government's counsel is present.
> It came to the Court - - this Court's attention Monday morning, just before the Court started the hearing on selection of jurors, or doing what we refer to as the death penalty qualification, that the Government had filed a motion requesting that their motion be filed under seal. I looked at the motion and granted the motion, the motion to file under seal, and later in the day, started examining the actual motion, and then into the evening yesterday, examining it, and decided, after looking at it, that it was necessary to set the matter for a sealed hearing first thing this morning, at which time the U.S. Attorney appeared and made a presentation on what was entitled Government's Motion for Order Delaying the Production of Witness' Names. That hearing was concluded. Then, as we started to begin the hearing for qualification of death qualified jurors, it was my understanding the U.S. Attorney desired to make an announcement, and at that point, I stopped the proceeding because I was concerned about the sealed issue.
> And, so, I want to make inquiry of the Government at this time, if you desire to proceed with this matter in the presence of defense counsel, and do you desire that this matter continue to be sealed?

> MR. SPERLING: I think we can proceed with defense counsel. I think where we were at - - and I'm doing my best, Your Honor, to recall where we were when we stopped - - when I - - I'm not sure exactly what thought I was - -

> THE COURT: I'll tell you where I was, is I was - - because of the nature of the pleading, I was concerned about security issues. And, so, that's why I thought it appropriate to stop and wait to hold this hearing at a time when we

12

had more time to think about it. And the nature of the announcement you were about to make, it sounded like there had been some discussion with defense counsel. And that's about as much as the Court knows.

MR. SPERLING: Okay. I'm willing for the matter to be unsealed. And here is where we are, Your Honor. I would really like to give this some additional thought, because we want to expeditiously identify the witnesses to defense counsel. We have attendant causes for concern. And, you know, I'm just thinking a bit aloud now, but I would want the Court's standard admonition with regard to contacting witnesses. We are working in the direction of either making the witnesses available in our office, or providing information such that the investigator for the defense can contact them and locate them. I'd really like to give this some thought this evening, before we come up with an explicit plan, but I think in one way or another, we're prepared, in the very near future, to do one of those two things.

THE COURT: From the defense?

MR. HILFIGER: Well, I don't have much more to say about - - I mean, we have talked about it, and they've made some offer, and I think that that's a workable solution.[9]

Vol. II of Tr. of Hearing held on September 13, 2005 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, pp. 26-28.

The next day, before the Court could issue a formal ruling on the government's motion, the parties announced to the Court that they had reached an agreement regarding these witnesses. Specifically, after indicating that it looked like the Court would complete the death qualification process by the end of the week, the following colloquy occurred:

THE COURT: . . . . . Let me - - the motion that we discussed at the end of yesterday, that was filed under seal, is it necessary to seal the courtroom in regard to that matter?

---

[9]At this point in the proceedings, defense counsel raised other matters of concern with the Court and no further discussion of disclosure of witnesses was held.

MR. SPERLING: It is not, and we have an announcement with regard to - - Your Honor, I believe we have reached an agreement whereby on Monday, we will give to the defense the names of these seven, their places of abode, criminal history, and any deals or promises that may have been made in exchange for their prospective testimony. We have also - - we are also working in the direction of making them available in our office next Thursday or Friday.

There are two incarcerated witnesses - - and I have also discussed this with counsel - - I don't know why we can't commit to telling them, you know, when they're here, they'll be brought here by writ, and then making them available in that manner.

THE COURT: Mr. Hilfiger, any comment?

MR. HILFIGER: That's what I understand, and at this time, we don't have any objection to that. That should be sufficient time, based on what we talked about yesterday, on the jurors that we sort of - -

THE COURT: I mean, Monday may be the last day. I think that if everything goes well, if we have a decent - - I think we had 52 total, and - - I don't want to get overly optimistic, but, I mean, if we - - in the next two days, we'll have to pause, and I'll give you both an opportunity to give me your assessment. We do have jurors coming next week, if we think we need them, but if we have a reasonable number the next two days, we may be satisfied with what we have by the end of the week. But I would think, at the very most, Monday would be sufficient.

MR. HILFIGER: That's what I was sort of thinking, about being able to talk to the witnesses next Thursday.

THE COURT: So, it's my understanding that the Government is disclosing - - this will be the last of the witness disclosures; is that correct?

MR. SPERLING: I believe so, Your Honor.

THE COURT: Okay. And that's what the defense understands?

MR. HILFIGER: That's what I understand, yes.

THE COURT: The Court, unless I hear different, has sealed the original pleading. Unless there is an application otherwise, that will remain sealed. I don't know of any reason why it should or shouldn't but until I receive an

application, it will remain sealed.  But as I understand it, the witnesses' names will be turned over to the defendant on Monday?

MR. SPERLING: Yes, Your Honor.

(PAUSE)

THE COURT: The clerk has brought to my attention, in regard to the matters filed under seal that has to do with an application for a writ - - unless you file some - - and I'll ask the U.S. Attorney to advise the Court and the clerk by the close of business tomorrow, as to whether that should remain sealed, unless you know now.

MR. SPERLING: Until Monday, we would ask at this time that that remain under seal until Monday.  We can work with the Marshall (sic) service. I presume that the fact that it is under seal would not obviate our talking with them.

THE COURT: No.

MR. SPERLING: We can still talk with them, in order to give them that notice.

THE COURT: I'm just trying to clear up the record, to see if it should be - - if the announcement you've made today resolves everything that is under seal.

MR. SPERLING: I think it does, but we need to wait until Monday.  We want to have an opportunity to talk with the witnesses and to encourage them to show up here.

THE COURT: Well, I'll leave it unexecuted.  If you will notify the Court and the clerk by the end of the close of business on Monday.

Tr. of Individual Juror Qualification for Purposes of Stage One Proceedings held on September 14, 2005 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, at pp. 840-843.

Other than citing to Model Rule 2.9, Petitioner has not cited any authority to establish that the Court could not hold an *ex parte* hearing on the government's motion. Furthermore, in light of the fact that the names of these witnesses were disclosed to defense counsel on September 19, 2005, and the actual selection of jurors did not commence until September 26, 2005,[10] any actions taken by this Court in relation to the *ex parte* hearing did not prejudice the defendant's rights under § 3432 in any way. Simply looking at what occurred as it unfolded, the Court was focused on the immediate legal proceedings (*i.e.*, death qualification of the jurors) before ruling upon the issues contained in the government's motion to delay disclosure of witnesses. Once an announcement was made that counsel had discussed those issues and had reached an agreed resolution, there was nothing left for the Court to decide. Therefore, this Court finds no reasonable person would harbor doubts about the judge's impartiality in light of the facts of this particular case.

### 2. *Budget and CJA Voucher Rulings*

Next, Petitioner alleges the Court's administrative decisions "express opinions prejudging the merits of the relevant claims" and therefore, pursuant to 28 U.S.C. § 455(b)(3), the Court is required to recuse. Specifically, Petitioner argues this Court's opinions "expressed in [its] administration of funds under the Criminal Justice Act cannot be separated from the issues that must be decided in Mr. Barrett's claims." Doc. 45, at p. 14. In support of this allegation, Petitioner incorporates two declarations, one from John Echols and one

---

[10]*See*, *United States v. Barrett*, 496 F.3d 1079, 1116-17 (10th Cir. 2007).

from Julia O'Connell.[11]  The gist of these two declarations is that the Court did not strictly follow the recommendations of the Federal Public Defender in the appointment of counsel in this case and did not automatically approve all claims submitted by defense counsel.  Initially, the Court attempted to appoint the Federal Public Defender for the Northern and Eastern Districts of Oklahoma but the Federal Public Defender felt his office could not accept the case due to their prior obligations to represent a capital eligible defendant in *United States v. Edward Leon Fields*, Case No. CR-03-73-RAW, also pending in the Eastern District of Oklahoma.  *See*, Doc. 1, Exhibit 67 -  Declaration of Julia O'Connell, at p. 1.  The Federal Public Defender recommended the appointment of John Echols and Rob Nigh[12] of Tulsa.  *Id.* After considering the recommendation of the Federal Public Defender as required by 18 U.S.C. § 3005, the Court appointed Mr. John Echols as lead counsel and Mr. Roger Hilfiger as co-counsel.  Mr. Echols had represented Mr. Barrett in two state court trials arising from the same set of facts as those underlying the federal indictment.  *Id.*  Mr. Echols did not, however, have any federal capital trial experience.[13]  On the other hand, Mr. Hilfiger had served as United States Attorney for the Eastern District of Oklahoma, had previously tried a federal capital case in the Eastern District of Oklahoma in which the jury decided against

---

[11]These declarations are labeled Exhibit 34 and 67.  When referring to these Exhibits, the Court will refer to them as Doc. 1, Exh. 34 or 67.  Any page references to these two exhibits will refer to the page numbers at the bottom of the exhibits' pages as opposed to the page number given by the CM/ECF system on the top of these pages.

[12]It should be pointed out that Mr. Nigh had a conflict of interest and when asked to accept appointment in this proceeding declined because of his conflict.

[13]*See* Doc. 310, Tr. of Sealed Budget Hearing on December 9, 2004 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, at p. 3.

imposing the death penalty against his client, and had an office in Muskogee (the location of the United States District Court for the Eastern District of Oklahoma).[14]

Additionally, Petitioner argues, "in the course of his administrative decisions, [this Court] expressed distrust of John Echols, Mr. Barrett's former counsel, whose request for investigative and expert assistance are now at issue."[15] Doc. 45, at p. 15. What Petitioner fails to acknowledge is that after Mr. Echols was allowed to withdraw at his request,[16] this Court repeatedly encouraged defense counsel to submit supplemental budget requests if they felt they needed additional funding.[17] The budget was not carved in stone but as the definition implies was an estimate of what might reasonably be required. Additionally, the record is

_____

[14]*Id.*, at pp. 3-4. *See also*, *United States v. James Norwood Hutching, et al.*, Case No. CR-92-32-FHS (E.D.Okla.).

[15]It should be noted that Mr. Echols filed only two CJA vouchers in Petitioner's criminal case. The first voucher covered fees and expenses from October 20, 2004 thru January 31, 2005, CJA Voucher No. 0505060000012. The second voucher covered fees and expenses from February 1, 2005 thru February 28, 2005, CJA Voucher No. 05056000014. Mr. Echols was allowed to withdraw on May 5, 2005. The trial did not begin until September 26, 2005. Prior to approving payment on these vouchers as well as two CJA vouchers submitted by Mr. Hilfiger, this Court referred all four vouchers to the magistrate judge. In a very thorough report and recommendation, the magistrate judge found an adjustment of time claimed by the attorneys was necessary due, in part, because of "striking similarities between the substance of pleadings" filed in Petitioner's criminal case and the substance of pleadings filed in a state court case in which Mr. Echols was involved. *See*, Doc. 106 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP, at p. 3. On May 5, 2005, this Court entered an order affirming the magistrate's report and recommendation regarding defense counsel's CJA vouchers, as well as ruling upon several other *ex parte* defense motions. Doc. 128 filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP. See also, Doc. 38, Sealed Order Regarding Ex Parte Motion for approval of "Pre-Authorization" Budget for the Defense signed by Magistrate Judge Steven P. Shreder and filed on January 19, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP detailing procedures to follow in submitting a proposed litigation budget and in submission of vouchers.

[16]Doc. 113, Tenth Ex Parte Motion Concerning the Funding of Mr. Barrett's Defense filed on April 6, 2005 and Doc. 128, Order filed May 5, 2005. Both of these documents were filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

[17]*See*, Doc. 321, Transcript of Sealed Telephone conference held on May 5, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115 (Court advised Mr. Hilfiger that it was granting Mr. Echols Motion to Withdraw and advised counsel he would be given an opportunity to inform the Court of the effect of this decision on the trial schedule, the budget and anything else to do with the case); Doc. 318, Transcript of Sealed Ex Parte Budget Hearing held on October 3, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP (Court advised defense counsel that after granting Mr. Echols Motion to Withdraw the Court had indicated that an amended budget request would be considered but no amended budget was ever filed. Counsel were again encouraged to advise the Court of any supplemental budget requests they might have; but counsel advised the Court that they felt the budget was sufficient for everything including all of the experts that they needed). *See also*, Doc. No. 128, Order regarding funding issues filed on May 5, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

clear that the Court encouraged defense counsel on numerous occasions to file amended budget requests and/or to advise the Court if it needed to amend its budget as the case proceeded. Furthermore, the defendant clearly did not seek recusal in a timely fashion as it relates to his allegations that the Court showed "distrust of Mr. Echols" and, therefore, this Court finds this allegation to be untimely. *See*, *United States v. Nickl*, 427 F.3d 1286, 1297 (10th Cir. 2005) (citing *United States v. Kimball*, 73 F.3d 269, 273 (10th Cir. 1995)( Party seeking recusal must do so in a timely fashion.)

Petitioner does not cite and this Court has not found any cases to establish that a judge who makes administrative budget decisions during the course of criminal proceedings is "serv[ing] in a governmental employment" capacity "as counsel, adviser or material witness" as those terms are used in 28 U.S.C. § 455((b)(3). To the extent the record establishes that counsel did not use the entire budget approved by this Court, Petitioner has failed to establish that this Court, in approving an initial litigation budget[18] and in ruling on the two CJA vouchers submitted by John Echols, demonstrated an opinion on the merits of the claims contained in his Motion to Vacate. It is not unheard of for a district court judge to appoint a licensed attorney to represent a criminal defendant and then during the course of ruling on an ineffective assistance of counsel claim in a subsequent § 2255 action for that same judge to find that counsel appointed by the court rendered ineffective assistance of counsel. Until the Court considers each of the allegations in a § 2255 case, along with the evidence presented to support those allegations, the Court has no way of prejudging the claims. Simply not

[18]Doc. 97 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

19

following the recommendation of the Federal Public Defender does not establish that the Court has already decided any of the issues in this case.

3. *Court's decision regarding tolling of statute of limitations*

Finally, Petitioner argues this Court conducted "independent investigation" to use as a basis for denying Petitioner's motion to toll the statute of limitations. In support of this allegation, Petitioner cites Canon 2, Rule 2.9(C) of the Model Code for the proposition that independent investigation of facts by a judge is improper. The full text of the Rule relied upon states: "A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed." *Id.* Without citing any authority to establish that the Model Code is binding on this Court, Petitioner argues this Court's judicial finding that it had appointed the Federal Public Defender's Office for the Eastern District of California, and thereafter, relying upon the information contained on the public website of the Federal Public Defender's office[19] establishes bias or creates the appearance of bias toward Petitioner. As acknowledged by the government, the information which this Court took "judicial notice" of had no bearing on this Court's ultimate legal conclusion that there was no legitimate basis to authorize tolling of the statute of limitations in light of the specific facts considered by the Court. This was not a case where lead counsel died and no one else knew anything about the case. Rather, this is a case

---

[19]Without trying to address all of the trivial points raised regarding the specific language of this Court's Order filed on February 27, 2009 (Doc. 397), this Court would note that 18 U.S.C. § 3005 authorizes a district court to appoint "Federal Public Defender organizations" as opposed to individual attorneys within such an organization and this Court's written appointment order clearly envisioned that a Federal Public Defender organization was being appointed herein. *See*, Doc. 371, filed in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

where **lead counsel**, David Autry, had absolutely no medical concerns or other issues which were brought to the attention of this Court. Furthermore, lead counsel was aware for several months prior to requesting the Court toll the statute of limitations that he might need to take a more active role in preparation of petitioner's pleadings. Finally, whether or not the government felt tolling was appropriate, this Court had to make a legal decision regarding this issue. While petitioner and/or defense counsel may disagree with the legal decision made by this Court, the Supreme Court has made it clear that judicial rulings rarely constitute a valid basis for bias or partiality motions. *Liteky*, *supra*. *See also*, *Martin v. United States*, *supra*. Despite Petitioner's allegations, Petitioner has failed to establish that this Court's "impartiality might reasonably be questioned" or that this Court has any "personal knowledge of disputed evidentiary facts concerning the proceeding."

For the reasons set forth herein, this Court finds Petitioner has failed to establish, based upon the allegations in his Motion to Disqualify, either that a reasonable person knowing all of the facts would question this Court's impartiality, 28 U.S.C. § 455(a)) that this Court has a personal bias or prejudice against Petitioner or "personal knowledge of disputed evidentiary facts concerning this proceeding," 28 U.S.C. § 455(b)(1); or that this Court "has served in governmental employment and in such capacity participated as counsel, advisor or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case or controversy." 28 U.S.C. § 455(b)(3). Additionally, this Court does not anticipate being a witness in any proceedings in this case. 28 U.S.C. § 455 (5)(iv).

21

Accordingly, Petitioner's Motion to Disqualify based on 28 U.S.C. § 455 (Doc. 45) is hereby denied.

## **CONCLUSION**

For the reasons stated herein, it is the Order of this Court that Petitioner's Motion to Disqualify (Doc. 45) is hereby denied.

It is so ordered on this \_11th\_ of September, 2009.

James H. Payne
United States District Judge
Eastern District of Oklahoma

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT, )
)
      *Movant,* )
)
)    **Case No. 6:09-cv-00105-JHP**
v. )
)
UNITED STATES OF AMERICA, )
)
      *Respondent.* )

## MOTION TO DISQUALIFY AND RECUSE UNITED STATES DISTRICT JUDGE JAMES H. PAYNE FROM FURTHER PARTICIPATION IN THIS MATTER

**TABLE OF CONTENTS**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  APPLICABLE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  Constitutional Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.  Statutory Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.  28 U.S.C. § 455(a):  the appearance of bias . . . . . . . . . . . . . . . . . . . . . . . . 3

        2.  28 U.S.C. § 455(b): actual bias &disqualifying knowledge
            or association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.  The law requires heightened need for reliability in death penalty cases . . . . . . . 5

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  Judge Payne's Conduct Provides Reason to Believe he Harbors Bias or
        Prejudice against Mr. Barrett or in Favor of the Government, and Would
        Cause Any Fully Informed Person to Question his Impartiality in this Matter . . . 6

        1.  Judge Payne's ex parte communications with prosecutors and
            the necessity of adjudicating claims based on those communications
            constitute grounds for disqualification and recusal . . . . . . . . . . . . . . . . . 6

        2.  Judge Payne's administrative decisions and the necessity of
            adjudicating claims involving those decisions constitute grounds for
            disqualification and recusal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        3.  Judge Payne's independent investigation of facts underlying the
            denial of Mr. Barrett's motion for tolling constitutes grounds for
            disqualification and recusal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        4.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    B.  Recusal is Required Under 28 U.S.C. § 455(b) Due to Judge Payne's Status
        as a Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.  REQUEST FOR EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Aetna Life Insurance v. Lavoie, 475 U.S. 813 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Bracy v. Schomig, 286 F.3d 406 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

Brokaw v. Mercer County, 235 F.3d 1000, 1025 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Liteky v. United States, 510 U.S. 540 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Mayberry v. Pennsylvania, 400 U.S. 455 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

In re Murchison, 349 U.S. 133 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 13, 21

Murchu v. United States, 926 F.2d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Nichols v. Alley, 71 F.3d 347 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Spaziano v. Florida, 468 U.S. 447 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Taylor v. Hayes, 418 U.S. 488 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Cooley, 1 F.3d 985 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Gonzalez, 150 F.3d 1246 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Greenspan, 26 F.3d 1001 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Ward v. Village of Monroe, 409 U.S. 57 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Woods v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**FEDERAL STATUTES**

18 U.S.C. § 3432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 10, 11

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

18 U.S.C. § 3599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 26

28 U.S.C. § 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17

**MISCELLANEOUS**

ABA Model Code of Judicial Conduct, Canon 2, Rule 2.9(C) . . . . . . . . . . . . . . . . . . . . . . . . 17

Elizabeth G. Thornburg, *The Curious Appellate Judge: Ethical Limits on Independent Research*, 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| | ) | **Case No. 6:09-cv-00105-JHP** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**MOTION TO DISQUALIFY AND RECUSE UNITED STATES DISTRICT JUDGE
JAMES H. PAYNE FROM FURTHER PARTICIPATION IN THIS MATTER**

COMES NOW Kenneth Eugene Barrett, by and through his undersigned counsel, and,

pursuant to 28 U.S.C. § 455, and the Fifth, Sixth, Eighth and Fourteenth Amendments to the

United States Constitution, moves for an order disqualifying and recusing Hon. James H. Payne

from further participation in this case. The grounds for this motion and supporting legal authority

are set forth as follows:

## I. INTRODUCTION

On March 16, 2009, Mr. Barrett filed a motion pursuant to 28 U.S.C. § 2255 for collateral

relief, including vacating, setting aside and/or correcting his sentence. Docs. 1 & 2 ("Motion to

Vacate"). Among the grounds set forth in his motion, Mr. Barrett asserts that the trial court,

presided over by Judge James H. Payne, directly violated his constitutional and statutory rights in

ways that include violations of rules of judicial conduct. In addition, Mr. Barrett contends that

Judge Payne is a material witness to many of the facts and circumstances that comprise the basis

1

of various other claims set forth by Mr. Barrett, including Mr. Barrett's claims of prosecutorial misconduct and his claims of ineffective assistance of counsel.  Accordingly, Judge Payne is either the subject of or a potential material witness to facts that must be considered in evaluating Mr. Barrett's claims and, as such, Judge Payne is disqualified, and must recuse himself, from making any rulings in these proceedings.

Additionally, prior to the filing of his Section 2255 Motion, Mr. Barrett filed a Motion for Equitable Tolling in Case No. 6:04-CR-00115, requesting that the trial court toll the time period for the filing of the Motion to Vacate.  In considering that motion, Judge Payne violated the canons of judicial ethics by conducting an independent investigation on the internet of information he later relied upon to deny relief without giving Mr. Barrett prior notice or an opportunity to be heard.

Whether these acts are considered individually or collectively, any reasonable person fully informed of the law and facts, at a minimum, would question Judge Payne's impartiality.

## II.  APPLICABLE LAW

**A.      Constitutional Authority**

The fair trial guarantees of the Due Process Clause of the Fifth Amendment encompass a litigant's right to have "a neutral and detached judge" preside over judicial proceedings.  *Ward v. Village of Monroe,* 409 U.S. 57, 62 (1972). In *In re Murchison,* 349 U.S. 133 (1959), the Supreme Court has stated:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias. But our system of law has always endeavored to prevent even the probability of unfairness. . . . Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their

> very best to weigh the scales of justice equally between contending
> parties. But to perform its high function in the best way "justice
> must satisfy the appearance of justice."

*Id.* at 136 (citations omitted).

So important is this constitutional guarantee that its denial is not subject to the harmless error rule. *See, e.g., Tumey v. Ohio,* 273 U.S. 510 (1927); *Bracy v. Schomig,* 286 F.3d 406, 414 (7th Cir. 2002) ("There is no harmless error analysis relevant to the issue of judicial bias.").

**B.      Statutory Authority**

*1.       28 U.S.C. § 455(a):  the appearance of bias*

Section 455(a) is broader than 28 U.S.C. § 144 and Section 455(b), providing that disqualification of a United States judge is warranted not only when there is actual bias or prejudice but also when "the impartiality of the judge might reasonably be questioned."  The goal of Section 455(a) is to avoid even the appearance of partiality.  *See Nichols v. Alley,* 71 F.3d 347, 351 (10th Cir. 1995).  "The test in this circuit is 'whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.'" *United States v. Cooley,* 1 F.3d 985, 993 (10th Cir. 1993) (citations omitted); *see also United States v. Greenspan,* 26 F.3d 1001, 1005 (10th Cir. 1994) (the statute imposes on the trial judge "a continuing duty to ask himself what a reasonable person, knowing all the relevant facts, would think about his impartiality").

Whether recusal is required is determined by an objective standard that considers what a reasonable person might believe.  As summarized by the Supreme Court:

> [W]hat matters is not the reality of bias or prejudice but its
> appearance. Quite simply and quite universally, recusal was

required [pursuant to § 455(a)] whenever impartiality might be questioned.

*Liteky v. United States,* 510 U.S. 540, 548 (1994).

> **2.      28 U.S.C. § 455(b): actual bias &disqualifying knowledge or association**

Section 455 (b)(1) of the Judicial Code provides:

> (b) [A judge] shall also disqualify himself in the following circumstances:
>
> > (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . .

The first clause of Section 455(b)(1) parallels 28 U.S.C. § 144, and the standard for recusal is similar:  whether a reasonable person would be convinced that the judge was biased. *See Brokaw v. Mercer County,* 235 F 3d 1000, 1025 (7th Cir. 2000).  Recusal under this statute "is required only if actual bias or prejudice is proved by compelling evidence." *Id.*  However, the section is proposed in the disjunctive, requiring disqualification if either bias or personal knowledge of disputed facts exists.

Section 455 (b)(1) is distinct from Section 144 in that its provisions are applicable to all justices, judges and magistrates and places the obligation to identify the existence of these grounds upon the judge, rather than requiring recusal only in response to a party affidavit as in Section 144.  *See Liteky,* 510 U.S. at 548.

A judge must also disqualify himself in the event he has been or will be a witness in the case in controversy.  Section 455(b)(3) provides that a judge shall disqualify himself "[w]here he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the

4

particular case in controversy."  Along similar lines, Section 455(b)(5)(iv) states that a judge

should disqualify himself when he "[i]s to the judge's knowledge likely to be a material witness

in the proceeding."

**C.      The law requires heightened need for reliability in death penalty cases**

Death penalty cases are significantly different from ordinary felony cases because the

"finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however

long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-

determination procedures.  *Woodson v. North Carolina,* 428 U.S. 280, 305(1976); *see also*

*Gardner v. Florida*, 430 U.S. 349, 357-58 (1977) ("From the point of view of society, the action

of the sovereign in taking the life of one of its citizens also differs dramatically from any other

legitimate state action.  It is of vital importance to the defendant and to the community that any

decision to impose the death sentence be, and appear to be, based on reason rather than caprice or

emotion."); *Spaziano v. Florida,* 468 U.S. 447, 468  (1984) (Stevens, J., concurring in part and

dissenting in part) ("because of its severity and irrevocability, the death penalty is qualitatively

different from any other punishment and hence must be accompanied by unique safeguards").

The judge's role under federal law literally gives the power of life and death.  Recusal issues are

treated differently in capital cases.  *See, e.g., Bracy v. Schomig,* 286 F.3d 406, 418 (7th Cir.

2002) ("In evaluating [the trial judge's] rulings at the penalty phase of this proceeding, we are

again mindful that death is indeed different.")

### III.  ARGUMENT

This motion presents several grounds for Judge James H. Payne being disqualified from

this case.  The grounds include that Judge Payne has demonstrated bias, or the appearance of

bias, against Mr. Barrett or in favor of the Government in several ways, and that Judge Payne is a material witness to events that occurred off the record and that are at issue in Mr. Barrett's claims. These circumstances are individually or collectively sufficient to disqualify Judge Payne and require him to recuse himself without taking further action in this case.

**A.      Judge Payne's Conduct Provides Reason to Believe he Harbors Bias or Prejudice against Mr. Barrett or in Favor of the Government, and Would Cause Any Fully Informed Person to Question his Impartiality in this Matter**

> ***1.       Judge Payne's* ex parte *communications with prosecutors and the necessity of adjudicating claims based on those communications constitute grounds for disqualification and recusal***

Claim 1 of Mr. Barrett's Motion to Vacate (Doc. 2) raises allegations about the conduct of the trial judge James H. Payne both in his judicial and administrative capacities. Doc. 2 at 17-42. Mr. Barrett hereby incorporates by specific reference the averments made on pages 17 through 42 of his Motion to Vacate and all exhibits cited therein. The relevant allegations are based on witnesses' accounts of statements Judge Payne made off the record, and documents and transcripts that are part of the record. The constitutional and statutory violations alleged in Claim 1 stem from Judge Payne's administrative and *ex parte* conduct, not his judicial rulings.

Evidence obtained by Mr. Barrett's post-conviction counsel gave rise to the following allegations that are relevant to the instant Motion:

(a) that on September 13, 2005, Judge Payne engaged in improper *ex parte* communications with prosecutors which included giving prosecutors the benefit of (1) the court's independent legal research into the application of 18 U.S.C. § 3432 to Mr. Barrett's case, (2) the court's view that the Government's motion for a protective order

6

lacked merit, (3) knowledge that the court would find merit in a defense request for a continuance, and (4) advance notice of a potential violation of Federal Rule of Evidence 404(b);

(b) that during the *ex parte* conference on September 13, 2005, prosecutors informed Judge Payne that they were aware of a witness who when questioned would not corroborate claims of the Government's trial witness Charles "Monk" Sanders (Tr. 9/13/05 Hr'g at 14, 17);

(c) that later on September 13, 2005, Judge Payne, in describing the content of his *ex parte* conversation with prosecutors to Mr. Barrett's counsel, misrepresented the conversation by omitting information important to the defense;

(d) that Judge Payne concealed the full extent of his *ex parte* communications with prosecutors – including his statements that the Government lacked grounds for keeping information from the defense – with the knowledge that the Government wanted to delay revealing that information for as long as possible and that the Government wanted to obtain concessions from the defense before revealing the information;

(e) that Judge Payne continued to conceal the full extent of his *ex parte* communications with prosecutors after he observed Mr. Barrett's counsel forego the pursuit of remedies such as a continuance that Judge Payne anticipated would be needed by the defense;

(f) that Judge Payne concealed from the defense the existence of the impeachment witness described to him during the *ex parte* conference even after Sanders testified to the claims the witness could not corroborate.

Claim 5 of Mr. Barrett's Motion to Vacate asserts that his constitutional and statutory rights were violated by the suppression of evidence that could have been used to impeach prosecution witnesses, including Monk Sanders. Mr. Barrett hereby incorporates by specific reference the allegations of Claim 5 and all exhibits cited therein. Judge Payne's failure to disclose the content of prosecutors' *ex parte* communications with him makes him complicit in the suppression of evidence.

The American Bar Association's Model Code of Judicial Conduct ("Model Rules") provides the following:

> A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter, except as follows:
>
> [¶] When circumstances require it, ex parte communication for scheduling, administrative, or emergency purposes, which does not address substantive matters, is permitted, provided:
>
> > (a) the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication; and
> >
> > (b) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication, and gives the parties an opportunity to respond.

Canon 2, Rule 2.9. Judge Payne's conduct on September 13, 2005 violated this rule.

Judge Payne called the *ex parte* hearing for the purpose of addressing the Government's motion for a protective order. Tr. 9/13/2005 Hr'g at 2. It appears from the transcript that the *ex*

*parte* communications took place in Judge Payne's chambers.[1] The Government's motion sought approval for prosecutors previously redacting from the Government's witness list the names and contact information of seven witnesses. While it may be that Judge Payne believed the *ex parte* conference was necessary for "emergency purposes," ABA Model Rule 2.9, what transpired during the hearing shows Judge Payne saw no emergency, and, in any event, that he permitted the discussion to include matters of substance about which he did not inform the defense and to which he gave Mr. Barrett no opportunity to respond.

At the beginning of the hearing, Judge Payne informed the prosecutors that he saw no merit in the written motion where the Government had relied upon the court's prior orders that Mr. Barrett be restrained with an electric shock belt and that the jury be anonymous. Tr. 9/13/05 Hr'g at 3-4. He stated that these rulings were not based upon concerns about Mr. Barrett being dangerous. *Id.* at 4. Towards the end to the hearing, after he gave prosecutors an opportunity to present additional factual support for the Government's motion, Judge Payne specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger. *Id.* at 20. The transcript thus gives no indication that Judge Payne might have granted the Government's motion.

The transcript also shows Judge Payne "address[ed] substantive matters" beyond the immediate purpose of the Government's motion. Model Rule 2.9. At the end of the *ex parte* conference Judge Payne said "there is 404(b) material obviously in the proposed motion, it appears to me," Tr. 9/13/05 Hr'g at 22, referring to Federal Rule of Evidence 404(b), which

---

[1] At the conclusion of the *ex parte* conference, Judge Payne stated that they would "proceed with jury selection," and "I'll see you downstairs." Tr. 9/13/2005 Hr'g at 23.

would have required the Government to "provide reasonable notice in advance of trial." The prosecutor agreed that Rule 404(b) matter "appears to be implicit" in the information provided in the motion for a protective order. *Ibid.* Then the prosecutor offered a rationale for not providing notice, and Judge Payne said he would "take this matter under advisement" before calling the conference to an end. *Id.* at 23. But that was not the only substantive matter addressed in the *ex parte* hearing.

During the *ex parte* hearing, Judge Payne invited the prosecutors to proffer additional grounds for a protective order beyond the matter set forth in the written motion. Tr. 9/13/05 Hr'g at 13, 19 (Judge Payne: "what evidence amy I going to be furnished to demonstrate that these people are in danger"). Assistant United States Attorney Michael Littlefield attempted to persuade Judge Payne that Mr. Barrett posed a danger to witnesses by telling about an interview he conducted with a female witness. Littlefield told Judge Payne that Sanders, the confidential informant, had been in a woman's apartment when she received a telephone call. Sanders claimed that although the woman held the receiver he could hear the voice on the other end and recognized it as Mr. Barrett's voice calling from the jail. Sanders claimed Mr. Barrett said something to the woman about finding the identity of the confidential informant and doing harm to him. Littlefield told Judge Payne he interviewed the woman Sanders named, and she did not confirm his story, but, Littlefield added, he believed she was afraid. Tr. 9/13/05 Hr'g at 14, 17.

At the conclusion of this presentation Judge Payne summed up the prosecution's evidence as follows:

> . . . what you are telling me is nothing – you have no evidence of anyone being threatened that is on your witness list now. You are saying if we list them, we are afraid they will be threatened?

Tr. 9/13/05 Hr'g at 19.

Based on his statements during the *ex parte* hearing, Judge Payne believed at the time, that cases interpreting 18 U.S.C. § 3432 gave Mr. Barrett the legal right to be informed of the Government's witnesses. Tr. 9/13/05 Hr'g at 4-5. Judge Payne's statements also indicated he saw no merit in the Government's motion for an order permitting those witnesses' identities to be retained under seal. *Id.* at 4-5, 7, 13 & 19-20. Judge Payne learned from the prosecutors' *ex parte* communications that they believed the Government would "gain a procedural, substantive, or tactical advantage," Model Rule 2.9, if the motion for a protective order were not simply denied, and the Government was permitted to pursue negotiations for concessions from the defense in exchange for disclosure. Judge Payne also permitted the Government the tactical advantage of making *ex parte* representations regarding the defense attorneys' alleged view of the law. Tr. 9/13/05 Hr'g at 7. At the conclusion of the *ex parte* hearing, Judge Payne failed "promptly to notify all other parties of the substance of the ex parte communication," Model Rule 2.9, and consequently failed to give Mr. Barrett an opportunity to respond.

Following the *ex parte* conference, the court held further proceedings with defense counsel present. At the beginning of these proceedings the prosecutor sought guidance from the Judge Payne regarding "where we were when we stopped" the *ex parte* conference. Tr. 9/13/05 Hr'g at 26. Judge Payne said they had been discussing "security issues." *Ibid.* He said, "it sounded like there had been some discussion with defense counsel. And that's about as much as the Court knows."[2] *Ibid.* The Court did not describe the discussion of § 3432, the prosecutor's

---

[2] Immediately after this misleading characterization of the *ex parte* conference, and on the basis of that characterization, the prosecutor withdrew opposition to having the transcript remain under seal. Tr. 9/13/05 Hr'g at 26.

representations regarding the defense attorney's view of the law, the court's rejection of the written grounds in the Government's motion, the prosecutors' factual proffer, including the information about Monk Sanders, or the discussion of Rule 404(b).

Most importantly, Judge Payne did not reveal his understanding that the Government's witnesses were so important that the defense would likely request, and be entitled to, a continuance. Rather than ensure that the Government gained no procedural, substantive, or tactical advantage from the *ex parte* communication, Judge Payne permitted the defense to agree to concessions from the Government – including further delay – before gaining access to information about the witnesses.

On September 14, 2005, after jury selection proceedings ended, the court raised the issue of the unidentified witnesses. The United States Attorney informed the court that the Government and Mr. Barrett's counsel had reached an agreement that the witnesses' names, contact information, criminal histories and (allegedly) promises made to them would be revealed the following Monday. R. 840. The United States Attorney further advised the court that the defense would, possibly, have access to some of the witnesses at the prosecutor's office. R. 841. defense counsel Roger Hilfiger stated that he had no objection to the arrangement, "based on what we talked about yesterday." *Ibid.* The court then stated that this would make a "clear record" and the parties' "announcement . . . resolves everything that is under seal." R. 843.

The record thus shows that Judge Payne's violation of Model Rule 2.9 on September 13 and 14, 2005, provided the prosecution with advantages and Mr. Barrett with disadvantages, and that Judge Payne was aware of these trade-offs when he concealed the full extent of his *ex parte* conference. Any reasonable person informed of these circumstances would question Judge

12

Payne's impartiality as regards Mr. Barrett's position in this case. On the basis of this record, Judge Payne is disqualified from presiding in this case, and he must recuse himself.

At a minimum, Judge Payne is disqualified from adjudicating Claims 1 and 5 of Mr. Barrett's Motion to Vacate due to his own conduct being at issue. Proceeding after the *ex parte* hearing without giving Mr. Barrett notice of the court's intentions or the bases for its (in)action with respect to the Government's motion violated Mr. Barrett's right to due process. *Cf. Lankford v. Idaho*, 500 U.S. 110 (1991). This is not a question of the correctness of a ruling that might be reversed by a higher court, but whether Judge Payne engaged in conduct that could subject him to disciplinary proceedings and public obloquy. Any reasonable person fully informed of these circumstances would doubt that Judge Payne, or any other judge, could impartially adjudicate the propriety of his own conduct. *In re Murchison*, *supra*, 349 U.S. at 136. It would violate Mr. Barrett's right to due process in these proceedings for Judge Payne to continue to decide matters in this case. *Aetna Life Ins. v. Lavoie*, 475 U.S. 813, 825 (1986).

### 2. *Judge Payne's administrative decisions and the necessity of adjudicating claims involving those decisions constitute grounds for disqualification and recusal*

A judge is required to recuse himself "[w]here he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy." 28 U.S.C. § 455(b)(3). Several claims in Mr. Barrett's Motion to Vacate raise constitutional and statutory violations stemming in whole or in part from decisions Judge Payne made in an administrative capacity under the Criminal Justice Act. Judge Payne's prior administrative decisions express opinions prejudging the merits of the relevant claims.

13

Claim 1 asserts in relevant part that Judge Payne's administrative decisions to deny Mr. Barrett's counsel access to investigative and expert assistance encroached upon the constitutionally and statutorily protected independence of defense counsel. Claim 2 asserts in relevant part that Mr. Barrett's trial counsel were ineffective in various ways including lack of preparation and a failure to secure expert and investigative assistance. Claim 3 asserts in relevant part that Mr. Barrett was denied his constitutional and statutory right to expert and investigative assistance due to the budgeting decisions Judge Payne made prior to trial. Mr. Barrett hereby incorporates by specific reference the averments made on pages 17 through 247 of his Motion to Vacate (Doc. 2) and all exhibits cited therein.

Judge Payne's opinions expressed in his administration of funds under the Criminal Justice Act cannot be separated from the issues that must be decided in Mr. Barrett's claims. For example, in Claims 2 and 3 Mr. Barrett alleges the outcome of the trial is unreliable because his trial counsel unreasonably failed to challenge the "expert" testimony of Iris Dalley and her "reconstruction" of the crime scene. Judge Payne denied Mr. Barrett's counsel access to funds necessary to have a crime scene reconstruction expert assist in challenging Dalley's testimony. Although Judge Payne would permit counsel to consult with an expert on a limited basis, he denied counsel's request for funds to have a defense expert travel to Oklahoma where he could observe the Government's expert's testimony and advise counsel about its shortcomings. In denying these funds, Judge Payne advised Mr. Barrett's counsel that he had never permitted a crime scene reconstruction expert to testify. Order filed 3/18/05 at 3 in Case No. 04-cr-115-JHP. He later permitted the Government to present such testimony. R. 3154-3484.

Section 455(b)(3), on its face, applies to actions a judge carried out in something other than a judicial capacity. Judge Payne's decisions regarding assistance to the defense were administrative, not judicial. As the Court of Appeals for the Tenth Circuit has said, "the court essentially acts in an administrative, not a judicial, capacity when approving voucher requests and related motions for trial assistance." *United States v. Gonzalez*, 150 F.3d 1246, 1255 (10th Cir. 1998). While "grounds for a later appeal might be created by the denial of funds for expert witnesses, investigators, or other services relating to an adequate defense," the court involved in creating that record "at most is acting in a quasi-judicial capacity in the CJA process." *Ibid*.

In the course of his administrative duties Judge Payne expressed distrust of John Echols, Mr. Barrett's former counsel, whose requests for investigative and expert assistance are now at issue. In Claims 1, 2, and 3, Mr. Barrett asserts that Mr. Echols made reasonable requests for expert assistance and other resources. Judge Payne's responses to those requests included implicit and explicit attacks on Mr. Echols. Judge Payne's letter to Mr. Echols dated February 22, 2005, implies that Mr. Echols was seeking to enrich himself through his representation of Mr. Barrett. Exh. 65 to Mot. to Vacate. Judge Payne's order in response to Mr. Echols motion to withdraw accuses Mr. Echols of violating court orders requiring detailed descriptions of tasks for budget requests. Order in Case No. 04-cr-115-JHP filed 5/5/05 at 4. Judge Payne did not impose the same requirements on Roger Hilfiger, whose representation of Mr. Barrett is the subject of Claim 2. Judge Payne personally nominated Mr. Hilfiger to represent Mr. Barrett over the recommendations of two Federal Defenders who recommended another attorney. Exhs. 34 & 67 to Mot. to Vacate.

Mr. Barrett alleges, *inter alia*, that Mr. Hilfiger unreasonably failed to secure the assistance of experts and other forms of evidence. Mr. Barrett's pleadings demonstrate prejudice in part through the opinions of witnesses whose expertise parallels that of the experts Mr. Echols tried to retain. Judge Payne's prior rulings on Mr. Echols's budget requests create a source of bias. Judge Payne, through his budget rulings, communicated to trial counsel that he believed Mr. Echols's requests were unreasonable. In that respect Judge Payne has prejudged issues that arise in Mr. Barrett's claims.

Under analogous circumstances where a relationship of distrust or animosity developed between counsel and the court, the Supreme Court has required judges to recuse themselves. In *Taylor v. Hayes*, 418 U.S. 488, 503 (1974), the Court concluded that the case of an attorney accused of contempt had to be heard by a different judge than the one who initially brought the charges because the record showed the judge had "an unfavorable personal attitude toward petitioner, his ability, and his motives." 418 U.S. at 501. Similarly, in *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971), the Court held that the trial judge should have recused himself and permitted another judge to decide the issue of contempt because, during the course of the dispute between the contempt and the court, "marked personal feelings were present on both sides." 400 U.S. at 464. Judge Payne's statements on the record reflect both marked dissatisfaction with Mr. Echols as an attorney and marked personal regard for Mr. Hilfiger.

In sum, Judge Payne's administration of the Criminal Justice Act, his interpretation of the Judicial Conference's CJA Guidelines, and his expressed attitude towards Mr. Barrett's various counsel reflect prejudgment of the issues presented in Claims 1, 2, and 3. Judge Payne, in his administrative decisions, expressed the opinion that it was not necessary for trial counsel to

conduct the investigation and preparation for trial that Mr. Barrett asserts in Claim 2 was reasonably necessary under the circumstances and the prevailing norms of capital defense practice. Any reasonable person fully apprised of the circumstances would question Judge Payne's impartiality in adjudicating the affects of his own administrative decisions, particularly where those decisions expressly prejudged the question whether certain areas of investigation or expert assistance were necessary. It would be a violation of Mr. Barrett's due process rights for Judge Payne to adjudicate the affects of his own administrative decisions.

### 3. *Judge Payne's independent investigation of facts underlying the denial of Mr. Barrett's motion for tolling constitutes grounds for disqualification and recusal*

"A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed." ABA Model Code of Judicial Conduct, Canon 2, Rule 2.9(C). The ABA Model Rules appropriately place the prohibition on independent judicial investigation within the context of other *ex parte* communications due to the judge collecting "evidence" from third-party sources without providing notice or an opportunity to be heard to the parties that may be affected by the judge's investigation.[3] "The prohibition against a judge investigating the facts in a matter extends to information available in all mediums, including electronic." *Id.*, commentary. Judge Payne exhibited bias or the appearance of bias against Mr. Barrett when he violated Model Rule 2.9(C) and relied upon "facts" he independently collected as a basis for denying Mr. Barrett's motion to toll time without giving Mr. Barrett prior notice or an opportunity to be heard.

---

[3] *See* Elizabeth G. Thornburg, *The Curious Appellate Judge: Ethical Limits on Independent Research*, 28 Rev. Litig. 131(Fall 2008).

On February 9, 2009, Mr. Barrett filed a motion to toll the time limits imposed in 28 U.S.C. § 2255. Doc. No. 382 in Case No. CR-04-115-JHP. Mr. Barrett's motion was based primarily on the inability of his appointed counsel to perform the work necessary to complete the motion due to a medical condition. *Ibid.* The Government responded that "Defendant's counsel cites unique and extraordinary circumstances which justify the time relief requested herein." Doc. No. 390 in Case No. CR-04-115-JHP. Although Mr. Barrett tentatively reported that the Government opposed the motion, in its response, the Government withdrew its initial opposition to granting Mr. Barrett any relief, and conceded that the circumstances presented in the motion satisfied the higher courts' criteria for tolling. *Ibid.*

The court's order filed February 27, 2009, denied Mr. Barrett's motion *in toto*. The order shows that Judge Payne searched the Web site for the Federal Defender Office for the Eastern District of California ("FDO") in order to gather information he would use to adjudicate the motion. Order filed 2/27/2009 in Case No. CR-04-115-JHP at 1-2. Judge Payne expressly and primarily relied upon the Web site's list of attorneys working both in the Sacramento and Fresno branches of the FDO to "find[] the Defendant has failed to establish that counsel can not timely file a completed motion to vacate within the current statute of limitations period." *Id.* at 3.

The record shows Judge Payne gave neither party notice that he was conducting his own independent investigation. The record also shows Judge Payne gave Mr. Barrett no opportunity to be heard regarding the "evidence" he believed he had developed as a basis for denying the motion. The record shows Judge Payne gave no consideration to whether any of the attorneys listed on the FDO Web site were qualified to represent Mr. Barrett as required by 18 U.S.C. § 3599. Evidence would lead a reasonable person to conclude that Judge Payne consciously

18

omitted from his order any mention of the qualifications for appointment to a case such as Mr. Barrett's because to do so would undermine reliance upon the information Judge Payne gleaned from the FDO Web site.

Judge Payne's February 27 Order misstated the circumstances under which Assistant Federal Defender Tivon Schardl was appointed to represent Mr. Barrett, and did so in such a way as to make the findings of his independent investigation seem more pertinent than could be justified under the true circumstances. As Judge Payne stated, "this Court appointed David B. Autry as lead counsel and the Federal Defender for the Eastern District of California, Capital Habeas Unit as co-counsel." Order at 1. The Court appointed the Capital Habeas Unit, and more specifically appointed "David B. Autry and Assistant Federal Public Defender, Eastern District of California Tivon Schardl" as counsel for Mr. Barrett (Minute Order filed 4/3/2008 (Doc. 374) in Case No. CR-04-115-JHP). Although the Court did not appoint the entire FDO from the Eastern District of California to this case from the Eastern District of Oklahoma, the February 27 Order cited the fruits of Judge Payne's independent investigation to imply that the Federal Defender had accepted appointment to Mr. Barrett's case without specifying the Capital Habeas Unit or Mr. Schardl.

Judge Payne specifically relied upon the FDO Web site's identification of 37 attorneys at branches in Sacramento and Fresno, Order at 1-2, although he knew or reasonably should have known that only a fraction of those attorneys worked in the Capital Habeas Unit ("CHU") in Sacramento. Indeed, the Web site specifies that the CHU is in Sacramento.

Judge Payne acknowledged, "It should be noted that this Court had the assistance of the Federal Public Defender of the Northern and Eastern District of Oklahoma's assistance in

19

locating a Federal Public Defender's office willing to accept appointment in this matter." Order at 2 n.1. Judge Payne's note omits some of the circumstances surrounding the appointment of counsel. In response to a request, Mr. Schardl wrote Federal Defender Julia O'Connell on March 26, 2008 that "the Federal Defender for the Eastern District of California, has authorized me to inform you that our *Capital Habeas Unit* is able to represent Mr. Barrett." Letter from Tivon Schardl to Julia O'Connell dated 3/26/2008 (emphasis added). The letter goes on to specify Mr. Schardl's qualifications for appointment. Following the submission of that letter, and with no other contact between Mr. Schardl and the court, Judge Payne specifically substituted David Autry and Mr. Schardl as counsel for Mr. Barrett. Thus, it was disingenuous for Judge Payne to represent in the February 27 Order that "the Federal Defender in the Eastern District of California" had "accept[ed] appointment to this case," Order at 2, such that any of the 37 attorneys working in the FDO were available to represent Mr. Barrett.

Judge Payne's indisputable violation of Rule 2.9(C) in search of a factual basis to deny Mr. Barrett's motion constitutes sufficient grounds for disqualification. However, the February 27 Order contains additional evidence of bias, or the appearance of bias, against Mr. Barrett. Judge Payne cited as the second ground for denying Mr. Barrett relief that "according to the Motion, the Government opposes tolling the statute of limitations." Feb. 27 Order at 2. Judge Payne omitted the fact that *after* Mr. Barrett filed his motion the Government filed a response in which it did not oppose relief. The third ground Judge Payne cited for denying relief was "the Government's response contain[ing] numerous citations to cases in which the courts have found equitable tolling was not appropriate." *Ibid.* Judge Payne omitted the Government's statement that the circumstances presented in Mr. Barrett's motion fit within cases where the courts found

20

tolling *was* appropriate.  Together Judge Payne's independent search for a factual basis upon which to deny the motion and his selective references to the motion and response – including only things negative to Mr. Barrett and omitting the statement of both parties' counsel in his favor – reflect a bias, or the appearance of bias, against Mr. Barrett's pursuit of relief.

Any reasonable person fully informed of Rule 2.9(C), and Judge Payne's conduct would question Judge Payne's impartiality in this matter.  Judge Payne sought *ex parte* information regarding the matter pending before him and relied upon that information to deny Mr. Barrett relief without giving Mr. Barrett prior notice or an opportunity to be heard.  He also presented a distorted picture of the facts that would make the information he obtained appear more persuasive than it would have been if the circumstances had been described accurately and completely.  Therefore, Judge Payne is disqualified from presiding over this case and must recuse himself.  28 U.S.C. §§ 455(a) & (b)(1) (disqualification required where judge has "personal knowledge of disputed evidentiary facts concerning the proceeding").

### *4.      Conclusion*

The foregoing evidence is sufficient to establish that Judge Payne is biased against Mr. Barrett (or in favor of the Government), or that he has prejudged aspects of Mr. Barrett's claims. While Judge Payne may in fact not be biased against Mr. Barrett, due process requires recusal where there is a sufficient appearance of bias.  *Taylor*, 418 U.S. at 501 (citing and quoting *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964)), and *In re Murchison*, 349 U.S. 133, 136 (1955).  The circumstances of this case more than meet that test.

21

**B.**    **Recusal is Required Under 28 U.S.C. § 455(b) Due to Judge Payne's Status as a Witness**

A judge is disqualified from proceedings and must recuse himself where the judge "is to the judge's knowledge likely to be a material witness of the proceeding," 28 U.S.C. § 455(b)(5)(iv), or where the judge has "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1).  Claim 1 of Mr. Barrett's Motion to Vacate asserts in relevant part that Judge Payne applied his own standards rather than those set forth in the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") when choosing counsel to appoint to represent Mr. Barrett. Claims 1, 2, and 3 also assert in relevant part that Judge Payne's selection of Roger Hilfiger to represent Mr. Barrett, and Judge Payne's rejection of John Echols's resourceful approach to the case in favor of Mr. Hilfiger's less expensive approach to the case was prejudicial to Mr. Barrett.

The grounds upon which Judge Payne rejected the recommendations of two Federal Defenders in order to appoint Mr. Hilfiger, and some of the grounds upon which Judge Payne rejected Mr. Echols's requests for funds are not part of the trial record.  Mr. Barrett relies upon the declarations of witnesses to Judge Payne's statements including those of former Federal Defender Paul Brunton, current Federal Defender Julia O'Connell, and John Echols.  To the extent the Government disputes those statements, Judge Payne is likely to be a material witness and his personal knowledge – gained in an administrative rather than judicial capacity – is likely to be in dispute.

Title 18 U.S.C. § 3005 provides that in a capital case the court shall "assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases . . .. In

assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization." Pursuant to the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") the Federal Defender and the court should take into account "the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation." CJA Guidelines ¶ 6.01 (B)(1). Courts are encouraged to appoint counsel who "are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation." *Id.*

In this case, Judge Payne expressed a desire to appoint the Federal Defender to represent Mr. Barrett in his federal trial proceedings. When the Federal Defender's office received notice that Judge Payne intended to appoint it to represent Mr. Barrett, the office informed Judge Payne that it could not adequately represent Mr. Barrett because of its limited resources and current involvement in a death penalty case. Exh. 67 to Mot. to Vacate (Decl. Julia O'Connell). Two Federal Defenders and an Assistant Federal Defender recommended that Judge Payne appoint John D. Echols – who effectively represented Mr. Barrett in his two state court trials – and Robert Nigh – a Tulsa attorney with significant federal death penalty experience. *Id.*; Exh. 34 to Mot. to Vacate (Decl. John D. Echols). The Federal Defender Office made this recommendation because it believed that these two attorneys were qualified to try the case effectively as an alternative to the Federal Public Defender. Exh. 67.

Judge Payne initially appointed John Echols to the case. In appointing Echols, Judge Payne stated that "he wanted the case tried quickly and that this should be no problem because [Echols] had handled Kenny's state case." Exh. 34. Judge Payne, however, declined to appoint

23

Robert Nigh and instead appointed Roger Hilfiger, the former United States Attorney for the

Eastern District of Oklahoma. Exhs. 67 & 34.[4] Judge Payne's rationale for this appointment was

not based on factors recognized by the Judicial Conference or national indigent defense

organizations as indicative of an attorney's qualifications to provide effective representation.

Rather, Judge Payne stated that it seemed that the federal death penalty cases that were being

filed in Oklahoma were being prosecuted in the Eastern District and because of that, "if counsel

from the Eastern District were appointed, that lawyer or lawyers could then take other death

penalty cases filed in the Eastern District in the future." Exh. 67. Judge Payne thus admitted that

he intended to appoint less qualified counsel in Mr. Barrett's case as a means of giving local

attorneys experience so that a local panel could be formed to provide representation in capital

cases. Exhs. 34 & 67. This admission created a conflict between the court's interests, counsel's

interests and Mr. Barrett's interests in a vigorous, independent defense. *See generally Woods v.*

*Georgia,* 450 U.S. 261 (1981).

The situation deteriorated further when Judge Payne effectively forced Mr. Echols off the

case (discussed *supra*) and elevated Roger Hilfiger to first chair. At that point, Judge Payne

appointed Bret Smith to second chair. Mr. Smith had no capital experience whatsoever.

---

[4] In its minute order, the Court first stated that the substitution of Mr. Hilfiger for Mr. Nigh was by agreement with the Federal Defender. When the Federal Defender wrote to Judge Payne asking that the Court's order reflect the Federal Defender's objection to the substitution, Magistrate Judge Shreder entered an amended minute order specifying that Mr. Echols had been appointed at the request of the Federal Defender and Mr. Hilfiger had been appointed at the direction of the Court. (Decl. John D. Echols, Filed as Exh. 34 to Mot. to Vacate).

As stated *supra*, the information Judge Payne obtained and the opinions he expressed regarding the appointment, provisioning, and performance of Mr. Barrett's counsel occurred when Judge Payne was acting in an administrative rather than a judicial capacity.

In order to determine whether the process by which Judge Payne appointed counsel was appropriate, the conduct of Judge Payne is at issue. Accordingly, further factual inquiry before a different factfinder is necessary to resolve this claim, for reasons of both actual bias and the appearance of impropriety. *Murchu v. United States,* 926 F. 2d 50, 57, 59 (1st Cir. 1991) (remanding to different district court judge because "further factual inquiry is necessary to resolve this claim [of alleged judicial misconduct], and that, to avoid any appearance of impropriety, the matter should be decided by another factfinder").

## IV.  REQUEST FOR EVIDENTIARY HEARING

Should Judge Payne not disqualify himself on the grounds of actual bias, prejudice, appearance of partiality or because he is a material witness, Mr. Barrett requests that an evidentiary hearing on this Motion be conducted before another judge. Because Judge Payne is a material witness to some of the factual matter alleged in this Motion, due process requires that at least the Motion to Recuse or Disqualify be referred to another judge for a hearing. *Murchu v. United States,* 926 F. 2d 50, 57 (1st Cir. 1991).

## V.  CONCLUSION

WHEREFORE, for the foregoing reasons, Mr. Barrett respectfully seeks an order disqualifying and recusing Judge James H. Payne from any further participation in this matter, and requests this Court to enter such further order as is necessary to cause another Judge to be assigned to hear all issues that remain to be decided and for such other relief as this Court deems

just and proper.  Should Judge Payne not disqualify himself, Mr. Barrett requests that an evidentiary hearing on this Motion be conducted before another judge.

DATED:        May 28, 2009

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA# 11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600


DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Movant
KENNETH EUGENE BARRETT

## CERTIFICATE OF GOOD FAITH

I hereby certify, pursuant to 28 U.S.C. § 144, that the foregoing motion and the supporting affidavit of Mr. Barrett have been submitted in good faith.


/s/ Tivon Schardl
TIVON SCHARDL

DATED:        May 28, 2009

**CERTIFICATE OF SERVICE**

This will certify that, on today's date, this motion was served upon the United States by filing via ECF.

/s/ Tivon Schardl
TIVON SCHARDL

DATED: May 28, 2009

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
)
*Plaintiff,* )
)
v. ) Case No. CR-04-115-P
)
KENNETH EUGENE BARRETT, )
)
*Defendant.* )

## DEFENDANT'S COMBINED EMERGENCY MOTION & BRIEF TO TOLL TIME

COMES NOW defendant KENNETH EUGENE BARRETT, by and through his undersigned counsel, and respectfully requests that this Court enter an order tolling time for filing Defendant's motion pursuant to 28 U.S.C. § 2255. This motion is supported by the following points and authorities, and the attached declarations of counsel:

1. In summary, extraordinary circumstances – specifically, a medical condition described in the sealed declaration of counsel – prevents Mr. Barrett from being able to file a complete motion pursuant to § 2255 within the presumptive statutory period. The circumstances preventing counsel from fulfilling their duties to Mr. Barrett meet the requirements for equitable tolling, *see Gibson v. Klinger*, 232 F.3d 799, 808 (10th Cir. 2000), and are in fact more serious than impediments to counsel's performance that other courts have found sufficient to justify tolling the limitations period.

2. Assuming for purposes of this motion that the applicable triggering date for the statute of limitations in this case is the date on which the judgment became final, 28 U.S.C. § 2255(f)(1), Mr. Barrett's motion to vacate, set aside or correct the sentence is due to be filed March 17, 2009. *See Barrett v. United States*, ___ U.S. ___, 118 S. Ct. 1646 (Mar. 17, 2008)

(mem.); *Clay v. United States*, 537 U.S. 522, 527-28 (2003). In view of the limited time left before the presumptive filing date, Mr. Barrett respectfully requests expedited review of this motion.

3. As this Court recognized in appointing the undersigned (Doc. 374), Mr. Barrett has a right to counsel in pursuit of his motion for post-conviction relief. 18 U.S.C. § 3599(a)(2); *MacFarland v. Scott*, 512 U.S. 849, 855-56 (1994). The statute provides that Mr. Barrett "shall be entitled to the appointment of one of more attorneys and the furnishing of such other services" as are necessary and consistent with the statute's purposes. 18 U.S.C. § 3599(a)(1).

4. This Court appointed the two undersigned counsel, and, as set forth in the sealed declarations of counsel, the appointed attorneys have divided the work necessary to file Mr. Barrett's § 2255 motion. However, one of Mr. Barrett's counsel has a neurological condition that has recently and unexpectedly progressed to a point where he is unable to complete work on the motion within the presumptive limitations period. As set forth in counsel's sealed declarations, counsel's medical condition severely impairs their ability to conduct the review of files and research necessary to complete preparation of Mr. Barrett's motion. Counsel's condition became an impediment to timely filing only after the attorneys this Court appointed divided the work that would have to be done. By the time counsel became impaired it was too late to reallocate responsibility to one attorney for drafting large sections of the motion and marshaling the relevant evidence.

5. The Tenth Circuit has not published an opinion in circumstances like those Mr. Barrett faces. The court's leading statement on the issue appears in a non-capital case of a petitioner seeking relief from a state-court judgment:

> AEDPA's one-year statute of limitations is subject to equitable tolling but only

"in rare and exceptional circumstances." *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir.1998), *cert. denied*, 526 U.S. 1074 (1999). Equitable tolling would be appropriate, for example, when a prisoner is actually innocent, *Miller v. Marr*, 141 F.3d 976, 978 (10th Cir.), *cert. denied*, 525 U.S. 891 (1998), when an adversary's conduct-or other *uncontrollable circumstances-prevents a prisoner from timely filing*, or when a prisoner actively pursues judicial remedies but files a defective pleading during the statutory period, *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). Simple excusable neglect is not sufficient. *Id*. at 96. Moreover, a petitioner must diligently pursue his federal habeas claims.

*Gibson v. Klinger*, 232 F.3d 799, 808 (10th Cir. 2000) (parallel citations omitted) (emphasis added). *See also Lawrence v. Florida*, 549 U.S. 327, 335-37 (2007) ("equitable tolling may be available, in light of arguably extraordinary circumstances and the petitioner's diligence").

6. Other circuits have held or stated in their reasoning that equitable tolling is appropriate where an attorney's incapacity prevents a diligent habeas corpus petitioner from filing on time. *See Holland v. Florida*, 539 F.3d 1334, 1339 (11th Cir. 2008) (entitlement to equitable tolling of limitations period for capital § 2254 petition could be established by limited circumstances including egregious attorney misconduct or "mental impairment or so forth on the lawyer's part"). The Tenth Circuit has aligned itself with other circuits in requiring that equitable tolling on the basis of some action or inaction by the attorney may be appropriate where there was "egregious attorney misconduct." *Fleming v. Evans*, 481 F.3d 1249, 1256 (10th Cir. 2007). The cases cited in *Fleming* as support for the court's decision in the context of a § 2254 case included three § 2255 cases. *Ibid.*[1]

7. District courts in capital § 2255 cases have granted equitable tolling of the

---

[1] The Seventh Circuit has held that attorney incapacity is not grounds for equitable tolling in a non-capital case, but noted "[a]n exception may exist for capital cases, *see, e.g., Fahy v. Horn*, 240 F.3d 239, 244-45 (3rd Cir. 2001)." *Modrowski v. Mote*, 322 F.3d 965, 967-68 (7th Cir. 2003). However, even under the Seventh Circuit's reasoning for non-capital cases, attorney incapacity may be grounds for tolling if the circumstances prevented a diligent petitioner from having sufficient notice of his attorney's problem to compensate for it.

limitations period where circumstances impeded the progress of defendants' attorneys. For example, in *United States v. Fields*, W-01-CR-164, Order Doc. No. 296 (W.D. Tx. Dec. 4, 2008), the court tolled the limitations period for six weeks. The court was "persuaded that additional time should be provided to allow Defendant to file a comprehensive motion under § 2255," *ibid.*, where the defendant argued that delays in receiving funds for expert assistance prevented timely completion of the motion. *See Fields*, Emergency Motion for Equitable Tolling, Doc. No. 295 (W.D. Tx. Nov. 28, 2008). On information and belief, courts tolled the limitations period prescribed in § 2244(d) under similar circumstances in *Cannady v. Cockrell*, No. 2:01-CV-00273 (S.D. Tex. Mar. 11, 2002), and *King v. Cockrell*, No. 1:01-CV-435 (E.D. Tex., Beaumont Div., Mar. 18, 2002).[2]

8.    The United States has not objected to tolling in circumstances less dire than those present here. For example, in *United States v. Paul*, Criminal No. 96-60022-001 (W.D. Ark. Aug. 26, 2002), the Government did not oppose equitable tolling based upon a four-month delay in appointing post-conviction counsel, delay in obtaining records, and counsel's lack of availability to focus on the case due to other litigation. In *United States v. Allen*, 07CV00027 ERW, Order Doc. No. 42 (E.D. Ms. Nov. 13, 2007), the government did not oppose a request for equitable tolling that was based upon delays in obtaining the files of the defendant's trial counsel and delays in the appointment and funding of counsel. Although the court found these circumstances were not extraordinary, and at least partially within the control of post-conviction counsel, the limitations period was tolled on the basis of the Government's non-opposition. *Ibid.*

9.    Mr. Barrett and his counsel have been diligent in pursuing post-conviction relief.

---

[2] This representation is based upon a review of the dockets in those cases. The budgeting documents are sealed.

Counsel have gathered relevant records and continue to do so through the assistance of investigators and a paralegal. Counsel have made diligent efforts to review these documents and draft a § 2255 motion in an efficient manner, consistent with this Court's budgeting orders and desire that counsel divide the costs and labors between the Federal Defender and private counsel. Counsel's efforts include using digital scanning technology to make review of documents more accessible for counsel. Despite these efforts, counsel's medical condition prevents counsel from completing the motion within the presumptive time period.

10. The cases referenced *supra* show that courts have granted equitable tolling to similarly situated capital post-conviction petitioners. Mr. Barrett submits the circumstances create a more substantial impediment to completing a motion than existed in *Fields* or cases where the Tenth Circuit has approved tolling. At a critical time in the preparation of Mr. Barrett's motion, one of his co-counsel has been rendered unable to perform his duties due to a medical condition. These circumstances are extraordinary and impair completion of at least half the claims counsel have identified, and collaboration on all of Mr. Barrett's the claims.

11. Based on the progress achieved thus far, undersigned counsel believe that an extension of 60 days is minimally necessary in order to ensure "an adequate corrective process for the hearing and determination of claims of violation of federal constitutional guarantees." *Case v. Nebraska*, 381 U.S. 336, 337 (1965).

12. In the alternative, should this Court deny equitable tolling, Mr. Barrett respectfully requests that this Court permit him to file an amended motion on or before May 18, 2009, with any and all allegations made therein deemed timely and to relate back to the filing date of March 17, 2009.

WHEREFORE, based upon the foregoing and all related exhibits and appendices, Mr.

-5-

BARRETT respectfully requests the following relief:

a.      Review and rule upon this motion on an expedited basis as Mr. Barrett's

presumptive filing date is a little over one month away;

b.      Enter an order tolling until May 18, 2009, the time for filing any motion to vacate,

set aside or correct the sentence pursuant to 28 U.S.C. § 2255, or in the alternative;

c.      Enter an order directing that if Mr. Barrett files a § 2255 motion by March 17,

2009, any amendment of that motion and all allegations and legal theories presented

therein, if filed on or before May 18, 2009, shall relate back to the motion filed of March

17, 2009.

DATED:   February 9, 2009

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

KENNETH EUGENE BARRETT,

*Defendant*.

Case No.  CR-04-115-JHP
6:04-CR-115-JHP

**ANSWER TO DEFENDANT'S COMBINED
EMERGENCY MOTION AND BRIEF TO TOLL TIME AND
DEFENDANT'S SUPPLEMENTAL AUTHORITIES AND OFFER TO STIPULATE
IN SUPPORT OF MOTION TO TOLL TIME**

COMES NOW Plaintiff, United States of America, by and through United States

Attorney Sheldon J. Sperling and responds to Defendant's above-entitled pleadings.

1. **Defendant seeks an order tolling time for filing a 2255 motion.**

2. **Defendant's counsel cites unique and extraordinary circumstances which justify the time relief requested herein.**

3. **Given the nature and substance of communications heretofore between counsel for defendant and the Court, this Court is likely in a much better position than the undersigned to assess whether defendant has diligently pursued his rights.**

4. **The Tenth Circuit Court of Appeals has recognized the application of equitable tolling to §2255 limitation.**

The one-year §2255 limitation begins to run on the date the Supreme Court denies a

petition for writ of certiorari, regardless of whether a rehearing request has been or could be

advanced.  The one-year §2255 limitation is not jurisdictional and may be subject to equitable

tolling.  However, a defendant's motion to equitably toll the §2255 limitation, unaccompanied by

a substantive §2255 motion, is technically not ripe for adjudication because such procedural

motion does not constitute a §2255 motion.

See *U.S. v. Martinez*, 2008 WL 5220669, (10th Cir. Dec. 16, 2008) (unpublished) (federal prisoner, convicted of possession with intent to distribute meth, not entitled to equitable tolling of the one-year limitation, assuming he was on lockdown for two months and denied access to a law library and his legal materials for two months, because he "[h]as provided no specificity regarding the alleged lack of access and the steps he took to diligently pursue his federal claims. (Citations omitted). Denial of access to legal materials by corrections officials, especially when the filing deadline is fast approaching, can constitute an extraordinary circumstance providing a basis for equitable tolling.")
       *U.S. v. Quintana-Navarette*, 2008 WL 4183914, (10th Cir. Sept. 12, 2008) (unpublished) (federal prisoner, convicted of conspiring to distribute and possession with intent to distribute over 1000 kgs of marijuana, not entitled to equitable tolling of §2255 one-year limitations where he failed to provide specifics why he was unable to access his legal files or Tenth Circuit opinion)
       *U.S. v. Starr*, 275 Fed.Appx. 788, 789, 2008 WL 1868030, (10th Cir. Apr. 28, 2008) (unpublished) (federal prisoner, convicted of assault and aggravated sexual abuse, not entitled to equitable tolling of limitations period based on asserted actual innocence because his contention "[t]hat no reasonable juror would have convicted him if evidence of the victim's statements had been presented at trial" related to evidence available before trial and discovered by defense counsel so that "[a]ny failure to adduce this evidence is more properly characterized as a claim for ineffective assistance of counsel and such a claim is barred by the applicable limitations period.")
       *U.S. v. Garcia-Rodriguez,* 275 Fed.Appx. 782, 782-783, 2008 WL 1868019, 1 (10th Cir. Apr. 28, 2008) (unpublished) (federal prisoner, convicted of possession with intent to distribute 500 plus grams of meth, not entitled to equitable tolling because his "[c]ursory statements, devoid of specific factual support, regarding his inability to timely file" were akin to "unadorned statements about language deficiencies [which] will not support a finding of exceptional circumstances" as to constitute complete failure to satisfy requisite equitable tolling burden)
       *U.S. v. Gabaldon*, 522 F.3d 1121, 1123, (10th Cir. 2008) (federal prisoner, convicted of second degree murder and kidnaping resulting in death, was "[n]ot ineligible for equitable tolling because he waited until late in the limitations period to file his habeas petition" nor should he "[b]e faulted, however, for failing to file early or to take other extraordinary precautions early in the limitations period against what are, by definition, rare and exceptional circumstances that occurred later in period, but government should have opportunity on remand to contest petitioner's allegations "whether [he] is entitled to equitable tolling of the statutory one-year limitations period for at least 36 days because prison staff confiscated all his legal materials just six weeks before the expiration of the limitations period and held them until two weeks after that period expired.")
       *U.S. v. Spry,* 260 Fed.Appx. 52, 53, 2008 WL 41063, (10th Cir. Jan. 2, 2008) (unpublished) (federal prisoner, convicted of two 924(c) counts and sentenced to consecutive prison terms, filed untimely Rule 60B motion four years after his conviction became final, recharacterized as

§2255 motion, not entitled to equitable tolling where CTA10 found no extraordinary circumstances justifying untimely request for relief)

*U.S. v. Buckaloo*, 257 Fed.Appx. 88, 2007 WL 4230696 (10th Cir. Dec. 3, 2007) (unpublished) (federal 922(g) prisoner not entitled to equitable tolling of AEDPA limitation period based on asserted grounds of mental and medical condition and solitary confinement which were not raised in district court and are thus waived, nor did prisoner show he diligently pursued his habeas claims or that his confinement status prevented him from timely filing)

*U.S. v. Saunders,* 248 Fed.Appx. 967, 968, 2007 WL 2827642, (10th Cir. Oct. 1, 2007) (unpublished) (federal child porn convict's petition, construed by court as §2255 and filed two years after original notice of appeal should have been filed, not subject to equitably tolled limitation because petitioner "[failed to demonstrate] that circumstances beyond his control prevented him from filing a §2255 motion within the one-year period.")

*U.S. v. Chapman,* 220 Fed.Appx. 827, 2007 WL 901945 (10th Cir. Mar. 27, 2007) (unpublished) (federal prisoner, convicted of murder and sentenced to life imprisonment, not entitled to equitable tolling of §2255 limitations based on "[v]ague and conclusory allegations that he lacked access to library materials because of potentially hostile fellow inmates" or his meritless "[c]ontention that he was somehow tricked by the government into allowing the statute of limitations to expire" or that he was actually innocent in case wherein petitioner pled guilty to first degree murder 12 years earlier and "[n]ow argues, without alleging the existence of any evidence beyond the recantation of his prior guilty plea, that his alleged victim had committed suicide and he had only claimed to be the murderer to gain prestige with the Aryan Brotherhood.")

U.S. v. Williams 219 Fed.Appx. 778, 2007 WL 744635 (10th Cir. Mar. 13, 2007) (unpublished) (federal prisoner, convicted of possession with intent to distribute over 50 grams of crack, not entitled to equitable tolling for 2255 filed three months late, assuming claim he was denied access to legal materials during a two-week prison lockdown, where prisoner filed to claim he was diligent in attempting to retrieve his legal documents and petitioner's asserted difficulties in obtaining his trial transcripts did not "[c]onstitute extraordinary circumstances beyond his control.")

*U.S. v. Pedraza*, 466 F.3d 932 (10th Cir. 2006) (federal prisoner, convicted of possession with intent to distribute 5+ kilos of cocaine, not entitled to equitable tolling of §2255 one-year limitations to reassert suppression of evidence claim)

*U.S. v. Daniels,* 191 Fed.Appx. 622, 2006 WL 1892584, (10th Cir. Jul.11, 2006) (unpublished) (motion seeking to file §2255 motion out of time is not §2255 motion and " ... [t]he question of equitable tolling is ripe for adjudication only when a §2255 motion has actually been filed and the statute of limitations has been raised by the respondent or the court *sua sponte*.")

*U.S. v. Arrington,* 187 Fed.Appx. 838, 2006 WL 1793263 (10th Cir. June 30, 2006) (unpublished) (federal drug convict's time to file a §2255 motion runs from the date "[w]hen the Supreme Court denied his petition for a writ of certiorari, regardless of the fact he filed a petition for rehearing from the denial of certiorari" and petitioner's asserted "[c]onfusion about when his conviction was final does not constitute a 'rare and exceptional circumstance[]' warranting equitable tolling of the statute, (Citations and quotations omitted)")

*U.S. v. Tafoya*, 164 Fed.Appx. 700, 2006 WL 148278 (10th Cir. Jan. 20, 2006) (unpublished) (federal drug offense prisoner not entitled to equitable tolling where he failed to diligently pursue his claims and was unable "[t]o point to anything that limited his ability to file his action within the required tolling period.")

*U.S. v. Peterson*, 120 Fed.Appx. 764, 2005 WL 226246 (10th Cir. Feb. 1, 2005) (unpublished) (petitioner's assertion that "[h]e did not know the time for filing his claim was limited because the law library at his prison did not have a copy of the (AEDPA)" does not constitute extraordinary circumstance warranting equitable tolling of §2255 limitations)

*U.S. v. Glenn*, 61 Fed.Appx. 571, 2003 WL 1232586 (10th Cir. Mar. 18, 2003) (unpublished) (doctrine of equitable tolling does not save federal defendant's untimely §2255 motion where defendant was not reasonably diligent to contact his attorney and timely "[p]ossessed all materials available for the preparation of his §2255 motion.")

*U.S. v. Verners*, 49 Fed.Appx. 803, 2002 WL 31323727 (10th Cir. Oct. 17, 2002) (unpublished) (federal drug and gun convict's motion seeking equitable tolling of the one-year AEDPA limitations, denied where petitioner failed to file his §2255 motion)

*U.S. v. Brittain*, 41 Fed.Appx. 246, 2002 WL 734768 (10th Cir. Apr. 26, 2002) (unpublished) (allegedly legally blind federal meth conspiracy convict's §2255 limitation period not equitably tolled because he was transferred between prisons and none of the institutions had legal materials for the visually impaired, where petitioner failed to demonstrate that he diligently pursued his federal claims, and limitation is not tolled during time he was in state custody following his federal conviction)

*U.S. v. Rodriguez-Aguirre*, 30 Fed.Appx. 803, 2002 WL 182117 (10th Cir. Feb. 6, 2002) (unpublished) ("[T]he AEDPA's one-year limitation period is not a jurisdictional bar and is subject to equitable tolling. Equitable tolling is available however only in rare and exceptional circumstances. The prisoner must demonstrate he diligently pursued his claims and that his failure to timely file was due to extraordinary circumstances beyond his control. (Citations omitted)" §2255 motion stamped as filed one day late, untimely and not subject to equitable tolling despite federal prisoner's attorney's failure to ensure timely filing.)

*U.S. v. Verners*, 15 Fed.Appx. 657, 2001 WL 811719 (10th Cir. July 17, 2001) (unpublished) ("[e]quitable tolling is not ripe until [petitioner] actually files a §2255 motion ... . *** It is well established in this Circuit that AEDPA's one-year limitations period is not jurisdictional, but is, instead, subject to equitable tolling. (Citation omitted) *** [Petitioner] has not identified, however, a single case resolving the question of equitable tolling in advance of the actual filing of a §2255 motion. In fact, until a §2255 motion is actually filed and the affirmative defense of the statute of limitations actually raised, the propriety of equitable tolling is purely an abstract concern. Under Article III of The Constitution, federal courts have subject matter jurisdiction only over 'cases and controversies.' One aspect of the case-or-controversy requirement is the ripeness doctrine, which is 'intended to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.' Article III's ripeness requirements 'forestall[s] judicial determinations of disputes until the controversy is presented in clean-cut and concrete form.' This Court considers two issues to determine whether a claim is ripe for adjudication" (1) the fitness of the issue for judicial resolution and (2) the hardship to the parties of withholding judicial consideration. We conclude that the question of equitable tolling is ripe for adjudication only when a §2255 motion has actually been filed and

the statute of limitations has been raised by the respondent or the Court *sua sponte*. It is only at this point that the record will be sufficient to determine whether the requisite 'extraordinary circumstances' are present to the magnitude necessary to merit equitable polling. Furthermore, this Court can discern no hardship to [petitioner] in withholding judicial consideration of the question of equitable tolling until a §2255 motion is actually filed and limitations period raised. Accordingly, we conclude that question of equitable tolling is not ripe and that the Motion is, therefore, not justiciable. (Citations omitted)"

*U.S. v. Willis*, 202 F.3d 1279, (10th Cir. Feb. 1, 2000) (unpublished) (Bank larceny and assault conspirator's federal case did not present extraordinary circumstances justifying equitable tolling. "[A] judgment of conviction is final for purposes of the one-year limitation period in §2255 when the United States Supreme Court denies a petition for writ of certiorari after a district appeal, regardless of whether a petition for rehearing from the denial of certiorari is filed.' After the Supreme Court has denied a petition for rehearing from the denial of certiorari, neither the filing of a petition for rehearing from the denial of certiorari, nor the expiration of the time in which such a petition could be filed delays the commencement of the one-year limitation period.")

*U.S. v. Sterling*, 1999 WL 1020855, (10th Cir. Nov. 10, 1999) (unpublished) (federal bank robbery convict lockdowns lasting 31 days, during which law library was unavailable to prisoners, does not constitute "[r]are and exceptional circumstances to justify equitable tolling, nor did petitioner diligently pursue his §2255 claim)

*U.S. v. Reed*, 1998 WL 817750, (10th Cir. Nov. 27, 1998) (unpublished) (federal drug conviction petitioner's assertions concerning attempts to obtain grand jury and trial transcripts, limited law library access, prison transfer, and prison officials misplacement of petitioner's legal papers do not justify equitable tolling of one-year limitations period under §2255)

**5.      As an alternative, the Court may instruct that counsel file the motion within the statutorily prescribed limitations and then permit such additions, corrections or deletions as may be the product of the cited extraordinary circumstances and reallocation of counsel's work to substitute counsel.**

Defendant's previous pleading, at pages 5-6, has made this request.

> In the alternative, should this Court deny equitable tolling, Mr. Barrett respectfully requests that this Court permit him to file an amended motion on or before May 18, 2009, with any and all allegations made therein deemed timely and to relate back to the filing date of March 17, 2009. In defendant's prayer for relief, he requested that the Court enter an order directing that if Mr. Barrett files a section 2255 motion by March 17, 2009, any amendment of that motion and all allegations and legal theories presented therein, if filed on or before May 18, 2009, shall relate back to the motion filed of March 17, 2009.

6. **The government accepts defendant's offer to stipulate that any order granting the pending motion should not be considered for any precedential value in any other case due to the unique circumstances of this case.**

A stipulation is "[A] material article in an agreement."  Black's Law Dictionary, Revised Fourth Edition (1968).  By its nature, an agreement is binding upon the parties to the agreement but is not enforceable against other defendants in separate cases.  However, various citations to other orders suggest that this stipulation may be of limited global value.  Fortunately, the unique factors in this case are such that indistinguishable cases do not exist.

Wherefore, the government respectfully requests that the Court enter an order consistent with paragraph 5 above, wherein defendant's similar request is quoted.

Respectfully submitted,


s/Sheldon J. Sperling
SHELDON J. SPERLING, OBA #8502
United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
(918) 684-5100

**CERTIFICATE OF SERVICE**

I, hereby certify that on February 23, 2009, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry                         Tivon Schardl
Attorney at Law                        Assistant Federal Public Defender
1021 N.W. 16th Street                   801 I Street, 3rd Floor
Oklahoma City, OK 73106-6405           Sacramento, CA 95814

s/Sheldon J. Sperling
United States Attorney

7

# Exhibit E

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) Case No. CR-04-115-JHP
)
KENNETH EUGENE BARRETT, )
)
Defendant. )

## <u>ORDER</u>

This matter comes on for consideration of Defendant's Combined Emergency Motion and Brief to Toll Time (Doc. 382). After reviewing the Defendant's Motion and Brief to Toll Time, as well as the order appointing counsel herein, this Court hereby denies Defendant's Motion to Toll the statute of limitations herein for several reasons. First, on March 27, 2008, only ten (10) days after the United States Supreme Court denied certiorari from Defendant's direct appeal, this Court appointed David B. Autry as lead counsel and the Federal Defender for the Eastern District of California, Capital Habeas Unit as co-counsel. *See*, Doc. 371. According to the website for the Office of the Federal Defender for the Eastern District of California, this office has, in addition to the Federal Public Defender, one "first assistant," three "supervising attorneys" in addition to Mr. Schardl, one "senior litigator," eighteen (18) "assistant federal defenders," two (2) research and writing attorneys, in the Sacramento office where Mr. Schardl is employed and eleven (11) other attorneys in their Fresno office.

*See,* http://www.cae-fpd.org/attorneys.htm.   In accepting appointment to this case[1], the Federal Defender in the Eastern District of California has an obligation to ensure that the Defendant's case is handled expeditiously and timely.  Second, according to the Motion, the Government opposes tolling the statute of limitations.  Additionally, the Government's response contains numerous citations to cases in which the courts have found equitable tolling was not appropriate.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a one-year limitation period on the filing of a Motion attacking a federal sentence.  *See*, 28 U.S.C. § 2255(f).  This period begins to run from "the latest of" four dates, one of which is relevant here: "the date on which the judgment of conviction becomes final."  *Id*., § 2255(f)(1).  "Equitable tolling" of the statute of limitations excuses an untimely filing.  *Modrowski v. Mote*, 322 F.3d 965, 967 (7th Cir. 2003).  However, this equitable remedy is only available when an inmate diligently pursues his claims and demonstrates that the failure to timely file was caused by extraordinary circumstances beyond his control.  *See*, *Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998) (finding limitation period under §2244(d) relevant in a federal habeas petition challenging a state court sentence was not jurisdictional but was subject to equitable tolling).  Equitable tolling is appropriate where a prisoner is actually innocent or when uncontrollable circumstances prevent a prisoner from timely filing his motion to vacate.  *See*, *Gibson v. Klinger*, 232 F.3d 799, 808 (10th Cir. 2000).  Courts have seldom

---

[1]It should be noted that this Court had the assistance of the Federal Public Defender of the Northern and Eastern District of Oklahoma's assistance in locating a Federal Public Defender's office willing to accept appointment in this matter.

found justification for equitable tolling in a collateral relief context. *Modrowski*, *supra.* *Cf.,*

*Fahy v. Horn*, 240 F.3d 239, 244-245 (3rd Cir. 2001) (holding under particular facts of case,

because "death is different," refusal to equitably toll statute would prevent state capital

defendant federal review of his claims.) At this stage in the process, counsel herein should

be fairly close to completing any motion they intend to file. Certainly counsel should have

completed all of their investigation and a substantial draft of their motion. Additionally, the

Defendant has never alleged "actual innocence." Furthermore, in light of the fact Mr. Autry

is lead counsel and the Federal Defender in the Eastern District of California voluntarily

accepted this appointment as co-counsel, this Court finds the Defendant has failed to

establish that counsel can not timely file a completed motion to vacate within the current

statute of limitations period. Notice provided to the Court more than two months after Mr.

Schardl began having difficulties with a long-term medical condition is not sufficient cause

for this Court to toll the statute of limitations herein.[2] Counsel was appointed and has had

sufficient time to prepare a Motion to Vacate, Set Aside or Correct the Sentence in this

matter. Additionally, co-counsel has had sufficient time to seek the assistance of other

attorneys within his office.[3] Equitably tolling is just not appropriate under the particular facts

[2]Counsel's declaration indicates Mr Schardl began having a worsening of his medical condition in December, 2008 and he advised the Government sometime in January, 2009. He did not, however, file any notice with this Court until February 9, 2009, at which point he requested the Court to toll the statute of limitations.

[3]Attorney negligence is *not* grounds for equitable tolling since negligence is not extraordinary. *Modrowski v. Mote*, 322 F.3d 965 (7th Cir. 2003). Ineffective assistance of counsel generally does not warrant equitable tolling. *Beery v. Ault*, 312 F.3d 948, 951 (8th Cir. 2002). Furthermore, unlike the *Calderon v. United States District Court for the Cent. Dist. of California*, 128 F.3d 1283 (9th Cir. 1997), even if Mr. Schardl withdraws from the case at this point in time, Mr. Barrett still has the assistance of lead counsel and the assistance of the Federal Public Defender of the Eastern District of California's office who was actually appointed to represent Mr. Barrett in this matter. A contrary holding would lead to inconsistent results in the treatment of *pro se* litigants who would be dealt with more harshly than litigants with several trained attorneys. *See*, *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002).

of this case.  Accordingly, the Motion to Toll the Statute of Limitations is hereby denied.[4]

It is therefore the Order of this Court that Defendant's Combined Emergency Motion and Brief to Toll Time (Doc. 382), is for the reasons stated herein, denied.

It is so ordered on this  27th  day of February, 2009.

James H. Payne
United States District Judge
Eastern District of Oklahoma

---

[4]Once a timely filed motion to vacate is pending before this Court, other options may exist to allow amendment of the motion.  *See*, Fed. R. Civ. Proc. 15.  Any motion to amend, however, may be denied if the amendment would be barred by the statute of limitations.  *See*, *Rodriguez v. United States*, 286 F.3d 972, 980-981 (7th Cir. 2002).

# Exhibit F

KENNETH EUGENE BARRETT,        )
                                                     )

                            Petitioner,    )

                                                     )

vs.                                          )          Case No. 09-CIV-105-JHP

                                                     )

UNITED STATES OF AMERICA,       )

                                                   )

                          Respondent.  )

## <u>ORDER</u>

On March 16, 2009, Petitioner filed a "Motion for Collateral Relief, To Vacate, Set Aside, or Correct Sentence, and for a New Trial." Doc. 1. This document was 395 pages long and had three attachments which contained Exhibits 1-60. Thereafter, on March 17, 2009, Petitioner filed a Second "Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial." Doc. 2. The docket entry indicates this second motion is a "Corrected" Motion to Vacate. This document, however was 397 pages long and contained no attachments. Following filing of these two documents, the Court ordered the government to respond to Petitioner's Motion to Correct Sentence pursuant to 28 U.S.C. Section 2255 by June 16, 2009. Doc. 44. When the government sought leave for a six month extension of time to respond, Petitioner objected to anything more than a 60 day extension. Doc. 48. This Court granted an extension of time for the government to respond until October 16, 2009. Doc. 50. On September 25, 2009, Petitioner filed a document entitled "Amended Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial." Doc. 70. The main document is 453 pages long with ten attachments, which consist of Exhibits 1-10.

While no leave of court was necessary for Petitioner to file his Motion to Vacate pursuant to 28 U.S.C. § 2255, Petitioner sought no leave of court prior to filing any of the subsequent documents.[1]

While the Rules of Civil Procedure apply in this action, unlike most civil actions, this case involves a Motion to Vacate a conviction and sentence which occurred following a criminal jury trial. In denying Petitioner's Motion to Toll the Statute of Limitations, this Court in a footnote cited Rule 15 of the Federal Rules of Civil Procedure as a potential mechanism to allow amendment of a properly filed motion to vacate. Since, however, Rule 15 of the Federal Rules of Civil Procedure clearly contemplates amendments to a civil complaint prior to, during or after trial, Petitioner should have sought leave of court prior to filing amended or corrected pleadings herein. To the extent Petitioner waited for more than six months following the filing of his voluminous Motion to file an amendment without seeking prior leave of court, this Court finds Petitioner should show cause why this Court should now allow an amendment to his motion. Therefore, this matter is set for show cause hearing and a scheduling conference on October 6, 2009 at 2:00 p.m. in Courtroom 1 of the United States Courthouse, Muskogee, Oklahoma.

It is so ordered on this  29th  day of September, 2009.

James H. Payne
United States District Judge
Eastern District of Oklahoma

---

[1]It should be noted that none of the documents referenced in this paragraph comport with the standard form adopted in the Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 2(c). *See also*, LCvR 9.2. Further, LCvR 7.1(c) requires every motion, application, or objection to be filed as a separate pleading.

# Exhibit G

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## PETITIONER'S EMERGENCY MOTION TO VACATE SHOW CAUSE ORDER OR CONTINUE HEARING DATE TO PROVIDE ADEQUATE NOTICE AND AN OPPORTUNITY TO BE HEARD AND BRIEF IN SUPPORT OF MOTION

**TABLE OF CONTENTS**

I.  Introduction and Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  Grounds for Vacating or Modifying the Order to Show Cause . . . . . . . . . . . . . . . . . . . . 4

    A.  The Show-Cause Order Provides No Meaningful Notice or
        Opportunity to be Heard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.  Under Clearly Established Law Petitioner was Right to File
        his Amended Petition on September 25, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.  To the Extent Leave is Requires, it Should be Granted to Petitioner . . . . . . . . . 15

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Buder v. Merrill Lynch, 644 F.2d 690 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Calderon v. Ashmus, 523 U.S. 740 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Conley v. Gibson, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Davenport v. United States, 217 F.3d 1341 (11th Cir. 2000),
    *cert. denied,* 532 U.S. 907 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Davis v. United States, 417 U.S. 333 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fama v. Commissioner of Correction Services, 235 F.3d 804 (2nd Cir. 2000) . . . . . . . . . . . . . 8

Foman v. Davis, 371 U.S. 178 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Ford v. Wainwright, 477 U.S. 399 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Gillette v. Tansy, 17 F.3d 308 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Mayle v. Felix, 545 U.S. 644 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Moore v. Balkcom, 716 F.2d 1511 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Mullane v. Central Hanover Bank & Trust, 339 U.S. 306 (1950) . . . . . . . . . . . . . . . . . . . . . . 5

Rick-Mik v. Equilon, 532 F.3d 963 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Riley v. Taylor, 62 F.3d 86 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 19

United States v. Craycraft, 167 F.3d 451 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Espinoza-Saenz, 235 F.3d 501 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . 8, 19

United States v. Guerrero, 488 F.3d 1313 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 9, 13, 14

United States v. Pittman, 209 F.3d 314 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Saenz, 282 F.3d 354 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Thomas, 221 F.3d 430 (3rd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Woodford v. Williams, 263 F.3d 1135 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**DOCKETED CASES**

United States v. Sablan and Leon Guerrero, E.D. Cal. Case No. 08-cr-259-OWW . . . . . . . . . 6, 7

**FEDERAL STATUTES**

28 U.S.C. § 2242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 2244(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 U.S.C. § 2244(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2255 para. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

Fed. R.Civ. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Civ. P. 15(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Civ. P. 15(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

Fed. R. Civ. P. 15(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16

KENNETH EUGENE BARRETT,     )
    )
    Petitioner,     )
    )
v.     )      Case No. 09-CIV-105-JHP
    )
UNITED STATES OF AMERICA,     )
    )
    Respondent.     )

## EMERGENCY MOTION TO VACATE SHOW CAUSE ORDER OR CONTINUE HEARING DATE TO PROVIDE ADEQUATE NOTICE AND AN OPPORTUNITY TO BE HEARD AND BRIEF IN SUPPORT OF MOTION

**I.     Introduction and Summary of Argument**

Petitioner, Kenneth Eugene Barrett, by and through his undersigned counsel, hereby moves this Court to vacate or modify the order filed September 29, 2009, which directs counsel for Petitioner to show cause, at a hearing scheduled for October 6, 2009, why "this Court should now allow an amendment" to Mr. Barrett's Motion to Vacate Convictions and Sentences pursuant to 28 U.S.C. § 2255, which was filed on September 25, 2009. (Doc. 74)

Mr. Barrett respectfully submits this Court should vacate or modify its order for the following reasons: (1) This Court's order should be vacated, or, at a minimum, modified to provide more time to respond because the Order is unclear and, with only one week's notice, provides inadequate notice of the issues and affords Petitioner no

1

meaningful opportunity to be heard in violation of his rights to due process and to have his case heard by a fair and unbiased court. (2) A show-cause hearing is unnecessary because under precedent from the Supreme Court and Court of Appeals for the Tenth Circuit it is clear that Rule 15 of the Federal Rules of Civil Procedure (a) applies to these proceedings and (b) authorized Mr. Barrett to file his amended petition without leave of court. (3) A show-cause hearing is unnecessary under the law because, to the extent Mr. Barrett might have been required to seek leave of court, that leave is to be freely given and it would be an abuse of discretion to withhold leave under the circumstances of this case.

Mr. Barrett is filing this motion out of necessity. By making these arguments and seeking this relief he is not waiving his contention that the Honorable James H. Payne is disqualified from these proceedings and should recuse himself. Mr. Barrett's counsel have been diligently preparing a petition for writ of mandamus through which to pursue recusal, but have been unable to complete that petition before it became necessary to file this motion.

## II. Background

This Court's September 29, 2009 order states that Mr. Barrett filed a §2255 motion, with exhibits, on March 16, 2009 (Doc. 1), as well as a corrected motion on March 17, 2009 (Doc. 2); that the court directed the Government to respond to the §2255 motion by June 16, 2009 (Doc. 44); that the Government sought a six month extension of

2

time to respond to the motion, and that Petitioner objected to anything beyond a 60 day extension (Doc. 48); that the court granted the Government an extension of time to October 16, 2009 to respond to the motion (Doc. 50); and that Petitioner filed an amended §2255 motion, with exhibits, on September 25, 2009.  In its order, the court states that "[w]hile no leave of court was necessary for Petitioner to file his Motion to Vacate pursuant to 28 U.S.C. §2255, Petitioner sought no leave of court prior to filing any of the subsequent documents."  (Doc. 74, Order at 1, 2)

This Court's order asserts that although the Federal Rules of Civil Procedure apply to this action, it is unlike most civil actions because it involves a motion to vacate conviction and sentence imposed in a criminal jury trial.  The court's order notes that when the court previously denied Mr. Barrett's motion to toll the one-year period of limitations under the AEDPA, it cited Fed.R.Civ.P. 15 as "a potential mechanism to allow amendment of a properly filed motion to vacate."  The order states that since Fed.R.Civ.P. 15 "clearly contemplates amendments to a civil complaint prior to, during or after trial, Petitioner should have sought leave of court prior to filing amended or corrected pleadings herein."  The Court's order concludes by assuming that Petitioner "waited for more than six months following the filing of his voluminous Motion to file an amendment without seeking prior leave of court," and then "finds Petitioner should show cause why this Court should now allow an amendment to his motion."  Order (Doc. 74) at 2.

////

3

**III. Grounds for Vacating or Modifying the Order to Show Cause**

For the following reasons, the court's order to show cause should be vacated:

**A. The Show-Cause Order Provides No Meaningful Notice or Opportunity to be Heard**

The order to show cause should be rescinded, or, at a minimum, modified and any hearing should be continued, because it provides inadequate notice both in terms of the substance of the issues to be addressed at the hearing, and the time the Court allotted for Petitioner's counsel to prepare for the hearing. The Order provides no opportunity to counsel to consult with Petitioner or for him to be present.

The show-cause order is vague as to what the Court's position is, and the basis for the order. The operative paragraph on page 2 of the Order suggests the Court has concluded that Rule 15 of the Federal Rules of Civil Procedure does not or may not apply to this case. There may be a suggestion that by curing a defect in the form of his motion, the Court deems that correction to be an amendment, requiring leave of court before another amendment could be filed, assuming Rule 15 applies. If Rule 15 does not apply there is no indication in the Order what law the Court is proceeding under such that Petitioner would have notice of the requirements he must meet to satisfy the Court. The Order also contains suggestions in a footnote that Petitioner must seek leave to file his amended petition in a form other than the precise form appended to the Rules Governing Section 2255 Cases. However, as to all these matters, which individually could involve complex questions of fact and law, the Order presents Petitioner with no clear statement

4

of law or fact.

Proceeding on the show-cause order would violate general due process requirement that "adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 313 (1950). Constitutional notice, to be adequate, must be "reasonably calculated, under all the circumstances," to apprise the affected parties of the requirements they must meet; it "must be of such a nature as reasonably to convey the required information, and it must afford a reasonable time for those interested" to make their case. *Id.*, 339 U.S. at 314 (internal citations omitted).

The show-cause order provides Petitioner one week in which his counsel may prepare only oral argument on issues that ordinarily would be raised by a party in a motion following which the responding party would have at least 30 days to respond. The Court issued the show-cause order at a time when Petitioner's counsel were preparing to meet another, intervening deadline the Court imposed, i.e. the requirement that Petitioner file a document on September 30, 2009. The Court also was aware when it entered the show-cause order that Petitioner had moved to recuse Judge Payne, and that Mr. Barrett could be prejudiced from delay in seeking appellate relief from the denial of that motion.

The Court also was aware that one of Mr. Barrett's lawyers is visually impaired and resides approximately 2,000 miles away from the Eastern District of Oklahoma. The Federal Defender Office for the Eastern District of California will have to expend funds

unnecessarily for Mr. Schardl's travel and lodging arrangements to attend a hearing which should not occur because, as argued *infra*, Rule 15 permitted Petitioner to file his amended motion without prior leave of court. The Court's indifference to the expense associated with travel on such short notice stands in sharp contrast to the strict controls over the public fisc at trial, as reflected in Claims 1, 2, and 3, of the § 2255 motion.

At the time the Court entered the show-cause order Mr. Schardl was scheduled to be away from his office on October 1, 2009, for an inspection of discovery documents in Atwater, California. (Decl. Tivon Schardl appended hereto.) This trip is part of another federal death penalty case, *United States v. Sablan and Leon Guerrero*, E.D. Cal. Case No. 08-cr-259-OWW. Mr. Schardl also was under a summons to appear for jury duty beginning October 5, 2009, which date was set following a postponement he received in order to complete Mr. Barrett's amended petition. *Id.*

Although he arranged to postpone jury service for another week, it remains unclear whether Mr. Schardl will be able to appear at the hearing. As stated in his letter to this Court seeking appointment, Mr. Schardl is an adjunct professor at the University of the Pacific, McGeorge School of Law. He is currently teaching a seminar that meets for two hours every Monday evening. Unless he can find a substitute or reschedule, in order to appear for the hearing, Mr. Schardl would have to cancel this class. As this Court is aware, Mr. Schardl is visually impaired. He is unable to drive from the nearest airport in Tulsa to the courthouse in Muskogee on the day of the hearing. Due to airline schedules,

6

in order to arrive in time, he must travel to Tulsa on Monday and get a ride from lead counsel to court on Tuesday. *Id.*

To the extent the September 29 Order requires Petitioner to address such complex issues as whether Petitioner may have filed a previous amendment, whether the Court has the discretion to strike a capital § 2255 pleading based on assertions in a footnote regarding matters of form, whether any part of the amended petition relates back to the initial petition, the vagueness of the Order and its seven days' notice denies Mr. Barrett an essential element of due process: the opportunity to substantiate his position before it may be adjudicated. *See Ford v. Wainwright*, 477 U.S. 399, 414 (1986).

For the foregoing reasons, and those that follow, the show-cause order should be vacated. Should this Court be unable to resolve the matters raised in the order after consideration of this Motion, it should issue another order or memorandum clarifying the issues, and afford Petitioner a reasonable time, perhaps 30 days, to brief the issues before setting another hearing date.

**B. Under Clearly Established Law Petitioner was Right to File his Amended Petition on September 25, 2009**

A show cause order is inappropriate in the circumstances of this case. The text of Rule 15, and the manner in which it or the Rule has been interpreted by the courts in connection with collateral attacks in § 2254 and § 2255 cases, demonstrates that Mr. Barrett was within his rights amend his motion "as a matter of course" on September 25, 2009 without prior leave of court.

This Court's suggestion in its order that Rule 15 is of questionable applicability in these §2255 proceedings, and provides only a "potential mechanism" for amending a §2255 motion, conflicts with Supreme Court precedent and precedent from every circuit, including the Tenth Circuit.  It also conflicts with 28 U.S.C. § 2242.  *See, e.g., Mayle v. Felix,* 545 U.S. 644, 655 (2005)("§ 2242 specifically provides that habeas applications 'may be amended ... as provided in the rules of procedure applicable to civil actions.'"; Court acknowledged Fed.R.Civ.P. 15 applies to habeas proceedings by virtue of §2242); *See also Davis v. United States*, 417 U.S. 333, 344 (1974) ("there can be no doubt that the grounds for relief under § 2255 are equivalent to those encompassed by § 2254, the general federal habeas corpus statute").

Even before the Supreme Court decided *Felix*, it was uncontroversial that Rule 15 applied in §2255 and §2254 proceedings.  As the court recognized in *United States v. Saenz,* 282 F.3d 354, 355 (5th Cir. 2002), "every circuit that has addressed this issue agrees the Anti-Terrorism and Effective Death Penalty Act's one-year statute of limitations, 28 U.S.C. §§2244(d)(1) and 2255 does not render Rule 15 inapplicable to federal habeas proceedings."  *See Calderon v. Ashmus,* 523 U.S. 740, 750 (1998) (Breyer, J., concurring); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 814-16 (2nd Cir. 2000) (applying Rule 15 to § 2254 case based on decisions from the Third, Fourth, and Eighth Circuits applying the rule in § 2255); *United States v. Espinoza-Saenz,* 235 F.3d 501, 503-04 (10th Cir. 2000) (§ 2255 motion); *United States v. Thomas,* 221 F.3d 430, 436 (3rd Cir.

2000)(Rule 15 applies to §2255 action as long as the petitioner is not seeking "to add an entirely new claim or new theory of relief"); *Davenport v. United States,* 217 F.3d 1341, 1344-46 (11th Cir. 2000), *cert. denied,* 532 U.S. 907 (2001); *United States v. Pittman,* 209 F.3d 314, 317-18 (4th Cir. 2000); *United States v. Craycraft,* 167 F.3d 451, 457 (8th Cir. 1999).

In light of this controlling precedent contrary to the Court's suggestion that Rule 15 may not apply to these proceedings, the show-cause hearing is unnecessary. As the Court observes, Mr. Barrett has not previously filed an amendment to his petition, and he has not been "served with a responsive pleading" from the Government. Fed. R. Civ. P. 15(a)(1)(A). Therefore, Mr. Barrett had a right to "amend [his] pleading once as a matter of course," Fed. R. Civ. P. 15(a)(1), without seeking the leave of court that should be "freely" given in other cases. Fed. R. Civ. P. 15(a)(2). The Supreme Court's decision in *Mayle v. Felix, supra*, leaves no room to question that in a collateral proceeding, "[b]efore a responsive pleading is served, pleadings may be amended once as a 'matter of course,' *i.e.,* without seeking court leave." *Felix*, 545 U.S. at 655. *See also, e.g., United States v. Guerrero,* 488 F.3d 1313, 1316 (10th Cir. 2007)("Under Fed.R.Civ.P. 15(a), a party may amend its pleading once as a matter of course prior to response by the opposing party. Guerrero filed his memorandum before the government responded, so it is timely with respect to Fed.R.Civ.P. 15(a)."); *Rick-Mik v. Equilon,* 532 F.3d 963, 977 (9th Cir. 2008)("First, Rick-Mik did not even need permission to amend before the district court if

9

it truly wanted to amend its complaint.  Under Federal Rule of Civil Procedure 15(a), 'a party may amend its pleading once as a matter of course ... before being served with a responsive pleading.'").

The Supreme Court's reasoning in *Felix* also runs contrary to this Court's suggestion that the time between Mr. Barrett's initial and amended petitions is significant for purposes of whether the amendment was properly filed as of right.  The Supreme Court expressly considered that there can be delay between the filing of a petition and an answer and "[i]n federal habeas cases that time can be rather long[]").  *Felix*, 545 U.S. at 663.  It was the Government's choice to delay its answer.

Significant to the question of whether Mr. Barrett had an absolute right to file his amended petition without leave of court under Rule 15(a)(1)(A), the Supreme Court in *Felix* rejected the habeas petitioner's argument that any such problem with the limitations period could be remedied by the fact that Rule 15(a)(2) requires leave of court or written consent of the opposing party before an amended petition is filed *after* a responsive pleading is served.  The habeas petitioner's argument "overlook[ed] a pleader's right to amend without leave of court '*any time before a responsive pleading is served*.'  Rule 15(a)."  *Mayle v. Felix,* 545 U.S. at 663 (emphasis added).

Petitioner's counsel put the Court and Government on notice in January that they faced significant difficulties in preparing the petition.  The Government conceded in February 2009 that Petitioner established extraordinary circumstances justifying equitable

tolling of the statute of limitations. While Petitioner's counsel have diligently been working to gather available evidence to support his claims, and to amend those claims as additional evidence came to light, the Government admitted in its first request for additional time to answer that it had done nothing to comply with the Court's first order for an answer until roughly ten days before the answer was due. There is no cause for this Court to penalize Petitioner for exercising his right to amend given that the need was precipitated in part by the extraordinary circumstances previously raised, and given that he amended within a time period that grew in part due to the Government's delay and asserted need for additional time.[1]

The show-cause order indicates this Court assumed Rule 15 does not apply to these proceedings and therefore "Petitioner should have sought leave of court prior to filing amended or corrected pleadings herein." Order (Doc. 74) at 2. Petitioner is, and at all times has been, unaware of any statute, rule or case that requires prior court authorization before a party may re-file a document correcting its form. Case law and the Advisory

_____

[1] While the court's concern that the amended motion was filed some six months after the timely motion is met because Rule 15(a)(1)(A), without qualification, permits an amendment without leave of court before a responsive pleading is served, the court's order makes it apparent that Petitioner and the Government are not "being fed out of the same spoon," so to speak. The court is requiring Petitioner to show cause why his amended motion should be allowed, when it is clearly permitted by Rule 15(a).

To the extent the Court is considering taking action against Petitioner due to the time that elapsed between the filing of the initial and amended motions, while the Court expressed no concerns about the Government's lack of diligence prior to June 16, 2009, and made no inquiry thereafter, that disparate treatment is further evidence of bias in these proceedings.

11

Committee Notes on Rule 2(b) of the Rules Governing Section 2255 Cases make clear

that Mr. Barrett was entitled to file a corrected motion and that the correction – adding a

verification – was not an "amendment" within the meaning of Rule 15(a).

When Rule 2 was amended in 2004, the Advisory Committee said the following:

> Current Rule 2(d), which provided for returning an insufficient motion has been deleted. The Committee believed that the approach in Federal Rule of Civil Procedure 5(e) was more appropriate for dealing with motions that do not conform to the form requirements of the rule. That Rule provides that the clerk may not refuse to accept a filing solely for the reason that it fails to comply with these rules or local rules. Before the adoption of a one-year statute of limitations in the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, the moving party suffered no penalty, other than delay, if the motion was deemed insufficient. Now that a one-year statute of limitations applies to motions filed under § 2255, see 28 U.S.C. § 2244(d)(1), the court's dismissal of a motion because it is not in proper form may pose a significant penalty for a moving party, who may not be able to file another motion within the one-year limitations period. Now, under revised Rule 3(b), the clerk is required to file a motion, even though it may otherwise fail to comply with the provisions in revised Rule 2(b). The Committee believed that the better procedure was to accept the defective motion and require the moving party to submit a *corrected* motion that conforms to Rule 2(b).

Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 2,

2004 Amendments, Advisory Committee's Note (emphasis added). Were this Court to

have required leave before Mr. Barrett corrected the formal defect in his motion, it would

12

have been contrary to Rule 2 and an abuse of discretion under *Guerrero*, *supra*.[2]

Petitioner, by filing a corrected motion on March 17, 2009, which merely added a verification, corrected a defect, and did not amend in any way the substance of the motion. Correcting the motion to add a verification did not impact either the concerns of Rule 2 or the notice concerns which are at the heart of Rule 15. In its order, this Court appeared to recognize that a corrected motion and an amended motion are distinct types of pleadings. Order at 2 (". . . Petitioner should have sought leave of court prior to filing *amended or corrected pleadings* herein") (emphasis added). The purpose of a verification is to provide evidence that the petitioner can substantiate his claims. Without the verification, Petitioner's first-filed motion had attached to it over 170 exhibits which

---

[2] In the footnote to its order to show cause, the court states Mr. Barrett's original and amended §2255 motions do not "comport with the standard form adopted in the Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 2(c)." The court also references LcvR 9.2, and states that LCvR 7.1(c) "requires every motion, application, or objection to be filed as a separate pleading."

Mr. Barrett's original and amended §2255 motions are in compliance. Rule 2(c), of the Rules Governing Section 2255 Cases states, in pertinent part, that "[t]he motion must *substantially follow* either the form appended to these rules or a form prescribed by a local district court rule." (emphasis added) LCvR 9.2 states in substance that if a §2255 motion is not on the form provided by the court's website, it should supply the court with the equivalent information required by the form. The information required by either form is contained within Mr. Barrett's §2255 motions. Counsel knows of no instance anywhere in the United States where a §2255 motion in a federal death penalty case not on a "standard form" has been found wanting where the pertinent information required on such forms is provided within the motion, regardless of format. Additionally, Mr. Barrett has complied with LcvR 7.1(c), because every motion – the original, corrected and amended §2255 motions – has been filed as a separate pleading. When the corrected motion was filed, the court clerk would not permit the exhibits which had been filed with the non-verified motion to be filed again.

13

were cited in the petition, and established that there is abundant evidence to substantiate his claims.

That a "corrected motion" which adds a verification is not an "amended motion" for purposes of Rule 15 was made clear in *United States v. Guerrero, supra*, 488 F.3d at 1315-17.  In that case, a §2255 petitioner timely filed a verified motion, and later filed a supporting memorandum containing a new claim before the 1-year limitation period expired.  The memorandum containing the new claim was unverified and thus did not comply with Rule 2(b).  The Tenth Circuit remanded the case to the district court, holding "[p]ursuant to the Advisory Committee Notes to Rule 2 ... Guerrero should have an opportunity to conform his motion to Rule 2(b)'s procedural requirements.  See §2255 Rules, Advisory Committee Notes, 2004 amendments (noting that court should allow movant to submit *corrected* motions conforming to Rule 2(b))".  *Id.* at 1316-17 (emphasis added).  In footnote 3, the court stated that remand to allow petitioner to conform the pleading to Rule 2(b)'s requirements was especially appropriate "in light of the strenuous requirements for filing a second or successive motion" under 28 U.S.C. §2255 para. 8 and 28 U.S.C. §2244(b).  *Id.* at 1317.  The court stated that "[u]pon remand, the court should give Guerrero an opportunity to file an amended §2255 motion *and/or* a memorandum signed under penalty of perjury."  *Id.* at 1314 (emphasis added).  There was no question that Guerrero was correcting the form of his petition.  Thus, Petitioner had the option under Tenth Circuit law either to correct the form of the motion itself or file a separate

14

memorandum.  Neither has any significance under Rule 15, which, as shown *supra*, applies to these proceedings.

For the foregoing reasons, and those that follow, the show-cause order should be vacated in that it is clear under controlling law that by filing his amended petition on September 25, 2009, Mr. Barrett was exercising his right under Rule 15(a)(1) of the Federal Rules of Civil Procedure to amend his petition once before the Government answered.  In that the above-cited authorities establish that Mr. Barrett was not required to seek leave of court prior to filing his amended petition, the show-cause hearing, and expense involved, is unnecessary.  To the extent these authorities do not resolve the issues raised in the show-cause order, Petitioner lacks sufficient notice of those issues, and Petitioner sufficient time to prepare a response.

## C.     Should this Court Interpret the Law to Require Leave, it Should be Granted to Petitioner

Mr. Barrett has shown above that his amended motion filed on September 25 (and the corrected motion filed on March 17, 2009) were properly filed without leave of court, and that the show cause order should be vacated.  Mr. Barrett filed his amended petition in reliance upon the above-cited authorities.

Out of an abundance of caution, however, even if it could be said simply for the sake of argument that any leave of court was required, the court should permit the corrected and amended motions to be fully considered in the interest of justice.  Where an amendment is filed following the service of a responsive pleading, which is not the case

15

here, a court should "freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2).

This is particularly true where, as here, no new claims in the amended petition[3] and

therefore there is no violation of the statute of limitations and no prejudice to the

opposing party, which in this case has not even filed its responsive pleading. In the

following section, Petitioner presents grounds for allowing his amendment. He has had

less than one week to prepare these arguments. If he was not justified in relying upon

existing law indicating that he was entitled to amend on September 25 without leave of

court, this Court should give him adequate notice of that opinion and afford him an

opportunity fully to prepare grounds for allowing amendment. The show-cause order

does not provide sufficient notice either of the grounds upon which he is required to seek

leave, the criteria the Court will consider in deciding whether to grant leave, and any

other factors that may bear on this issue.

The phrase "freely given" in Rule 15(a)(2) is a limit on a district court's discretion.
*Gillette v. Tansy,* 17 F.3d 308, 313 (10th Cir. 1994); *Riley v. Taylor,* 62 F.3d 86, 90, 92

(3rd Cir. 1995)(denial of leave to amend was reversible error; "the district court's order

denying Riley leave to amend his petition for a writ of habeas corpus is inconsistent with

the exercise of sound discretion in light of Rule 15(a)'s command that amendments

---

[3] The amended petition contains twenty claims, whereas the initial petition contained 19. However, Claim 19 of the Amended Petition groups under one heading the various allegations of ineffective assistance of appellate counsel that appeared under different headings in the initial motion. Thus, while there is one additional claim, numerically, substantively, there is no new claim.

should be freely allowed when justice so requires.")

Refusal to allow amendment of a §2255 motion in a capital case, where the cost to Petitioner may be his life, and where the Government can claim no prejudice, would be a particularly extreme abuse of discretion, and contrary to the Supreme Court's statement in the seminal Rule 15(a) case that "the purpose of pleading is to facilitate a proper decision on the merits." *See Foman v. Davis,* 371 U.S. 178, 182 (1962) (quoting *Conley v. Gibson,* 355 U.S. 41, 48 (1957)); *see also, Moore v. Balkcom,* 716 F.2d 1511 (11th Cir. 1983) (affirming denial of leave to amend on "futility" grounds, but noting that "[c]ertainly in a capital case, the district court should be particularly favorably disposed toward a petitioner's motion to amend"). Considering the corrected motion as an amendment would be contrary to *Foman.* Refusal to allow a habeas litigant to amend his petition in order to expand or clarify claims already made would constitute an abuse of discretion. *Gillette v. Tansy, supra.*

Declining leave to amend must be justified. *Foman v. Davis,* 371 U.S. at 182; *Riley,* 62 F.3d at 90. Permissible justification for refusing to allow amendment include: 1) undue delay; 2) bad faith or dilatory motive; 3) undue prejudice to the opposition; 4) repeated failures to correct deficiencies with previous amendments; and 5) futility of the amendment. *Foman,* 371 U.S. 182; *Riley,* 62 F.3d at 90. None of these potential justifications for denying an amendment is present here.

The amendment filed on September 25 does not create "undue delay" because Mr.

17

Barrett has already timely moved for relief under § 2255; his amendment was properly filed without leave of court *before* the Government has filed its responsive pleading; any delay in this case has been occasioned by the circumstances cited in Mr. Barrett's motion to toll the statute of limitations, the Government's two requests for extensions of time to respond, and the need to conduct further investigation or difficulties in obtaining additional evidence; and no undue delay is created by the amendment, which elaborates, clarifies, and expands upon arguments already made.

The amendment filed by Mr. Barrett on September 25 does not evince "bad faith" or "dilatory motive." Mr. Barrett has not lain behind the log, springing new arguments that do not relate back to the timely filing, or waiting for the Government to respond before seeking leave to amend. Rather, while the Government is still formulating its responsive pleading, having obtained two extensions of time to do so, Mr. Barrett's counsel and those assisting them have continued to investigate and work on his case, and prepared and properly filed the amended petition, as Mr. Barrett had an unqualified right to do, *before* the Government has served its response, and approximately 3 weeks before the Government's response is now due to be filed. Through the amendment, counsel for Mr. Barrett are adhering to the rules, including the demanding pleading requirements of Rule 2, and are seeking to give Mr. Barrett the best representation they can provide.

There have not been repeated failures to correct deficiencies with previous amendments. After recognizing the verification had been left out of the motion filed on

18

March 16, 2009, this deficiency was corrected immediately on March 17. There has been

no previous amendment to Mr. Barrett's §2255 motion, only the amendment timely and

properly filed on September 25 under Rule 15(a)(1)(A).

The amendment filed on September 25 is not "futile." Amendments are futile if

"they assert clearly frivolous claims." *Riley,* 62 F.3d at 91 ("[t]hough we cannot say

Riley will prevail on any of the [proposed amendments], we are equally unable to say the

amendments he proposed are so unlikely to affect the outcome that they would be

futile."); *Buder v. Merrill Lynch,* 644 F.2d 690, 695 (8th Cir. 1981). In the September 25

amendment, Mr. Barrett does not advance new claims that would be barred by the

limitation period, and thus futile, as in *Mayle v. Felix, supra.* The amendment elucidates,

expands or clarifies matters already raised which relate back to the timely filed motion

based on counsel's continuing investigation and research. The amendment simply asserts

claims arising out of the "conduct, transaction or occurrence" set out before. *See*

*Woodford v. Williams*, 263 F.3d 1135 (10th Cir. 2001); *United States v. Espinoza-Saenz*,

235 F.3d 501 (10th Cir. 2000); *cf. Felix*, *supra*, 545 U.S. at 664. Unlike the situation in

*Felix* and similar cases, Mr. Barrett's amended motion filed September 25 "relates back"

to the date of his timely filed motion under Rule 15( c)(1)(B), because it contains no new

ground or grounds for relief supported by facts that differ both in time and type from

those previously set forth.  The claims raised by Mr. Barrett are substantial, not frivolous.[4]

For reasons already alluded to, the amendment does not cause undue prejudice to the Government.  The amendment elaborates upon or clarifies claims already made in March, 2009.  Counsel for Mr. Barrett did not "wait" to file the amendment, they continued to collect evidence, and filed when that evidence could be incorporated into the existing claims and when the 400-page petition and the attached 203 exhibits could be prepared for presentation to this Court in the form and manner prescribed by the relevant rules.  Mr. Barrett did not wait until the Government had responded, and then seek leave of court or permission from the Government to amend.  He utilized his right under Fed.R.Civ.P. 15(a)(1)(A) to amend before the Government has served its response.

All the above demonstrates the court would abuse its discretion in not allowing the amendment, an amendment which, it bears repeating, was properly filed in the first instance without the necessity of seeking leave of the court.

## IV.    Conclusion

Based on the foregoing arguments and authorities, the court's show cause order should be vacated or, in the alternative, stayed until the Tenth Circuit acts on the soon to

---

[4] It is impossible for Mr. Barrett to say more regarding the relation-back doctrine because he has no notice whether this Court or the Government contests the timeliness of any part of the Amended Petition.  Whether an amended claim relates back to an earlier filed claim is contingent both upon a comparison between the two sets of facts alleged, and the substantive law governing the claim or claims. *See Felix*, *supra*, 545 U.S. at 664 & n.7.

be filed petition for writ of mandamus challenging the court's order of September 11, 2009 denying the motion to recuse and disqualify, or modified to provide adequate notice and an opportunity for Mr. Barrett to be heard. At a minimum, the court should continue the show cause hearing scheduled for October 6, 2009, to permit both of Mr. Barrett's counsel to attend and be as prepared as possible under the circumstances. To the extent the Court proceeds with the scheduled hearing, the arguments presented here should be considered at the hearing.

DATED October 2, 2009

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL
Fla. Bar No. 73016
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-6666
(916) 498-6656 [fax]

Lawyers for Petitioner,
Kenneth Eugene Barrett

## Certificate of Service

      I hereby certify that on this 2nd day of October 2009, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing. A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401 and Jeffrey B. Kahan, U.S. Department of Justice, 1331 F Street, N.W., Washington, D.C. 20530.

/s/ Tivon Schardl

# EXHIBIT H

Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
CM-ECFRetMail_OKED
to:
CourtCalendar_OKED
10/02/2009 03:38 PM
Bcc:
Tim Schardl
Show Details

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 10/2/2009 at 5:38 PM CDT and filed on 10/2/2009
**Case Name:**      Barrett v. USA
**Case Number:**   6:09-cv-105
**Filer:**
**Document Number:** 77(No document attached)

**Docket Text:**
**MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt [76]) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co-counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk)**


**6:09-cv-105 Notice has been electronically mailed to:**

Sheldon J. Sperling sheldon.sperling@usdoj.gov, bonnie.london@usdoj.gov, usaoke.criminal@usdoj.gov

Christopher J. Wilson Chris.Wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry dbautry44@hotmail.com

Tivon Schardl tim.schardl@fd.org, dianna.rosenberg@fd.org, hermida.diaz@fd.org, kathryn.nguyen@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan jeffrey.kahan@usdoj.gov

**6:09-cv-105 Notice has not been electronically mailed to:**

# Exhibit I

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,           )
                                  )
          Petitioner,             )
                                  )
v.                                )          Case No. CV-09-00105-JHP
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Respondent.             )

**PETITIONER'S OBJECTION TO AND MOTION TO RECONSIDER
THE ORDER FILED OCTOBER 2, 2009,
MOTION TO CONTINUE HEARING,
AND MOTION FOR COUNSEL TO APPEAR BY TELEPHONE**

COMES NOW Petitioner, KENNETH EUGENE BARRETT, by and through his

undersigned counsel, pursuant to the Due Process Clauses of the Fifth and Fourteenth

Amendments to the United States Constitution, 18 U.S.C. §§ 3599(a) and (e), 28 U.S.C. §

455(a), and Canon 3A (1), (4), (5) and (7) of the Code of Judicial Conduct, and makes the

following objections to the minute order (Doc. 77) entered on October 2, 2009, and moves this

Court to vacate or modify its order such that Petitioner may have meaningful notice of the

matters set for hearing and a meaningful opportunity to be heard.  Petitioner states the following

good cause for granting this motion:

1.     **Background.**

On September 29, 2009, this Court entered an order requiring Petitioner, at a

hearing scheduled for October 6, 2009, to "show cause why this Court should now allow an

amendment to his motion" for post-conviction relief pursuant to 28 U.S.C. § 2255.  Order

(Doc. 74) at 2.

1

On October 2, 2009, Petitioner filed an emergency motion and supporting brief seeking the following alternative forms of relief:

> the court's show cause order should be vacated or, in the alternative, stayed until the Tenth Circuit acts on the soon to be filed petition for writ of mandamus challenging the court's order of September 11, 2009 denying the motion to recuse and disqualify, or modified to provide adequate notice and an opportunity for Mr. Barrett to be heard. At a minimum, the court should continue the show cause hearing scheduled for October 6, 2009, to permit both of Mr. Barrett's counsel to attend and be as prepared as possible under the circumstances. To the extent the Court proceeds with the scheduled hearing, the arguments presented here should be considered at the hearing.

Pet's Emerg. Mot. Vacate of Modify Order (Doc. 76) at 20-21. Petitioner's motion was file stamped by the Court's electronic filing system at 3:54 p.m. Central Daylight Time. Petitioner's motion contained approximately twenty one pages of points and authorities and had attached a declaration of counsel.

At 5:38 p.m. Central Daylight Time, this Court issued a minute order denying in full Petitioner's motion. Doc. 77. The order "waive[d]" the presence of one of Petitioner's attorneys at the show-cause hearing, and limited that attorney's involvement in the hearing to arrangements the Court would make "for lead counsel to speak with co-counsel Tivon Schardl via telephone, if necessary." *Ibid.* The order also expanded the scope of the hearing, stating, "the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter." *Ibid.*

**2.     Objections and Grounds for Greater Notice and an Opportunity to be Heard**

**2.1**     This Court's summary rejection of Mr. Barrett's motion to vacate or modify the show-cause order did not afford Mr. Barrett due process of law. The show-cause order gave vague and temporally inadequate notice of potentially complex issues of fact and law. In a

desperate attempt to ensure that Mr. Barrett could present some of the evidence and argument that could be presented on the issues, his counsel prepared the 21-page motion and the attached four-page declaration. This Court denied the motion one hour and 44 minutes after it was filed.

**2.2** There is an appearance of impropriety in the Court's denial of all alternative forms of relief sought in Petitioner's emergency motion after it was pending for less than two hours. The appearance of impropriety is heightened by the substance of the Court's ruling in several respects. First, the Court appears to have refused to take Petitioner's written submission into consideration when deciding the issue presented in the show-cause order. One form of relief Petitioner sought in his emergency motion was the opportunity to have the arguments and evidence presented therein considered by the Court when it makes a decision on the issue of amendment. This Court appears to have summarily denied that form of relief. To the extent the Court is refusing to consider Petitioner's written submission, the October 2 Order arbitrarily limits the scope of argument and evidence Petitioner could present, and effectively strikes a written motion regarding amendment.

Second, in response to Petitioner's objection to receiving inadequate notice of, and an inadequate opportunity to be heard at the show-cause hearing, the Court (a) "waive[d]" the appearance of half of Petitioner's legal team, and (b) doubled the scope of the hearing to include not only the question of amendment but scheduling "necessary for disposition of this matter." Petitioner sought an opportunity to be heard, and had a statutory right to be heard, through both his counsel. This Court could have permitted one of Petitioner's attorneys to appear by telephone, as the Court arranged prior to a previous hearing. However, the Court limited Petitioner to one attorney who may be able to confer by telephone with his co-counsel, as arranged by the Court and "if necessary." This ruling will interfere with counsel's statutory and

ethical obligation to exercise independent professional judgment and provide fully-informed, effective representation.

Both of Petitioner's counsel were duly appointed pursuant to 18 U.S.C. § 3599(a)(2). This Court's order of October 2 denies Mr. Barrett the assistance of counsel contemplated by the statute. Congress provided for the appointment of "one or more attorneys" for Mr. Barrett and for representation by more than one at all times where such an appointment was made. Thus the statute states the following:

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, *each attorney* so appointed *shall* represent the defendant throughout *every subsequent stage* of available judicial proceedings including . . . all available post-conviction process . . . .

18 U.S.C. § 3599(e) (emphasis added). This Court's order "waiv[ing]" the appearance of co-counsel, and curtailing the performance of both counsel is contrary to law.[1]

Any objective observer fully informed of the Court's order would question the impartiality of this ruling. In practice, this Court's arrangement will deny Petitioner the representation to which he has a statutory right and be degrading to lead counsel who would be required to ask the Court to pause the hearing for a lengthy period so that he could inform co-counsel of what has transpired, and delay the hearing for long enough to confer, before relaying any points or authorities suggested by co-counsel. The arrangement is inherently degrading to and disparaging of Mr. Barrett's co-counsel who is unable to attend the hearing due to prior obligations and a visual impairment. Counsel for the Government face no such limitations. The Court insists upon these curtailed proceedings rather than grant a brief continuance of the hearing. The totality of circumstances that an observer would consider in assessing the propriety

---

[1] This motion serves as notice to the Court and opposing counsel that Mr. Barrett does not waive the appearance of both of his court-appointed counsel.

of the Court's ruling also include the Court's actions curtailing the pre-trial and trial performance of counsel as set forth in Claims 1, 2, and 3 of Mr. Barrett's § 2255 Petition and the exhibits referenced therein. Docs. 1, 2, 74, and Exhibits 34, 54, 56, 64, 65, 67, 82, and 118 thereto. *See also* Code of Judicial Conduct Canon 3 ("A Judge Shall Perform the Duties of Judicial Office Fairly, Impartially and Diligently), *specifically*, Canon 3A(3)( "A judge shall be patient, dignified, respectful and courteous to litigants . . . with whom the judge deals in an official capacity"), *and* 3A(4) ("A judge shall accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law.").

**2.3** Petitioner is unable fully to address the newly-announced scheduling matters due to the pending substitution of co-counsel. Petitioner's counsel informed this Court in February 2009 that co-counsel Schardl was leaving his position and would not be able to continue to represent Petitioner in his present role. Mr. Schardl has stayed on the case in order to complete work on the Amended Petition. The Federal Defender had assigned Assistant Federal Defender Joan Fisher to take over Mr. Schardl's role. While Ms. Fisher has been working on the case, including the soon-to-be-filed petition in the Court of Appeals, she has not yet entered an appearance. As it is Ms. Fisher who will primarily be responsible for the Federal Defender's role in the case, she should have an opportunity to participate in scheduling matters.

**3.     Conclusion and Prayer for Relief**

For the foregoing reasons and those set forth in Mr. Barrett's emergency motion (Doc. 76), and his motion for recusal (Doc. 45), Petitioner respectfully requests the following relief:

(a)     that the Honorable James H. Payne recuse himself from these proceedings, and stay proceedings until another judge is randomly selected;

(b)    that this Court reschedule the hearing set for October 2, 2009 so that each of the

attorneys appointed to represent Mr. Barrett may adequately prepare for and

appear to represent him at the hearing, either in person or by telephone;

(c)    in the event the Court proceeds with the hearing on October 2, that the Court

permit Mr. Barrett's co-counsel to appear telephonically;

(d)    in the event the Court proceeds with the hearing on October 2, that the Court not

address scheduling matters, and that the Court set a scheduling conference after

adequate notice and an opportunity for Petitioner's counsel to address the Court.

DATED:   October 5, 2009

Respectfully submitted,
 /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

 /s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

## Certificate of Service

      I hereby certify that on this 5th day of October 2009, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing. A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401 and Jeffrey B. Kahan, U.S. Department of Justice, 1331 F Street, N.W., Washington, D.C. 20530.

                                   /s/ Tivon Schardl

# EXHIBIT J

Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
CM-ECFRetMail_OKED
to:
CourtCalendar_OKED
10/05/2009 03:03 PM
Bcc:
Tim Schardl
Show Details

History: This message has been forwarded.

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

### Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 10/5/2009 at 5:04 PM CDT and filed on 10/5/2009
**Case Name:** Barrett v. USA
**Case Number:** 6:09-cv-105
**Filer:**
**Document Number:** 79(No document attached)

**Docket Text:**
**MINUTE ORDER by District Judge James H. Payne: denying [78] Petitioner's Motion to Reconsider; denying [78] Petitioner's Motion to Continue Hearing; finding as moot [78] Motion for Leave to Appear by Telephone pursuant to Minute Order [77] entered on 10/2/09. [78] Petioner's Motion to Recuse was previously denied by Order [66] entered on 9/11/09. (cjt, Deputy Clerk)**

**6:09-cv-105 Notice has been electronically mailed to:**

Sheldon J. Sperling sheldon.sperling@usdoj.gov, bonnie.london@usdoj.gov, usaoke.criminal@usdoj.gov

Christopher J. Wilson Chris.Wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry dbautry44@hotmail.com

Tivon Schardl tim.schardl@fd.org, dianna.rosenberg@fd.org, hermida.diaz@fd.org, kathryn.nguyen@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan jeffrey.kahan@usdoj.gov

**6:09-cv-105 Notice has not been electronically mailed to:**

# Exhibit L

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT, )
)
        Petitioner/Defendant, )
)
v. )        Case No. CIV-09-105-JHP
)
UNITED STATES OF AMERICA, )
)
        Respondent/Plaintiff. )

## SCHEDULING ORDER

Pursuant to the hearing held herein, the Court hereby enters the scheduling order:

Petitioner shall have thirty (30) days or until November 6, 2009 to file an Amended

Motion to Vacate in compliance with the Rules Governing § 2255 Proceedings and sixty (60)

days thereafter, or until January 5, 2010, to file a Brief in Support.

Respondent shall have sixty (60) days thereafter, or until March 8, 2010, to file an

Answer and Brief in Support.

Petitioner will thereafter have fifteen (15) days, or until March 23, 2010, to file a

Reply.

It is so ordered on this  7th  day of October, 2009.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma

# Exhibit M

## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

## AMENDED MOTION FOR COLLATERAL RELIEF,

## TO VACATE, SET ASIDE, OR CORRECT SENTENCE,

## AND FOR A NEW TRIAL

12.     Gelene Dotson, Mr. Barrett's mother, who testified superficially about Mr.

Barrett's childhood, his marriage and his adult life.

13.     Ernest Barrett, Mr. Barrett's father, who testified superficially about Mr. Barrett's

youth.

14.     Doris Barrett, Mr. Barrett's stepmother, who testified that Mr. Barrett was

like a son to her.

**III.   Claims for Relief**.

**Claim 1.     Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments

made elsewhere in this Petition and the exhibits thereto.

Actions of the trial court denied Mr. Barrett a fair trial under conditions required

or routinely provided to similarly situated defendants pursuant to 18 U.S.C. §§ 3005, 3006A, and

3599, the Judicial Conference's Guidelines for implementation of the Criminal Justice Act,

prevailing professional norms of criminal defense practice, and the Fifth, Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution.[1]

---

[1] As stated *supra* in § I.B, this claim and others presented in this Petition rely upon witness accounts of the trial judge's on- and off-the-record interference with Mr. Barrett's defense. Claim 1 also relies upon evidence that Judge James H. Payne engaged in improper *ex parte* communications with the prosecutors prior to trial, that he mislead Mr. Barrett and his counsel regarding the substance of those communications, and that following the *ex parte* communications, Judge Payne deferred ruling on a Government motion and that he was aware that delay conferred benefits upon the Government. Mr. Barrett respectfully submits that the law

(continued...)

Judicial interference with defense counsel carrying out their constitutional function as opponents of the Government violates the Sixth Amendment, without a showing of prejudice. *Geders v. United States*, 466 U.S. 648 (1976) (trial court's order prohibiting defense counsel from consulting with defendant during recess between direct and cross-examination); *Herring v. New York*, 422 U.S. 853 (1975) (order barring defense counsel from summing up in bench trial); *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (rule requiring defendant to testify before any other witnesses denied defendant benefit of counsel's advice and guidance); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (denial of counsel at arraignment where defenses had to be raised); *Ferguson v. Georgia*, 365 U.S. 570 (1961) (where state rule made defendant incompetent to give sworn testimony Constitution required that counsel be permitted to guide unsworn statement). While Mr. Barrett need not show prejudice from the court's actions described in this Claim, he can make that showing and does so in Claims 2, 3, 5, and 14, *infra*.

The trial court's stated interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and its communications with counsel created a conflict between the court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense. *See Woods v. Georgia*, 450 U.S. 261 (1981).

---

[1](...continued)
requires the trial judge to disqualify himself from ruling on this motion, and from any decisions respecting the process for ruling on this motion. 28 U.S.C. §§ 455(a), (b)(1), (b)(3), (b)(5)(iv); *In re Murchison*, 349 U.S. 133, 136 (1955); *Murchu v. United States*, 926 F.3d 50, 57, 59 (1st Cir. 1991). Mr. Barrett objects to the trial judge making any rulings in respect of this motion.

Since the initial Motion to Vacate was filed, Mr. Barrett has filed a separate motion to disqualify and require the recusal of Judge Payne. That motion was denied on September 11, 2009.

The evidence presented herein demonstrates that the trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases. The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as "a 'class of one,' . . . intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). *See also*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Imposition of the death penalty through such an arbitrarily skewed process violates the Eighth Amendment's prohibition on cruel and unusual punishment.

The trial judge's conduct towards Mr. Barrett's interests and his counsel violated the Code of Judicial Conduct and was not impartial. "No matter what the evidence against (a defendant), he had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Partiality on the part of a judge in a civil appeal violates due process. *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1985). The Supreme Court has "emphasized the special importance of fair procedure" in death penalty cases, including giving adequate notice to the defense of the judge's plans. *Lankford v. Idaho*, 500 U.S. 110, 125 (1991), quoting and citing, *Gardner v. Florida*, 430 U.S. 349, 357 (1977). The trial judge's conduct violated Mr. Barrett's rights under the Fifth and Fourteenth Amendments.

Federal law provides that the court shall consider the recommendations of the Federal Defender when appointing counsel. 18 U.S.C. § 3005. Pursuant to the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") the Federal Defender and the court should take into account "the facts and circumstances of the case to determine the qualifications which may be required to provide

effective representation." (CJA Guidelines, ¶ 6.01(B)(1)). Courts are encouraged to appoint counsel who "are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation." (CJA Guidelines ¶ 6.01.)

Judge Payne initially expressed a desire to appoint the Federal Defender to represent Mr. Barrett. When the Federal Defender informed Judge Payne that the only attorney in his office qualified to handle a capital case was already appointed to such a case, Judge Payne indicated that he anticipated the assistant federal defender who normally worked in the Eastern District would be responsible. The Federal Defender explained that the attorney was not qualified and his office could not provide competent representation to two capital defendants at the same time. (Exhibit 67.)

Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Exhibit 54; Exhibit 67; Exhibit 34). Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation. (Exhibit 54; Exhibit 67).

During discussions with these attorneys, the trial judge expressed an interest in considering factors that are not recognized by the Judicial Conference or national indigent defense organizations as indicative of an attorney's qualifications to provide effective representation. Judge Payne expressed an interest in appointing less-qualified attorneys to represent Mr. Barrett as a means of giving local attorneys experience so that a local panel could be formed for representation in capital cases. (Exhibit 54; Exhibit 67; Exhibit 34). To this end,

the trial judge rejected the recommendation of Robert Nigh and appointed Roger Hilfiger, based in part on Mr. Hilfiger's past experience as United States Attorney for the Eastern District of Oklahoma. *Id.*

The CJA Guidelines provide that courts budgeting federal death penalty cases should ask counsel for the "best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial." (CJA Guidelines, ¶ 6.02F(3)(C)(ii)).  The Judicial Conference's guidelines also provide that these "[c]ase budgets should be submitted *ex parte* and filed and maintained under seal." (*Id.* at ¶ 6.02(F)).  The trial court in this case required a high degree of specificity, and threatened to reverse the prior order Judge White entered authorizing *ex parte* submissions if counsel did not disclose "a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case)." (Exhibit 65 – Letter from Hon. James H. Payne to John David Echols dated 2/22/05.)

Judge Payne expressed a desire that the case rapidly proceed to trial.  (Exhibit 34.) On January 7, 2005, the court admonished Mr. Barrett's attorneys for failing to mention the need for a continuance during a status conference earlier in the day.  Doc. 31.  The court said, "Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel." *Ibid.*

On January 31, 2005, Mr. Barrett's counsel filed a detailed, 10-page, budget proposal.  (Doc. 46.)

Like the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases,[2] the Judicial Conference's guidelines recognize the importance of prompt authorization of funds so that delay will not result in a denial of effective representation. The CJA Guidelines encourage courts "to employ[] an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity," ¶ 6.02(F)(3), and encourage courts to "act upon requests for services where prompt authorization is necessary for adequate representation." (¶ 6.02(F)(5)). The trial court in this case did not hold such a conference.

On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals. (Docs. 50, 51.) On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but not about Mr. Hilfiger's representation. (Exhibit 65). Throughout the letter, Judge Payne expressed concern that Mr. Echols was being paid to represent Mr. Barrett in a third trial, and expressed the view that no further investigation should need to be done after the previous trials. *Ibid.* Mr. Echols responded by letter on February 28, 2005. (Exhibit 64.)

As noted *supra*, the statutes and guidelines related to case budgeting in federal death penalty cases state a preference for *ex parte*, sealed proceedings in order to protect defense confidentiality. The trial court in this case expressly considered using Mr. Barrett's budget submissions to aid the prosecution. In his letter to Mr. Echols, Judge Payne stated that lifting the order on *ex parte* budgeting "might actually help resolve this case more expeditiously by

---

[2] Eric Freedman, AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES & COMMENTARY TO GUIDELINES, 31 Hofstra L. Rev. 913 (2005).

allowing the government an earlier opportunity to object to the admissibility [of Mr. Barrett's experts] and perhaps allow the court to rule on the admissibility issues prior to expenditure of funds for experts which might not be allowed to testify at trial." (Exhibit 65 at 2.) Mr. Echols objected that this proposal would infringe on Mr. Barrett's Sixth Amendment rights, and it was not implemented.

On February 28, 2005, Mr. Echols informed the court that delays in authorization of a budget for any defense preparation was endangering counsel's ability to prepare for trial on the court's schedule. (Exhibit 64 at 5.) The court did not rule on the defense's budget proposal until March 18, 2005. (Doc. 97.) At that point, discovery was scheduled to close on May 11, 2005, and trial was scheduled to start on July 11, 2005. (Scheduling Order filed 12/11/04 (Doc. 22).)

Richard Burr, an attorney retained by the Office of the Defender Services of the Administrative Office of the United States Courts, served as an advisor to Mr. Barrett's counsel, John Echols, through the auspices of the Federal Death Penalty Resource Counsel project ("FDPRC"). (Exhibit 118; Exhibit 34.)[3] As Mr. Burr stated to the court at the time, the FDPRC collects "data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases." (Decl. Richard Burr re attorney compensation dated 4/4/05 and filed as Exh. B to Doc. 107.) Mr. Barrett's counsel relied upon the data collected by the FDPRC in making his funds requests. (Exhibit 64.)

The trial court's funding decisions were based on the judge's subjective view of what was "'reasonably necessary' to provide fair compensation and to provide the defense with

---

[3] Mr. Burr offered his assistance to Roger Hilfiger, but Mr. Hilfiger did not seek any assistance. (Exhibit 29; Exhibit 118.)

necessary tools for a fair trial." (Order filed 3/18/05 at 2.) However, the court's reasoning in denying specific requests was inconsistent with the Sixth Amendment role of counsel in exercising independent professional judgment and providing an adversarial testing of the prosecution's case. *Polk County v. Dodson*, 454 U.S. 312, 320-22 (1981).

The trial court had before it declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants. (Exhibit 118.) The trial court's order evidences no consideration of these norms or practice, whether adversarial or judicial. The trial judge's order evidences no consideration for the specific needs of counsel as expressed in their funds requests. The trial judge's limitations on funds were not based on any evidence of or expressed concern for fiscal limitations.

As expert counsel advised the court at the time,

> in the GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol, VII, "Appointment of Counsel in Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), Courts are encouraged in the course of case budgeting to secure counsel's "best preliminary estimate that can be made of all services," including the services of counsel.
>
> [] It is clear that the reason the attorney services were not included in the pre-authorization and circuit review provisions of 21 U.S.C. §§ 848(q)(9) and (10)(B) is that attorney services, to be meaningful, must be provided as the professional judgment of the attorney dictates and cannot, therefore, be subject to pre-authorization without significantly interfering with, even paralyzing, the process of representation.
>
> For this reason, the inclusion of attorney services in the case budgeting guidelines of the GUIDE TO JUDICIARY POLICIES AND PROCEDURES is intended, *not* to interject the courts into case management, but to require *counsel* to assess the representation needs of the case in order to give the courts a way of projecting what counsel believes to be reasonable expenditures of time. If the expenditure of attorney time thereafter begins to depart in substantial ways from these

projections, the budgeting of attorney time provides a basis for the court to question the attorney about the necessity of his or her efforts. This is the way in which the federal courts have uniformly approached the matter of budgeting attorney time in capital cases - with due deference to the exercise of attorney judgment, but with a basis for questioning certain expenditures of time.

(Decl. Richard H. Burr dated 4/4/05, filed as Exh. A to Doc. 107.)

Investigation is a core function of defense counsel. ABA Standards for Criminal Justice, Standard 4-4.1 (requiring "prompt investigation"). The relevant guidelines to administration of the Criminal Justice Act provide that "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services." The trial court authorized funds for Mr. Barrett's representation on a far more narrow basis.

Indeed, the trial court's funding order went beyond the simple approval or denial or funds. Mr. Barrett's trial counsel requested funds to investigate and develop evidence for the defense. (Doc. 51; Exhibit 64.) The trial court refused to permit trial counsel to expend funds in investigation based on their independent professional judgment. (Order filed 3/18/05 at 2 n.2.) The court stated that it would not approve payment of vouchers for investigative services unless counsel filed "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial." *Ibid.* This threat was contrary to the CJA Guidelines which provide in relevant part: "Courts, in examining the case budget, may reconsider amounts authorized for services prior to the budget's approval; however, *courts shall not rescind prior authorization where work has already been performed*." (CJA Guidelines, ¶ 6.02(F)(5) [emphasis added].)

The trial judge's conditioning of funds on his subjective evaluation of the significance of the facts counsel sought to investigate barred or chilled investigation into factual

matters trial counsel deemed necessary through their exercise of independent professional judgment. If Mr. Barrett had been represented by private counsel or an independent indigent defense office, the investigation of his case would not have been limited to factual issues that had "significance" to the person paying counsel.

As set forth more fully in Claim 3, *infra*, the court reduced the compensation rate of Mr. Barrett's investigator from the private investigator rate of $50.00 per hour to the rate charged by a state-subsidized agency for its salaried investigators. (Order filed 5/5/05 at 3 n.1.) In the court's initial order reducing the rate, the court did not disclose the state agency's rate as the basis for the reduction. (*See* Order filed 3/18/05 at 2.) This limitation meant that for Mr. Barrett's investigator, compared to his other cases, he *lost* $20.00 for every hour spent working on Mr. Barrett's case.

Mr. Burr compared this Court's March 18, 2005 order reducing resources for Mr. Barrett's defense with the data collected by the FDPRC. Mr. Burr informed the trial court:

> The number of hours needed for fact investigation of course varies from case to case. The number of hours requested here, however, is below the average for federal cases in which the death penalty has been authorized. The average number of hours approved for fact investigation in authorized cases is closer to 500 hours. The 100 hours approved by the Court is certainly enough to get a fact investigator started, but since it is far less than counsel has estimated is needed, approving only 100 hours now means that counsel in the near future will likely have to submit another request for approval of additional hours.

(Decl. Richard H. Burr re Non-Attorney Costs, dated 4/4/05, filed as Exh. C to Doc. 107.) The court treated this statement as an "illustration" that Mr. Barrett's counsel "have the attitude that the budget in this matter is unlimited . . . ." (Order filed 5/5/05 (Doc. 128) at 3 & n.1.)

The trial court did not merely deny funds to Mr. Barrett's defense, it interjected into the funding denial a false impression of the evidence that would be admitted at trial. The

court denied 75 percent of the time and one hundred percent of the in-court assistance trial counsel requested from a ballistics and crime scene reconstruction expert. (*Compare* Doc. 50 at 7 *with* Order filed 3/18/05 at 3.) At the same time, the court said, "Counsel should be aware that this Court has, [*sic*] never allowed crime scene reconstruction to be introduced in trial." (Order filed 3/18/05 at 3.) Trial counsel did not consult a crime scene reconstruction expert. (Tr. 10/3/05 Hr'g at 8.) The court's ruling gave counsel an unwarranted impression of the need to consult with a crime scene reconstruction expert and left counsel with no ability to bring such an expert to court to testify or assist in cross-examination. Contrary to the impression given by the court's March 18 order, the court permitted the Government to present and place heavy reliance upon crime scene reconstruction evidence. (*See* R. 3154-3484.)

As set forth more fully in Claim 3, *infra*, the trial court denied in full or in majority all Mr. Barrett's requests for expert and investigative services. The court stated no basis for any denial or reduction related to the facts or circumstances of the case. Based on the FDPRC's data regarding other capital cases, the court's ruling against Mr. Barrett was unique. Mr. Burr informed the court at the time that Mr. Barrett's request for a mitigation specialist was "well below average," and "no federal court ha[d] failed to provide expenses for mitigation specialists' work." (Decl. Richard H. Burr dated 4/4/05, Exh. C to Doc. 107.) Where this court denied funds for experts to travel as part of their work on Mr. Barrett's defense, Mr. Burr found that "[t]ravel expenses - lodging, meals, and transportation - are always provided, as are any other expenses incidental to the expert's ability to provide services." (*Id.*) Where this court permitted Mr. Barrett's counsel to retain only one mental health expert, regardless of the circumstances, the FDPRC found, the "standard practice in federal capital cases is to provide the

services of more than one mental health expert." *Id.* Trial counsel felt the court's restriction of funds was an impediment to preparing a mitigation investigation. (*See* Exhibit 56.)

The trial court paradoxically relied upon the experienced judgment of trial counsel as grounds for denying requests they made based on their considered professional judgment. For example, the court denied counsel's request for a jury consultant on the ground that trial counsel had extensive experience picking juries. (Order filed 3/18/05 at 3.) This ruling was influenced by the trial judge's personal choice of trial counsel. The trial judge personally selected Roger Hilfiger to represent Mr. Barrett against the recommendations of experienced defense counsel. (Exhibit 54; Exhibit 67.) The trial judge then relied upon his own subjective view of Mr. Hilfiger's experience, not as a defense lawyer, but as the former United States Attorney as a reason for denying counsel's request for a jury consultant. (Order filed 3/18/05 at 3.) However, as set forth *infra* this ruling did not bind Mr. Hilfiger as it would have bound Mr. Echols.

The trial judge hampered trial counsel's ability to prepare a defense by at first denying, then delaying, authorization for counsel to obtain the prior testimony of prosecution witnesses. (Order filed 3/18/05 at 4.) The court's reasoning is contrary to the purpose of the right to counsel. Where the Supreme Court has held that the purpose of defense counsel is opposing the prosecution, the trial judge initially denied access to the second state trial transcripts on the ground that "the government has indicated they do not need the prior transcripts to try this case. If counsel for the government are able to try this case without prior state court trial transcripts, defense counsel should be able to do the same." (*Id.* at 5.) Just as the right to cross-examine witnesses depends upon the availability of counsel, so too does the right depend upon the court not denying counsel access to readily available sources of cross-examination. *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

Initially, the court would not permit the second state trial transcripts to be obtained "unless convinced the testimony of said [prior] witness is critical to the issue of the defendant's intent as it relates to the elements of the offenses charged herein." (Order filed 3/18/05 at 6.) The court later rescinded this limitation and permitted counsel to obtain the transcripts they had been seeking since January 2005. (*See* Doc. 23.) Although some transcripts were obtained, the delay caused by the trial judge prevented preparation of transcripts before each witness who testified previously testified in federal court. The delay also impeded or prevented defense counsel's preparation for cross-examination. *See* Claim 2, Part A, *infra*.

The trial court also limited the ability of defense counsel to prepare for and conduct cross-examinations by denying access to transcripts of witnesses' testimony in earlier federal hearings. (Order filed 3/18/05 at 6.) This ruling was especially arbitrary and unfair in that the court could have provided Mr. Barrett's counsel these transcripts without making it part of the budget. The Criminal Justice Act specifically provides that court reporters may be paid separately for preparing transcripts in cases of indigence.

Congress, the Judicial Conference, and every professional association concerned with criminal defense practice have expressed the view that cases involving the death penalty require higher degrees of skill and greater preparation than other criminal cases. The trial judge in this case compared the budget for Mr. Barrett's case only to unidentified budgets in non-capital criminal cases. (*See generally* Orders filed 3/18/05 and 5/5/05.)

The court's rejection of Mr. Echols's proposed budget was part of a pattern of interference with, or indifference to, Mr. Barrett's legal representation. As stated *supra*, the trial judge initially wanted to appoint two local attorneys to represent Mr. Barrett so that the capital experience of the local bar would be increased. (Exhibit 67.) In his letter to Mr. Echols in

February 2005, Judge Payne indicated he had appointed Mr. Echols, at least in part, because Echols and the Public Defender left him with the understanding that "there would be a substantial savings in the amount of time that would be required for [Echols] to represent the defendant." (Exhibit 65.)

As stated *supra*, the trial court required Mr. Echols, as lead counsel, to submit very detailed and specific budget requests. On April 1, 2005, the Magistrate Judge recommended denying Mr. Echols any compensation for time spent preparing those budgets. The CJA Guidelines specifically provide that time spent on case budgeting in *capital* cases is compensable. Mr. Burr submitted a declaration to the Court regarding the extraordinary nature of the ruling against Mr. Echols's voucher:

> In every federal capital case with which the members of our project are familiar - which is virtually all such cases since the inception of the Federal Death Penalty Resource Counsel project in 1992 - defense counsel have been compensated for their work in seeking funding for the services of defense investigators and experts. We know of no other case in which the court has refused to compensate counsel for such work. The reason for this is that, in seeking funding for these services, counsel is required to plan the defense investigation and litigation, determine the specific need for investigation and expert assistance, identify appropriate, competent investigators and experts, and contact a number of investigators and experts to discuss the merits of the case and the need for their services and to determine whether those investigators and experts are actually appropriate and available. All of these efforts are in direct service to the client. Unlike the preparation of defense counsel's CJA 30 vouchers, through which counsel is compensated - and for which courts usually do not compensate counsel, the work of counsel in seeking finds [*sic*] for investigation and expert assistance is of no financial benefit to counsel. Its sole purpose if [*sic*] to assist the client in his or her defense.

(Decl. Richard H. Burr re Compensation for Budgeting, dated 4/14/05, filed as Exh. to Doc. 118.) The trial court denied Mr. Echols compensation, because lawyers in the Eastern District in *non-capital* cases were not compensated for budgeting. (Order filed 5/5/05 at 4.)

Mr. Echols's budget submissions were based in part on advice and data regarding other federal death penalty cases that Mr. Echols received from Federal Death Penalty Resource Counsel. Only Mr. Echols sought the advice of these experts; Mr. Hilfiger did not. (Exhibit 118; Exhibit 34.) Although compensation for consultation with expert counsel is specifically authorized by the Criminal Justice Act and 18 U.S.C. § 3599(f), the Magistrate Judge recommended denying payment for Mr. Echols's consultations, and Judge Payne upheld this ruling. (Order filed 5/5/05.)

On April 4 and 6, 2005, Mr. Echols filed motions seeking reconsideration of the March 18 budget order and April 1 report and recommendation regarding vouchers. These filings sought a budget conference as provided in the CJA Guidelines and included four declarations from Federal Death Penalty Resource Counsel, Richard Burr, some of which are quoted herein, regarding the CJA Guidelines and statements that the restrictions imposed by the court were unique in all the previously litigated federal death penalty cases.

On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett citing five circumstances that prevented him from providing effective representation: (1) the trial was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment. (Doc. 113.) Mr. Hilfiger had urged Mr. Echols not to file the motion. (Exhibit 118; Exhibit 34.) However, during a hearing on the motion, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order. (Exhibit 34.)

Mr. Echols stated as one ground for his motion to withdraw: "The relationship between the undersigned and co-counsel, Roger Hilfiger, is cordial, but we have not been able to work effectively together, and virtually all of the work performed on pleadings, budgeting and other issues has been performed by Mr. Echols." (Doc. 113 at ¶ 4.) In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work. (Order filed 5/5/05 at 5.) The court instead focused on Mr. Hilfiger being "more familiar with practice before this Court than Mr. Echols." (*Ibid.*)

In granting Mr. Echols's motion to withdraw the court expressed displeasure with the amount of information Mr. Echols provided in his budget submissions. (Order filed 5/5/05 at 2-3.) The court permitted Mr. Echols to withdraw in part because his budget proposals had not "'set forth separately and with specificity the time each of the appointed attorneys anticipates spending' on each of several categories." (*Ibid.* (quoting Order filed 1/29/05 (Doc. 38).) The record shows Mr. Echols filed lengthy budget requests describing the specific needs of the defense and, most, but not all the time, describing with particularity the experts he sought to hire and the work they would perform. (Docs. 50, 51.) Mr. Echols also sent Judge Payne a six page single-spaced letter detailing the amounts he and others were paid for Mr. Barrett's defense in state court, and what matters were not completely investigated there.

Judge Payne did not hold Mr. Hilfiger to the same standards as Mr. Echols. During the trial the court became concerned that Mr. Hilfiger and Mr. Smith would exceed the budget authorized on March 18, 2005. (Tr. 10/3/05 Hr'g.) In that event, Judge Payne said, "I think the safest thing to do maybe on the attorney's fees for October would be for y'all to analyze

that and get me an amended budget just to -- I mean, just make your best guestimate." (Tr. 10/3/05 Hr'g at 8.)

In his letter to Mr. Echols, Judge Payne expressed his concern that Mr. Echols not be unduly compensated for work if his prior representation of Mr. Barrett made further labors unnecessary. The court had limited Mr. Echols's rate of compensation to $125.00 per hour. On May 17, 2005, the day Mr. Hilfiger was made lead counsel, Judge Payne raised his compensation rate to $150.00 per hour. (Tr. 10/3/05 Hr'g at 3.)

The concerns Mr. Echols expressed in his motion to withdraw about the lack of work Mr. Hilfiger committed to the case proved to be well-founded, although the court was again unconcerned. On May 23, 2005, Mr. Barrett filed a motion seeking appointment of new counsel based, in part, on the assertion that the case loads of appointed counsel interfered with their ability to devote sufficient time to his defense. (Doc. 135.) Mr. Barrett's counsel did not file a response to the motion. There was no hearing on the motion.

On May 24, 2005, the court denied Mr. Barrett's motion to replace counsel. (Doc. 137.) The denial was based in part on the "finding" that "[c]ounsel has a copy of the first state court trial transcript . . . ." (Order filed 5/24/05 (Doc. 137) at 2 n.2.) The denial was based in part on the court's belief that appointed counsel "will have adequate time to prepare for this particular case." *Id.* at 2. Subsequent events suggest there was no basis for these two statements in the May 24 order.

On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date. (Doc. 138.) Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such

material needs to be reviewed to determine its value for defensive purposes, in this new action." (Doc. 138 at 1.) Mr. Hilfiger was not specific about when he received the materials, but the evidence indicates it was between May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion. Regardless of the specific date, the record reveals no basis for the court's statement that Hilfiger possessed the record on May 24, and shows that whatever Mr. Hilfiger "possessed" on that date, he had not reviewed it during the six months that had elapsed since his appointment in November 2004.

Mr. Hilfiger's statement about not having reviewed the records from the state-court proceedings, including discovery and transcripts, indicates that he had not made a sufficient inquiry into the facts of the case to support the position he took on the budget during the May 5, 2005, hearing. On May 17, 2005, the court directed Mr. Hilfiger to file by May 27, 2005, any supplemental budget request he deemed necessary. (Tr. 10/3/05 Hr'g at 3.) Assuming the trial court had learned on or before May 17, 2005, that Mr. Hilfiger had not become familiar with the previous litigation over the previous six months, it was unreasonable for the court to give Mr. Hilfiger only 10 days to request supplemental resources.

In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the files and records related to the case. (Doc. 50 at 4; Exhibit 64 at 1 n.1.) On March 18, 2005, the court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to complete these tasks. (Doc. 97 at 2.) In any event, it was impossible for Mr. Hilfiger to have completed these tasks between May 17 and May 27, and Mr. Hilfiger did not file an amended budget.

As noted *supra*, in January, when Mr. Echols was lead counsel, the court chastised Mr. Barrett's defense for failing to devote sufficient attention to the case that it could stay on schedule. (Doc. 31.) The court admonished counsel to give the case the "highest priority." *Ibid.* In May, when Mr. Hilfiger acknowledged that he had not reviewed the records from the prior state court proceedings, and after Mr. Echols and the lawyers' vouchers revealed the paucity of Mr. Hilfiger's work on the case, the trial court expressed no concern about Mr. Hilfiger's priorities, and simply granted the continuance. (Tr. 6/6/05 Hr'g; Doc. 142.) In September, Mr. Smith revealed that Mr. Hilfiger had not assembled the files and records related to the mitigation investigation that had been done in state court. (Tr. 9/9/05 Hr'g at 43.) Again, the court was not concerned with new counsel's priorities.

Mr. Hilfiger himself had informed Mr. Echols and the court that it would take him as second-chair 300 hours to prepare for trial, *not* including court hearings, legal research and preparation of pleadings and briefs. (Doc. 51 at 4.) On October 3, 2005, with the trial underway, Mr. Hilfiger informed the court that he had worked approximately 300 hours on the case, *including* legal research and writing and preparation for and in all court proceedings. (Tr. 10/3/05 Hr'g at 5.) Whereas the court had expressed a great deal of skepticism about Mr. Echols's requests for compensable hours, Mr. Hilfiger's statements prompted no expressions of concern.

In other respects, the record does not support the inference that Judge Payne's treatment of Mr. Echols was based either on fiscal concerns or concern for Mr. Barrett's representation. The trial court denied Mr. Echols's request for a jury consultant on the ground that, "Each of defense counsel come before this Court with combined practical experiences on in excess of sixty years in selecting criminal juries, including Mr. Hilfiger's experiences as United

States Attorney for the Eastern District of Oklahoma." (Doc. 97 at 3.) If counsel's allegedly vast experience supported their professional judgment in selecting the jury, as the court conjectured, there was no reason for the court to reject the same professionals' judgment that they required the assistance of a jury consultant.

As noted already, after he was elevated to lead counsel, Mr. Hilfiger filed no supplemental budget request. On September 9, 2005, Mr. Hilfiger informed the court that he would be relying upon a private jury consultant. (Tr. 9/9/05 Hr'g at 10.) Mr. Hilfiger casually stated, "I'll assume Angie Cole will be coming in with us the next two weeks. She's going to set [*sic*] at the counsel table with us during the selection." (*Ibid.*) The court recognized Ms. Cole's name and identified her as a jury consultant. (*Ibid.*) Despite the earlier denial of funds based on Mr. Hilfiger's particular experience, and the fact that the court was paying Mr. Hilfiger more than it had paid Mr. Echols, Judge Payne expressed no concern or objection to Mr. Hilfiger's unauthorized retention of an expert for two weeks of trial. (*Ibid.*) If Mr. Hilfiger had been able to obtain a jury consultant without funds from the court, he did not inform Mr. Echols of the fact.

In summary, Judge Payne had only reluctantly appointed John Echols to represent Mr. Barrett, and then based in significant part, at least, on the belief that Mr. Echols would be able to try the case cheaply and quickly. Judge Payne personally chose Roger Hilfiger to represent Mr. Barrett for reasons that had nothing to do with the circumstances of Mr. Barrett's case, but for the purpose of using Mr. Barrett to develop a local capital defense panel. During Mr. Echols's tenure, Judge Payne imposed requirements and restrictions on budgeting and investigation that experts concluded were unheard of in federal death penalty trials, and that intruded upon the constitutionally protected independence of counsel. At one point, Judge Payne threatened to use counsel's budget proposals as a mechanism for finding defense experts'

testimony inadmissible at trial. When Mr. Echols left the case due to these restrictions, and Mr. Hilfiger sought no additional resources, Judge Payne's conduct towards defense counsel changed. Judge Payne permitted, or through his actions encouraged, Mr. Hilfiger to show a lack of diligence and inattention to the conduct of the case including obtaining resources, investigative, and expert assistance. Under these conditions, Mr. Barrett did not receive independent, reasonably funded, reasonably prepared, representation.

The trial judge also violated Mr. Barrett's right to due process, and the Code of Judicial Conduct, by conducting *ex parte* communications with the prosecutors. During an *ex parte* hearing held September 13, 2005, the judge solicited the views of the United States Attorney regarding such matters as (a) when the trial started for purposes of 18 U.S.C. § 3432, (b) whether the defense should be entitled to a continuance based on delayed disclosure of witnesses, and (c) whether the disclosures posed a problem under Rule 404(b) of the Federal Rules of Evidence. (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 22-23.) Although the hearing was held for the purpose of disclosing information supposedly related to dangers to witnesses, the trial court solicited the prosecutor's views on these other matters which did not involve discussion of any information that could not be disclosed to the defense.

Also during the *ex parte* portion of the hearing Assistant United States Attorney Michael Littlefield revealed that he knew the identity of a witness who failed to corroborate statements by informant, Charles Sanders. (Tr. 9/13/05 Hr'g at 14, 17.)

The court's conduct during the *ex parte* portion of the September 13, 2005 proceedings, and its conduct in relation to those proceedings thereafter, violated Rule 2.9 of Canon 2 of the Code of Judicial Conduct.

After the *ex parte* portion of the hearing, and at the beginning of the hearing with defense counsel present, the court did not disclose the discussion regarding the meaning of § 3432, the discussion of the continuance, AUSA Littlefield's revelation about a witness, or the discussion of Rule 404(b). (Tr. 9/13/05 Hr'g at 25-27.) During the *ex parte* conversation, the judge revealed to the prosecutors that he had researched the § 3432 issue and found support for the proposition that the trial had started the previous day. (Tr. 9/13/05 Hr'g at 4-5.) The court permitted the prosecutor to represent, outside the presence of the defense, that the Government "and defense counsel have been operating under the inference that the trial begins on or after the 26th [of September]." *Id.* at 7.

Once defense counsel was present, the judge did not reveal the findings of his research in relation to § 3432, though they were potentially helpful to the defense. The court made no effort to confirm the prosecutor's representations, or familiarize itself with the defense attorneys' views on § 3432.

During the *ex parte* conference, the judge said the following regarding a possible continuance:

> Well, I – of course, the notice of who the witnesses are – the term ambush you are familiar with and I guess what concerns me is when these names are revealed with three days [*sic*] notice that we are going to have a request for a continuance. It would be difficult – if they are as important to the government's case as you say they may be, it looks like we are setting this case up for a long continuance.

(Tr. 9/13/05 Hr'g at 12.) Then the prosecutors conferred off the record. (At the conclusion of the *ex parte* conference the court said he would see the prosecutors "down stairs" indicating the conference occurred in chambers.) During the hearing with defense counsel present, the judge did not share his views regarding possible ambush and the defense potentially needing a long continuance.

The trial judge's statements showed the court was aware that the seven informant witnesses were very important to the Government's case. Nevertheless, during the portion of the hearing with defense counsel present, and in subsequent related proceedings on September 14, 2005, the court did not bring up the female witness who failed to corroborate confidential informant Charles "Monk" Sanders, either to ask whether the witness had been identified to the defense or to notify the defense that the court had been informed of the existence of a witness who could impeach Sanders.

The judge misrepresented the content of the *ex parte* conference to defense counsel. When the *ex parte* hearing concluded the judge and prosecutor were discussing Rule 404(b), with the court saying "there is 404(b) material obviously in the proposed motion, it appears to me." (Tr. 9/13/05 Hr'g at 22.) The prosecutor agreed "[i]t appears to be implicit." *Ibid.* Then the prosecutor offered a rationale for not "provid[ing] reasonable notice in advance of trial," (Fed. R. Evid. 404(b)), and the judge said he would "take this matter under advisement" before calling the conference to an end. *Id.* at 23.

At the beginning of the hearing with defense counsel present, the judge did not reveal these discussions. The prosecutor sought guidance from the court regarding "where we were when we stopped" the *ex parte* conference. (Tr. 9/13/05 Hr'g at 26.) The court said they had been discussing "security issues." *Ibid.* The court said, "it sounded like there had been some discussion with defense counsel. And that's about as much as the Court knows." *Ibid.* The transcript shows the court drastically understated the true scope of the *ex parte* communications. Once they were thus misstated, the prosecutor said, "I'm willing for the matter to be unsealed." *Ibid.* Mr. Barrett's trial counsel were entitled to rely upon the court's representations. The

combination of the court's omissions and the prosecutor's sudden willingness for the hearing to be unsealed suggested to defense counsel the transcript need not be requested or reviewed.[4]

During the *ex parte* portion of the hearing, the judge made statements suggesting skepticism about the Government's position. The court specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger. *Id.* at 20. The court did not inform the defense that the government had failed to produce evidence of an actual danger to its witnesses. Without disclosing the weakness of the Government's position, the court permitted defense counsel to agree (a) to further delays in learning the identities and contact information for the witnesses, and (b) to be limited in its access to Government witnesses to the extent that they would only be interviewed in the presence of Government representatives. (*Id.* at 27.)

The court had another opportunity to inform defense counsel of what transpired during the September 13 *ex parte* hearing. On September 14, 2005, after jury selection proceedings ended, the court raised the issue of the unidentified witnesses. The United States Attorney informed the court that the Government and Mr. Barrett's counsel had reached an agreement that the witnesses' names, contact information, criminal histories and (allegedly) promises made to them would be revealed the following Monday. (R. 840.) The United States Attorney further advised the court that the defense would, possibly, have access to some of the witnesses at the prosecutor's office. (R. 841.) Mr. Hilfiger stated that he had no objection to the arrangement, "based on what we talked about yesterday." *Ibid.* The court then stated that this

---

[4] Of course, whether it was unsealed during the trial was irrelevant insofar as Judge Payne had denied counsel any funds for obtaining pretrial hearing transcripts. (Doc. 97.)

would make a "clear record" and the parties' "announcement . . . resolves everything that is under seal." (R. 843.)

As shown in Claim 2, Parts A.4 and A.5, trial counsel acted unreasonably by failing to object to the delayed disclosures, by failing to seek a reasonable continuance, and by failing to investigate the seven informant witnesses. Evidence available at the time would have provided extensive grounds for impeachment and cross-examination.

It is a violation of due process for the Government to attempt to restrict defense access to witnesses, for example, by telling the witnesses they should only agree to defense interviews if the Government is present. *See Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969). It is unprofessional conduct for a prosecutor to condition a witness's interview with defense counsel on the prosecutor being present. (ABA Standard 3-3.1(c) (commentary)). The trial court permitted defense counsel for Mr. Barrett to agree to such restrictions (Tr. 9/13/05 Hr'g at 27; R. 841-42), without revealing to the defense the weaknesses in the Government's motion for a protective order that the court had freely discussed with the prosecutors.

The trial judge's withholding of his views about a continuance was particularly prejudicial. Mr. Hilfiger has consistently and repeatedly stated that he agreed to the delays and other restrictions on his access to information about the witnesses because he believed Judge Payne would not grant a continuance of the trial. (Exhibit 29.) Judge Payne's views, as freely expressed to the prosecutors, would have given Mr. Hilfiger a completely different view of the situation. If Judge Payne had revealed his research regarding § 3432, the issue would not have been reviewed for plain error on appeal. If Judge Payne had revealed his views on a continuance, Mr. Hilfiger likely would have requested one, and again the matter would have been reviewed

differently on appeal.  If Judge Payne had revealed his views on the weakness of the Government's motion for a protective order, Mr. Hilfiger would have had further grounds for a continuance and grounds for objecting to restrictions the Government placed on access to witnesses.  Mr. Hilfiger also would have had grounds for a continuance if Judge Payne had revealed that Mr. Littlefield knew the identity of an impeachment witness who had not been disclosed in discovery, as the court's earlier orders required.

The trial judge's conduct in soliciting *ex parte* the prosecutor's views on the court's private concerns while at the same time failing to accurately disclose those communications to the defense violated Mr. Barrett's right to due process of law.  The disparate conduct of the court between the prosecution and defense is evidence of bias.  In a capital case, courts may not consider information the defense has no opportunity to hear or explain.

For the foregoing reasons, the trial judge should recuse himself from this case. Thereafter, this Court should grant the relief sought herein.

To the extent the matters raised in this Claim could have been raised on direct appeal, appellate counsel were ineffective.  As stated *supra*, Judge Payne specifically selected Mr. Hilfiger for this case, and Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter.  Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal.  To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in this Claim could not be adequately litigated on appeal, because they required consideration of extra-record evidence.  (Exhibit 29.)  To the extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's

failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.  (ABA Guidelines, *supra*, Guideline 10.15.1.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal.  (Exhibit 29.)  However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal.  *Id.* Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards.  At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised herein had been raised on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 2.** **Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

This claim is governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny.  The acts and omissions described herein fell below prevailing professional norms of capital defense practice.  Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Barrett would not have been convicted of the charged offenses, or that he would have received a sentence less than death.

# Exhibit N

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,              )
       Plaintiff,              )
                          )
VS.                        )      NO. CR-04-115-P
                          )
KENNETH EUGENE BARRETT,              )
      Defendant.              )

\*      \*      \*

TRANSCRIPT OF HEARING ON GOVERNMENT'S MOTION
FOR ORDER DELAYING THE PRODUCTION OF WITNESS
NAMES AND REQUEST FOR PROTECTIVE ORDER

BEFORE THE HONORABLE JAMES H. PAYNE
UNITED STATES DISTRICT JUDGE

SEPTEMBER 13, 2005

VOLUME I OF II
\*      \*      \*

**A P P E A R A N C E S:**

FOR THE PLAINTIFF:      MR. SHELDON J. SPERLING
                            United States Attorney
                            MR. D. MICHAEL LITTLEFIELD
                            Assistant United States Attorney
                            1200 West Okmulgee Street
                            Muskogee, Oklahoma 74401

COURT REPORTER:       KARLA S. McWHORTER
                            UNITED STATES COURT REPORTER
                            P. O. Box 2251
                            Muskogee, Oklahoma 74402

KEB100589

<u>COURT IN SESSION</u>

THE COURT: This is case number CR-04-115, U.S.A. versus Kenneth Eugene Barrett. This matter comes on for the government's motion for order delaying the production of witness names and request for protective order.

This hearing is sealed pursuant to the request, government's request.

Appearances for the government, for the record, please.

MR. SPERLING: Shelly Sperling and Mike Littlefield, Your Honor.

THE COURT: I set this matter rather quickly. I was not fully aware of the government's motion, the content of the government's motion until late yesterday after we finished the day of jury selection or the death penalty qualification phase of the jury selection is probably a more accurate way to define it, in case number CR-04-115.

On reflection last evening and after some research, the Court has some concerns that I thought should be dealt with as soon as reasonably possible to perhaps -- and perhaps the government can address concerns that the Court has.

Since we are -- since we are where we are, I'll not

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

dwell on it. I am curious, but I don't want a long lengthy answer because of the time restraints that we have this morning, as to why this motion was not filed much, much earlier. We have had at least two, maybe three pretrials. Every time the Court has inquired about the status of discovery, I have been told it's moving along fine without problem. This issue is a -- my research suggests it is of utmost importance for several reasons. One, as pointed out by the government's motion, they are concerned about the safety of potential witnesses. So that we don't waste time -- and I have read the motions and I think it's important that the government understand that the anonymous jury selection process that the Court is going through does not support necessarily the action that the government suggests. The government suggests in the brief that the Court has determined that there is a danger -- that perhaps the defendant is dangerous and suggests that that is support for this motion. So you understand, my primary concern with the anonymous jury was one that has to do with publicity. I was concerned about the public being aware of who the jurors were and because this case has in the past gotten some attention in the press, that that was an effort on the part of the Court to perhaps protect those jurors from the public contacting them. I had no direct information that they

KEB100591

would necessarily be in any danger. The reference to the stun belt was a request on the part of the Marshal and a hearing was conducted earlier on the security issues that were raised by the Marshal. I had no further information that the defendant had a degree of dangerousness outside of the courthouse and outside of the transportation issues, not that the stun belt assists with transportation, but once in the building the Marshal made that request and we had that hearing, that you are aware of. As far as there being -- as far as the government drawing from those two orders on the part of the Court, that is dealing with the anonymous jury and the stun belt use by the Marshal with the defendant in transferring him to and from the holding cell on the first floor to the courtroom -- those in my mind are not connected to the government's motion, the motion that is before the Court now.

This motion was filed very late on Friday and came to my attention just minutes before we started the hearing yesterday. Of course, I think it is -- I have digested it now and I -- and I am concerned. The first thing I'm interested in the government addressing is when does the trial start. What is the -- did we start the trial yesterday? Does the trial start on the 26th? That's the reason I'm here. My research suggests there is a

KEB100592

possibility the trial started yesterday. I am further concerned -- and I'll allow the government to speak to this. The way the record appears to me is the government has filed a list of witnesses on Friday, I assumed complying with the three day requirement indicating that the government thinks perhaps the trial started yesterday.

Now, if I am overly concerned about something the government has a clear cut answer for, I'll be relieved. I'm concerned, at the very least. about the government's requirements to put on a preponderance of the evidence to demonstrate the concerns outlined in the motion for order delaying the production of witness names. I would advise the government that it's -- the Court has some concerns as to why this did not happen at a time when it could have been addressed more leisurely and comfortably. We are now here a few minutes before nine with the jurors coming in with only a few minutes to address this issue. So, I'm interested, first, in knowing from the government when does the trial start. I'm not so interested in excuses why it hasn't been done before, although that troubles me that we couldn't -- because if we had only had one pretrial, I would understand it, but I have had status conferences and pretrials. You could have filed this under seal weeks ago. As I say, I'm -- I don't want to waste time about what we could have done.

KEB100593

I want to address where you think we are now and what evidence you have to support the delay in producing the names of these witnesses.

MR. SPERLING: Judge, the defense has been made aware of the existence of civilian witnesses in a number of ways. Mike Littlefield has so informed them in a timely manner. We have also told them in two ways. One is we gave them a witness list and that witness list had these names deleted from the witness list. I also told Bret Smith last week that we were going to delete these and seek a request of the Court that they be maintained or remained sealed until a reasonable period of time before their actual testimony when the trial began. So it's not as if we have sneaked this up on them.

I appreciate the Court's concern that this matter could have been -- perhaps could have been raised earlier, but it was raised, I believe, in a timely manner, first by motion and then by notice to defense counsel to tell them of the existence of this circumstance. In fact, I told them actually the bases for it and I said we don't want -- in substance we don't want to find bodies. We have cause for concern. I also candidly told defense counsel at the same time that I would understand that they would want to be able to run the witnesses by their client to ask what their client knows about them. That's the

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

reason that we both provided them a witness list as is required by statute and then provided this information to the Court and informed defense counsel of what we were doing at the same time. I say this not by way of a solution, but the Court may be aware that we had a computer crash that began, I believe, mid-week last week. That doesn't explain the time prior to that, if we should have done it prior to that time, but our computers have been down. In fact, we are not back up fully.

THE COURT: What my concern is, is that -- and I -- you know, it's a little reassuring that there has been some discussion with defense counsel about the general subject. However, my concern is just -- I'll be upfront with you. My concern is if you are -- I don't know what evidence you intend to bring to the Court to show the preponderance of the evidence. If you fail and the trial started yesterday, there could be a problem with those witnesses. Now, that's not my concern, it's just one of the possiblities that puts the matter in a time frame that causes me a great deal of concern.

MR. SPERLING: We and defense counsel have been operating under the inference that the trial begins on or after the 26th. In our discussion with them, in our discussions about the witness list and doing -- in fact, that was one of the things that I brought out, is that

KEB100595

we are, in an abundance of caution, going to bring this up to the Court now so that it can be treated before the trial begins on the 26th. I know that trial is used variously.

THE COURT: Well, you understand my curiosity about that is you produced the witnesses three days before -- as far as I'm concerned, at least -- it's either a coincidence or you had some concern about Monday being the trial day.

MR. SPERLING: Well, we did it in an abundance of caution and that's why we presented it to the Court as well. I believe that we are in compliance with the statute. I believe -- we have also been operating, Your Honor, under the assumption that the trial doesn't begin until the jury is actually sworn.

THE COURT: Well, that --

MR. SPERLING: Although proceedings are beginning -- and I know that there is terminology, even in the Court's instructions perhaps that could --

THE COURT: There is even a little case law out there that is --

MR. SPERLING: Yes.

THE COURT: -- perhaps you are acquainted with that, which causes me some concern.

Okay. You may proceed.

KEB100596

MR. SPERLING: But in any event, we presented both the witness lists, as well as the witnesses that we wished delayed in a timely manner. Now, it may not be as timely and -- and I can't say that this could not have been done in some respects earlier. I must admit that some of the witnesses were relatively late breaking and, in fact, have been the product of a very recent interview by counsel, but at the same time I think that we are in compliance by virtue of having filed the list, having informed defense counsel, having given the Court the remaining items and --

THE COURT: You have informed defense counsel orally?

MR. SPERLING: Yes.

MR. LITTLEFIELD: Can I address this, Judge?

THE COURT: You may.

MR. LITTLEFIELD: I have informed defense counsel of the essence of the testimony of the witnesses, not just that there are witnesses, but they have been advised that -- and a number of these people -- they are all associates of Mr. Barrett's, associates or family. A number of those individuals were, they advised, at or about Mr. Barrett's residence during the months leading up to this particular incident and they have advised and we expect them to testify that Mr. Barrett knew there

KEB100597

was an arrest warrant outstanding, he expected law enforcement to come to his residence at some point in time and advised that -- words to the effect of I'm going to shoot when they come. And the defense has been told that that is the essence of what they are going to say.

THE COURT: Of these witnesses you are attempting to protect?

MR. LITTLEFIELD: Yes, Your Honor.

THE COURT: Well, now, you understand my concern is -- you know, I -- I have full confidence that you have done exactly what you have said you have done. However, if what -- there is no record, other than what we are making here under seal now, that this has transpired. I mean, the Court is not aware of it. What the comfort level of the defense with this process is is of great concern to me because I could foresee the term surprise being echoed through this case. Now, what you are telling me now starts to make me feel somewhat better about it, but defense counsel has an obligation to defend their client within every parameter of the law. Whether they think it's sufficient notice of what is -- of what is happening, I'm not sure.

MR. LITTLEFIELD: Mr. Smith specifically -- and, Judge, I'm an officer of the Court and I'm not going to tell Your Honor anything, you know, that hasn't existed.

FORM C-100 - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

These defense attorneys are honorable as well. I think that if the Court at some point in time asks them, have they been apprised of information regarding what we anticipate these people will say, I think they will --

THE COURT: Haven't you in effect disclosed to counsel then essentially who they are by telling them what the testimony is?

MR. LITTLEFIELD: No, no, because --

MR. SPERLING: Well, what the testimony is --

MR. LITTLEFIELD: We have told them what the testimony --

THE COURT: Once you have told them what the testimony is, if they talk with their client about it, isn't he going to be able to determine roughly who we are talking about?

MR. LITTLEFIELD: I don't believe so.

MR. SPERLING: Mike, hold on. Excuse me just a second.

(OFF THE RECORD DISCUSSION BETWEEN

MR. SPERLING AND MR. LITTLEFIELD)

MR. LITTLEFIELD: If -- Your Honor asks about does that notice them, the defense, as to who it is and my response would be yes and no. Yes, because the defense could go back through his recollection of who he might have said that to and have an access to the names. No,

KEB100599

because it is my belief that the defendant said that to many, many more people than those that we have found. I have learned of one person, for example, who -- through witnesses, who would have been a participant in a conversation with Mr. Barrett in which statements of this nature would have been made. I talked to that person. That person refused to acknowledge it, I think in large measure because of the fear.

THE COURT: Well, I -- of course, the notice of who the witnesses are -- the term ambush you are familiar with and I guess what concerns me is when these names are revealed with three days notice that we are going to have a request for a continuance. It would be difficult -- if they are as important to the government's case as you say they may be, it looks like we are setting this case up for a long continuance.

(PAUSE)

(OFF THE RECORD DISCUSSION BETWEEN

MR. SPERLING AND MR. LITTLEFIELD)

MR. SPERLING: What we propose, particularly with regard to Witness Turman, Your Honor, we have grave concerns about him and --

THE COURT: About who?

MR. SPERLING: Witness Turman, who has been identified, I believe, in our pleadings. What we propose

KEB100600

-- and I'm not trying to parlay as the primary support for this motion the notion that there has been a stun belt or that the Court has exercised caution with regard to juror identification. I stated those because I think they are relevant features of this case and I think that if -- from our perspective, although perhaps not from the Court's, they are concerns which support those items and also support the principle that we are advancing in this cause.

THE COURT: I would simply say that, you know, probably any capital case where I was the presiding judge a stun belt would be used just because of the nature of the potential punishment. It just seems that it's a common -- almost a common sense call under those circumstances. That's what I wanted to convey to you this morning. So what I'm interested in hearing is what is the support for the -- what evidence am I going to be furnished to demonstrate that these people are in danger?

MR. SPERLING: I think that our brief with regard to the defendant being reasonably believed to be dangerous, that if convicted he faces substantial sentences, that there may well be media coverage...I need not belabor that. I want to focus on, C, exactly why the Court should delay the production of certain witnesses in this case. We have identified each of these witnesses,

KEB100601

Your Honor. Two of them are in prison; one in federal, one in state. Others live in and around Sequoyah County, which is the home county of the defendant. It is -- there is common knowledge, Your Honor, that guns and drugs go hand in hand and particularly in Sequoyah County, methamphetamine distributors are often armed. The defendant is a hero to certain drug traffickers, as at Doss Gann's residence. He was a federal defendant and was prosecuted here. In fact, Mr. Littlefield was the prosecutor in that case and Doss had a picture of the defendant on the wall with the inscription hero after the time of this incident, this shooting. Randy Turman and Brandie Price have explicitly expressed concern about intimidation, threats, and safety of family members. The confidential informant that has been identified in our pleading, Your Honor, stated such. He was at the house of defendant's associate and overheard the defendant speaking on the phone saying we have got to find out who the C.I. is and take care of him. Mr. Littlefield has spoken directly with that confidential informant, who is identified in our pleading by name.

THE COURT: What is the time frame of that?

MR. LITTLEFIELD: It was after the arrest, while Mr. Barrett was -- and I don't know --

THE COURT: In '99?

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

MR. LITTLEFIELD: It would have been in the time frame of '99, early 2000 is my best guess. I didn't ask specifically because I -- but the informant was at someone's residence, a phone call was made, the informant was next to the person who was the recipient of the phone call, recognized Mr. Barrett's voice over the telephone and heard Mr. Barrett tell this associate that we need to find out who the confidential informant is and take care of him.

THE COURT: Okay. You may proceed.

MR. SPERLING: All right. I think the pleading speaks for itself with regard to Cindy Crawford and Randy Turman, but we would point out in particular that Randy Turman has explicitly stated to counsel that he seriously fears Jerry Graham, who is a very dangerous man, recently released from prison and believed involved in Sequoyah County drug activity. This is according to District Attorney Investigator Clint Johnson. Jerry Graham is a neighbor of Randy Turman's and several law enforcement officers, as we noted in our pleading, who are familiar with Jerry Graham advised that he is believed to have killed in the past.

There is another matter, another man by the name of Randy Weaver. We have set forth the substance of what we expect that he will testify to. Brandie Price is also an

FORM C-100 - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

defendant's arrest, the informant was at the residence of a female associate of Barrett's when Barrett called and that's when Barrett advised the female that they needed to identify the informant and, quote, "take care of him," end quote.

There is also Travis Crawford and Travis Crawford is -- you know, this statement about taking care of someone -- I mean, I must admit that sometimes perception is reality and the Court needs to deal with reality rather than someone's unreal fears, but I don't believe in the context of this case that these concerns are unrealistic. Travis Crawford was in Kenneth Barrett's yard on the afternoon of the charged murder when there was an apparent drive-by by an unmarked police vehicle. Travis Crawford apparently was told by the defendant that the defendant recognized the Bronco as a cop car, expressed that he didn't give an explicitive, that the law was coming in, and said that he was going to go out in a blaze of glory. As we have --

THE COURT: When did that witness testify?

MR. LITTLEFIELD: He has not yet testified. Part of our concern too here is, Your Honor, these are not witnesses that have previously testified in state court. So does the defendant have some idea as to whom he interacted with at or about that time? Yes. Does he

know about these specific people by name? No.

THE COURT: I was curious about -- you said that witness said that he could testify that the defendant said something about a cop car?

MR. SPERLING: On the day --

THE COURT: Before it happened?

MR. SPERLING: Yes, before it happened. Well, the day prior to the midnight event or so. So, this is within a relative few hours that -- apparently there was a drive-by by an unmarked Bronco. It was Buddy Hamilton.

THE COURT: I understand.

MR. SPERLING: And the defendant saw it, made it as a cop car, said the law was coming in, said he didn't give an explicitive, and said he was going to go out in a blaze of glory. Part of the problem there is this guy, as well as Cindy Crawford -- Travis Crawford is Kenneth Barrett's cousin. It would take minimal effort for him to establish contact with and intimidate that witness through any number of family members. It's for those reasons, essentially, Your Honor, that when we put together the collection of information, we have a cause for concern about these witnesses and our proposal was to turn them over to the defense, if the Court should so permit -- well, a time -- in a time frame reasonably close to when they would testify sufficient to make inquiry, but at the

KEB100606

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,                )
          Plaintiff,                    )
                               )
vs.                                      )          NO. CR-04-115-P
                               )
KENNETH EUGENE BARRETT,                  )
          Defendant.                    )

\*     \*     \*

TRANSCRIPT OF HEARING ON GOVERNMENT'S MOTION
FOR ORDER DELAYING THE PRODUCTION OF WITNESS
NAMES AND REQUEST FOR PROTECTIVE ORDER

BEFORE THE HONORABLE JAMES H. PAYNE
UNITED STATES DISTRICT JUDGE

SEPTEMBER 13, 2005

VOLUME II OF II

\*     \*     \*

A P P E A R A N C E S:

FOR THE PLAINTIFF:          MR. SHELDON J. SPERLING
                         United States Attorney
                         MR. D. MICHAEL LITTLEFIELD
                         Assistant United States Attorney
                         1200 West Okmulgee Street
                         Muskogee, Oklahoma 74401

FOR THE DEFENDANT:          MR. ROGER HILFIGER
                         Attorney at Law
                         620 West Broadway
                         Muskogee, Oklahoma 74401

                         MR. BRET A. SMITH
                         Attorney at Law
                         315 North 5th Street
                         Muskogee, Oklahoma 74401

COURT REPORTER:             KARLA S. McWHORTER
                         UNITED STATES COURT REPORTER
                         P. O. Box 2251
                         Muskogee, Oklahoma 74402

FORM C-100 · LASER REPORTERS PAPER & MFG. CO.   800-626-6313

KEB100612

<u>COURT IN SESSION</u>

THE COURT: Let the record reflect the Court is in session again in U.S.A. versus Kenneth Eugene Barrett, CR-04-115. The record should reflect that the defendant is present with counsel and the Government's counsel is present.

It came to the Court -- this Court's attention Monday morning, just before the Court started the hearing on selection of jurors, or doing what we refer to as the death penalty qualification, that the Government had filed a motion requesting that their motion be filed under seal. I looked at the motion and granted the motion, the motion to file under seal, and later in the day, started examining the actual motion, and then into the evening yesterday, examining it, and decided, after looking at it, that it was necessary to set the matter for a sealed hearing first thing this morning, at which time the U.S. Attorney appeared and made a presentation on what was entitled <u>Government's Motion for Order Delaying the Production of Witness'</u> Names. That hearing was concluded. Then, as we started to begin the hearing for qualification of death qualified jurors, it was my understanding the U.S. Attorney desired to make an announcement, and at that point, I stopped the proceeding because I was concerned about the sealed issue.

And, so, I want to make inquiry of the Government at this time, if you desire to proceed with this matter in the presence of defense counsel, and do you desire that this matter continue to be sealed?

MR. SPERLING: I think we can proceed with defense counsel. I think where we were at -- and I'm doing my best, Your Honor, to recall where we were when we stopped -- when I -- I'm not sure exactly what thought I was --

THE COURT: I'll tell you where I was, is I was -- because of the nature of the pleading, I was concerned about security issues. And, so, that's why I thought it appropriate to stop and wait to hold this hearing at a time when we had more time to think about it. And the nature of the announcement you were about to make, it sounded like there had been some discussion with defense counsel. And that's about as much as the Court knows.

MR. SPERLING: Okay. I'm willing for the matter to be unsealed. And here is where we are, Your Honor. I would really like to give this some additional thought, because we want to expeditiously identify the witnesses to defense counsel. We have attendant causes for concern. And, you know, I'm just thinking a bit aloud now, but I would want the Court's standard admonition with regard to

FORM C-100 · LASER REPORTERS PAPER & MFG. CO. 800-626-6313

contacting witnesses. We are working in the direction of either making the witnesses available in our office, or providing information such that the investigator for the defense can contact them and locate them. I'd really like to give this some thought this evening, before we come up with an explicit plan, but I think in one way or another, we're prepared, in the very near future, to do one of those two things.

THE COURT: From the defense?

MR. HILFIGER: Well, I don't have much more to say about -- I mean, we have talked about it, and they've made some offer, and I think that that's a workable solution. Jumping into another matter, though -- because what we were talking about is, like, sometime next week, maybe having them made available, knowing that, you know, we still have this death penalty qualification going on. But we sort of discussed and asked -- you know, sort of inquiring of the Court, is it your intention to go through everybody, or are you going to -- or is it your attention, when you reach a certain number that you think are death qualified jurors, that we stop at that point?

THE COURT: Well, the only -- I haven't, of course, made a final decision. I would say, just to give you some indication, I think we've made very good progress these first two days. If we continue to make that kind of

KEB100615

progress, I would, of course, inquire of both the Government and the defense, I think that if these numbers continue to add, like they have these two days, the next two or three days, I would think by the end of this week, at the latest, we would have enough jurors and we would stop -- hopefully by Friday, we would have enough. Now, as you know -- as you both know, it may blow up in our face tomorrow and we don't qualify any.

MR. SPERLING: I wouldn't want to jinx it, Judge.

MR. HILFIGER: I can see --

THE COURT: But I'm not going to -- you know, I haven't really put a -- what's the magic number? I'm thinking if we get, you know, 75 or 80, we're close.

MR. HILFIGER: And I wasn't trying to tie you to a number, but sort of our thinking was that possibly this death qualification wouldn't be going all next week.

THE COURT: No. No. I haven't -- I have three -- hopefully three extra days in there, if necessary.

MR. HILFIGER: And that's sort of what we are thinking, those extra days, that that might be the time available if we could visit with these witnesses.

THE COURT: Well, that's -- I mean, the purpose of this hearing today was to clarify those issues. If

KEB100616

there's been discussion between the Government and the defendant, that you're making headway, and the defense has, perhaps, concerns -- no concerns, then I don't have any problem with that. I just wanted --

MR. HILFIGER: Yeah.

THE COURT: -- I wanted to get this issue -- when the U.S. Attorney mentioned it, you understand I'd ordered this matter sealed. And apparently what I heard was there was a discussion going on that the U.S. Attorney no longer had an interest in the matter being sealed, and I think that's where we are. It's unsealed now.

MR. HILFIGER: I don't think he has a problem with the matter being unsealed, but the names, at this particular time, are -- you know, his concern is that they are still in their own knowledge. You know, we don't know the names.

THE COURT: And I guess that's the issue -- I assume for you the issue is when -- how quickly are we going to get the names, is of importance to you, and I think Mr. Sperling is saying he wants to think about it tonight and perhaps he'll have an answer tomorrow.

MR. HILFIGER: That's why I was inquiring about what I had -- or what we had talked to the U.S. Attorney about was we didn't want to have these names after we start the trial, two or three days into the trial --

KEB100617

THE COURT: I do not --

MR. HILFIGER: -- and we get these names, and we have to go out and try to find them.

THE COURT: No. I want to avoid that at all possible cost, because I understand the dilemma the defense could have with having time to interview as the trial is moving forward.

MR. SPERLING: I think we can reach a reasonable accommodation, and give us the --

THE COURT: What I'd like to know, in the very near future, like, if at all possible by close of business, to know from the Government and the defense that this issue is resolved. That is, that you have a -- that the defense feels comfortable with the disclosure and time, and I don't want that -- I don't want this to be a -- if there is an issue, I want to have a hearing and get it presented and move on. I don't want it to be something that pops up after we have this jury selected.

MR. HILFIGER: Right.

THE COURT: So, I'm going to say -- I will ask for a report at the close of business tomorrow, to give the Government a chance to think about it. But at that time, if it's not resolved, then we'll need to set this for a hearing and deal with it.

MR. HILFIGER: Okay. That's fine, Judge.

KEB100618

MR. SPERLING:  Thank you, Your Honor.

(END OF PROCEEDINGS)

"I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter."

_____
KARLA S. McWHORTER

_____
DATE

KARLA S. McWHORTER
OKLAHOMA CERTIFIED SHORTHAND REPORTER
CERTIFICATE NO. 00981
EXPIRES DECEMBER 31, 2006

KEB100619

# Exhibit R

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,    )
    )
        *Movant,*    )
    )
v.    )    **Case No. 6:09-cv-00105-JHP**
    )
UNITED STATES OF AMERICA,    )
    )
        *Respondent.*  )

---

## EXHIBIT 67

## TO KENNETH EUGENE BARRETT'S

## AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

# DECLARATION OF JULIA O'CONNELL

I, Julia O'Connell, declare the following:

I am currently the Federal Defender for the Northern and Eastern Districts of Oklahoma. I am licensed to practice law in the State of Oklahoma, the various federal district courts in Oklahoma, and the United States Court of Appeals for the Tenth Circuit.

I am familiar with issues surrounding the appointment of counsel for Kenneth Eugene Barrett in his federal capital trial in the Eastern District of Oklahoma. At the time Mr. Barrett was charged, I was an Assistant Federal Defender. Paul Brunton was the Federal Defender for the Northern and Eastern Districts. When Mr. Barrett was initially charged, we received notice that the Court intended to appoint our office to represent him. Mr. Brunton and I met with Judge Payne regarding Mr. Barrett's representation, because we did not feel our office could effectively represent Mr. Barrett, due to the fact that our office was very small and we were already appointed in another death penalty case that we were preparing for trial. *United States v. Edward Leon Fields,* No. CR-03-73-RAW. The *Fields* case was taxing our office resources and I was the only trial lawyer in the office with death penalty trial experience. We explained to Judge Payne that we did not feel it was feasible for our office to effectively represent Mr. Barrett because I was already representing Mr. Fields in his pending capital case.

Mr. Brunton and I asked that John Echols— who represented Mr. Barrett throughout his state court prosecution and had already effectively tried the case (twice)—

1

and Rob Nigh of Tulsa-- who had federal death penalty experience in the Timothy

McVeigh case-- be appointed to represent Mr. Barrett. Both Mr. Echols and Mr. Nigh are

highly qualified capital attorneys. Based on discussions Mr. Brunton and I had with these

two lawyers, we knew they were willing to represent Mr. Barrett. We asked Mr. Echols

and Mr. Nigh if they would accept appointment in the Barrett case because we knew that

the government would likely seek the death penalty against Mr. Barrett, and we knew our

office could not accept the case because of the other pending capital case. Thus, we

wanted to get commitments from well-qualified lawyers who were willing to be

appointed for Barrett's federal capital trial, so that we could assist the Court by

recommending attorneys we felt the judge could rely on to try the case effectively as an

alternative to the Federal Public Defender.

Judge Payne initially indicated that he wanted our office appointed, but Mr.

Brunton told him that I was the only attorney in the office with capital trial experience

and that I could not effectively handle two capital trials scheduled so closely to one

another. This led to a discussion of the statutory requirement to appoint "learned

counsel" as first chair. Judge Payne or his staff had evidently researched the issue, and

the Judge explained that he felt "learned counsel" was not defined in the materials he had

reviewed. Judge Payne further explained that it seemed that the federal death penalty

cases that were being filed in Oklahoma were being prosecuted in the Eastern District,

and he expressed the idea that if counsel from the Eastern District were appointed, that

2

lawyer or lawyers could then take other death penalty cases filed in the Eastern District in the future.

My recollection is that Judge Payne did not appoint Mr. Nigh to represent Mr. Barrett. Instead, he appointed John Echols and Roger Hilfiger, the former United States Attorney for the Eastern District, as Mr. Barrett's lawyers. Mr. Echols eventually withdrew from the case. Judge Payne elevated Roger Hilfiger to first chair and appointed Bret Smith second chair. To my knowledge, Mr. Smith had no capital experience.

On June 21, 2005, I forwarded copies of orders the district court had issued in *United States v. Fell,* No. 2:01-CR-12-01 from the District of Vermont regarding fact-specific voir dire in capital cases to Mr. Hilfiger. I sent these orders to him hoping it would impress upon him the importance of mitigation in a capital case, because I suspected that the Barrett trial attorneys were not fully versed on how to investigate and utilize mitigation evidence. At the time I sent the e-mail, neither of the Barrett attorneys had consulted with me regarding the case.

Mr. Hilfiger called my office on June 30, 2005. I was away from the office , so he left me a voice message, asking if my mitigation specialist was going to be in Muskogee in the future and whether she would be willing to meet with him to discuss mitigation. Although I do not remember the exact wording of his message, I remember that it alarmed me. I got the distinct impression that Mr. Hilfiger did not know what was expected from a defense lawyer during the punishment phase of a federal capital trial.

3

The message led me to believe Mr. Hilfiger thought "mitigation" merely entailed a short meeting with my mitigation specialist (who was in no way involved in or familiar with his client's case) within a few weeks of commencement of trial. I suspected that Mr. Hilfiger did not understand the nature, value or extent of adequate, effective death penalty mitigation. I was taken aback by Mr. Hilfiger's inquiry, because Mr. Barrett's trial was imminent, and there was not sufficient time to do an adequate mitigation investigation. At a minimum, in my opinion, it would take a mitigation investigator or investigators at least six months to conduct an adequate penalty phase investigation.

I responded by e-mail on July 3, 2005, when I returned to the office and received his message. My e-mails to Mr. Hilfiger are attached to this declaration. In my July 3 e-mail response to Mr. Hilfiger, I gave him contact information for Dick Burr, one of the federal capital resource attorneys. I gave him Mr. Burr's contact information because I knew Mr. Burr to be an extremely competent lawyer in the area of death penalty cases, and knew that he was willing to help every lawyer who sought his assistance. I do not know whether Mr. Hilfiger ever contacted Mr. Burr or any other capital resource counsel regarding a mitigation specialist. In any event, as mentioned above, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second stage investigation if it hadn't been substantially completed on June 30, even if Mr. Hilfiger had been able to secure the services of a mitigation investigator or investigators at that late date.

4

I declare under penalty of perjury that the foregoing declaration is true and correct.

Executed by me this _28_ day of _February_ , 2009, in _Tulsa_ County, Oklahoma.

_Julia L. O'Connell_
Julia O'Connell

# Exhibit S

KENNETH EUGENE BARRETT, )
)
         *Movant,* )
)
v. )        **Case No. 6:09-cv-00105-JHP**
)
UNITED STATES OF AMERICA, )
)
        *Respondent.* )

**EXHIBIT 34**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

**DECLARATION OF JOHN DAVID ECHOLS**

I, John David Echols, declare the following:

I am an attorney licensed to practice in the State of Oklahoma and the various federal district courts in Oklahoma, including the Eastern District. I am also admitted to practice in the United States Supreme Court and the United States Court of Appeals for the Tenth Circuit. I am currently a trial attorney with the Oklahoma Indigent Defense System, Capital Trial Division, Sapulpa office.

I represented Kenneth Eugene Barrett in his two state court trials for the shooting death of Oklahoma Highway Patrol trooper Rocky Eales. Lawyer Jeffrey Standing Bear was second chair counsel in Mr. Barrett's first state trial. Attorney Jack Gordon was second chair counsel in Mr. Barrett's second state trial. During the time of Kenny Barrett's state trials, I was assisted by OIDS investigators Steve Leedy, Jack Stringer, and Lisa Cooper. We also had the assistance of a mitigation investigator, Roseann Schaye, who did preliminary investigative work for a second stage case. Ms. Schaye's work was suspended prior to the first state trial.

Mr. Barrett's first state trial ended in a hung jury during the guilt/innocence phase. In his second state trial, Mr. Barrett was acquitted of first degree murder and convicted of first degree manslaughter. He was also convicted of a lesser included offense, assault and battery with a dangerous weapon (ABDW). On the remaining two counts of discharging a deadly weapon with intent to kill, Mr. Barrett was acquitted. Mr. Barrett was sentenced by the jury to 20 years on the manslaughter charge, and 10 years on the ABDW charge.

1

Mr. Barrett was indicted in federal court on charges related to Trooper Eales's death the day before the statute of limitations ran on the underlying drug charges. When Mr. Barrett was indicted, Paul Brunton, the Federal Defender for the Northern and Eastern Districts of Oklahoma, called me about being lead counsel for Mr. Barrett in his federal case. The proposal, as stated to me by Mr. Brunton, was that I would be appointed lead counsel and Rob Nigh of Tulsa was to be appointed second chair. I was to handle the majority of the trial preparation, including preparation of the penalty phase defense, as well as trial work; Mr. Nigh was to assist with motions work and handle administrative matters such as budgeting requests.

Mr. Brunton met with United States District Judge James Payne about appointing Mr. Nigh and me to represent Mr. Barrett. Judge Payne agreed to appoint me, but declined to appoint Mr. Nigh. Mr. Brunton informed me that Judge Payne wanted to develop a local capital defense bar in the Eastern District, and therefore decided to appoint former Eastern District United States Attorney Roger Hilfiger as co-counsel. In it's minute order, the Court first stated that the substitution of Mr. Hilfiger was by agreement with Mr. Brunton. It is my understanding that Mr. Brunton then wrote Judge Payne, asking that the Court minute reflect Mr. Brunton's objection to the substitution of Mr. Hilfiger for Mr. Nigh. Magistrate Judge Shreder then entered an amended minute order specifying that I had been appointed at the request of the Federal Defender, an Mr. Hilfiger had been appointed at the direction of the Court.

I was familiar with Mr. Hilfiger because when he was the United States Attorney

for the Eastern District, he had handled the prosecution of a client of mine in a Savings and Loan matter.  That matter was resolved successfully for my client.  After Mr. Hilfiger was appointed as co-counsel for Mr. Barrett, I provided Mr. Hilfiger with access to a secure website, which had my state files in Mr. Barrett's case on a computer data base.  Those who access the site are identified when they visit the site.   I was able to track who visited the site, and during the time I worked on Kenny Barrett's case with Mr. Hilfiger, I saw no indication of him accessing the database containing the state files.

The first time Mr. Hilfiger and I appeared before Judge Payne on Mr. Barrett's case, Judge Payne stated that he wanted the case tried quickly and that this should be no problem, because I had handled Kenny's state case.  I explained to Judge Payne at the time that there were significant tasks that needed to be undertaken to prepare the case adequately for another trial.  For example, while the preliminary investigation begun by Roseann Schaye had identified certain evidence and avenues of investigation regarding potential mental state guilt and penalty phase defenses, significant additional investigation and expert consultation remained to be done.  Similarly, questions regarding the existence and role of a confidential informant in this case had not been resolved to my satisfaction by the conclusion of the state proceedings.  The federal authorities' decision to prosecute Mr. Barrett in a capital case therefore made it imperative for me to investigate the practices of the District 27 Drug Task Force including, but not limited to, their cultivation and reliance on purported informants or "snitch" witnesses.

As I informed Judge Payne in my motion for permission to withdraw, during the

3

time Mr. Hilfiger and I were appointed to work together, we maintained a cordial relationship. As I also informed Judge Payne, however, I felt Mr. Hilfiger was not doing work on the case that I had expected him to do, and I was left to handle virtually all the substantive tasks, as well as the all the case budgeting. I also stated my concerns about Mr. Hilfiger's lack of work to Richard Burr, who was the representative of the Federal Death Penalty Resource Counsel project assisting with the case. Although I was lead counsel, I was aware that Judge Payne had specifically selected Mr. Hilfiger for the case over Mr. Brunton's recommendation of Rob Nigh.

At the outset, Judge Payne stated that he regarded himself as the guardian of the public purse and that he would not authorize what he regarded as unnecessary expenses. During my representation of Mr. Barrett in federal court, virtually the only budgeting request Judge Payne approved without drastic cuts was for defense counsel to travel to the Justice Department in Washington, D.C. for a meeting to try to persuade the Justice Department to decline a capital prosecution of Mr. Barrett.

Over the course of my federal court representation of Mr. Barrett, I submitted approximately nine budgeting requests for experts, investigators, expenses and the like, all of which were rejected in whole or in substantial part by Judge Payne. As I informed Judge Payne at the time, the budget I submitted was based in part on my knowledge of the tasks that were not completed during the state proceedings, and in part on materials which I received from Federal Death Penalty Resource Counsel, and from my review of materials they made available on their website. These materials, and information I

4

subsequently received from Richard Burr, indicated the time I budgeted for attorneys, and the resources I sought, were in line with the time, fees, and personnel relied upon in other federal capital prosecutions.

Prior to my submitting a proposed budget of attorney hours for various categories of work Mr. Hilfiger provided me his projections of the time he would need to spend in each category. Other than giving me these projections, Mr. Hilfiger did not assist with administrative or substantive case preparation tasks. This division of labor required me to expend an inordinate amount of time on budgeting requests and administrative matters. In April 2005, the court held that I would not be compensated for any of the time I spent preparing the detailed budgets on which Judge Payne insisted. This included time spent conferring with experts regarding the needs of the defense. These conferences were necessary for two reasons. First, so that the experts could learn what the status of my knowledge of the evidence was, and second, so that I could prepare the budget requests. Mr. Hilfiger did not participate in these conferences, although I had no objection to him being involved in these aspects of preparing Mr. Barrett's defense.

I was basically not being compensated for consulting with Mr. Hilfiger on the few occasions that he was available to me, nor with Federal Death Penalty Resource Counsel. For example, payment vouchers I sent in for legal research would be cut in half. The judge believed I did not need to do much if any research on federal death penalty law because I was "learned counsel." The same was true for research I did on search and seizure issues. Simply stated, my fee requests and budgeting requests were not being

5

approved, or were being approved for far less than the time I devoted to tasks that I and Federal Death Penalty Resource Counsel believed were reasonably necessary to prepare the case for trial.

As I recall, one of my first requests concerned preparation of transcripts of the second state court trial. Judge Payne initially opposed our request based in part upon his stated opinion that we could rely upon my memory of the trial.

Based on the capital nature of the case and the involvement of drugs, I wanted to hire an investigator to complete the investigation of mental state issues and law enforcement practices. The rate I was quoted for private investigative services in the area was Fifty Dollars ($50.00) per hour. At that rate, I would have been able to engage Dale Eberle, who had formerly participated in the NDOK drug task force, and who was therefore particularly qualified to conduct the drug subculture investigation which we needed to defend the federal case. Judge Payne, however, said he would authorize a maximum of only Thirty Dollars ($30.00) per hour for such services, because that was the rate charged OIDS by an investigator who withdrew for health reasons prior to the first state court trial.

Judge Payne authorized only 100 hours of investigation. Based on the information I received from consulting with the Federal Death Penalty Resource Counsel, which I shared with Judge Payne, it was my understanding that the hours I requested constituted only 3/5 of the average hours authorized by federal courts for fact investigation in capital cases; and the requested hourly rate of $50 an hour was $15 below the low end of the

range ($65 - $85) nationally authorized for fact investigators in federal capital cases at the time.

I also sought to retain the services of jury consultant Joe Gustaferro. Mr. Gustaferro had recently assisted the attorneys in Terry Nichols' state court trial and those attorneys recommended him highly. Judge Payne, however, would not authorize any payments whatsoever for jury consultation, citing the extensive litigation experience of Mr. Hilfiger and me.

I also requested authorization for 267 hours of the services of a mitigation specialist to be compensated at a rate of $75 per hour, for a total of $20,025; and travel expenses $5,000. Judge Payne approved only 100 hours at $150 per hour, and no travel expenses. I again shared with Judge Payne the information compiled by the Federal Death Penalty Resource Counsel demonstrating that the requested hours were barely a third of those authorized in an average federal death penalty case; and that these substantially limited hours were reasonably necessary to complete the preliminary mitigation investigation that had been initiated in state court. Although Judge Payne inexplicably doubled the requested rate of compensation for the mitigation investigator, this was of no practical assistance to me because, as Judge Payne was also informed by the Federal Death Penalty Counsel, the denial of expense was completely unworkable and apparently unprecedented in federal death penalty litigation.

Judge Payne also made substantial and unworkable reductions in the amounts requested for the services of forensic experts, including a tool mark and illegal drug

analyst, and a trajectory and crime scene reconstruction expert.  Although the requested hourly rate for these experts was well within the range established by national practice at the time of compensating such qualified experts between $125 and $250 per hour, Judge Payne authorized only $100 per hour.  Judge Payne also denied most of the requests for the experts' travel and other out-of-pocket expenses.  The reduced hourly rate approved by Judge Payne and the lack of expenses again made it unworkable to obtain the services of any expert qualified to perform the requested services.

Judge Payne similarly made unworkable reductions to my request for the services of mental health experts to assess Mr. Barrett's brain dysfunction, future dangerousness and hypervigilant overreaction to perceived threats of annihilation.  My request for a total of $24,000 was well under the average authorization for a federal death penalty case at the time ($30,000) and indicated hourly rates of $125-$150 were at the low end or well below the range of hourly rates authorized by federal courts in death penalty cases for the services of a psychologist ($150-250) and psychiatrist ($250-350).  Judge Payne nevertheless approved the retention of only one mental health expert for 40 hours of work, limited compensation to a rate of $100 an hour for an expert who was a psychologist or $125 per hour for a psychiatrist, for a total of $4,000-5,000.  Based on the data assembled by the Federal Death Penalty Resource Counsel, and provided to Judge Payne, the limitation on the number of experts, hours, rate of compensation, as well as the denial of expenses, were all completely out of line with the standards of practice prevailing in federal death penalty cases, and precluded meaningful investigation of

mental health issues.

On one occasion, after I submitted the budget requests, Mr. Hilfiger called me and told me to substantially reduce the requests solely because the judge would not approve them. To my knowledge, Mr. Hilfiger's suggestion was not based on any consultation with the Federal Death Penalty Resource Counsel attorneys, or any other experienced capital litigator. Nor did Mr. Hilfiger have sufficient knowledge of the facts, training and experience as a capital lawyer to render an informed, independent opinion regarding the reasonableness of my funding request. Based on my own training and experience, as well as my consultation with attorneys at the offices of the Federal Death Penalty Resource Counsel, I knew that Mr. Hilfiger's suggestion to reduce the budget request was unreasonable. In a conference call among Judge Payne, Mr. Hilfiger and myself to discuss this matter, Mr. Hilfiger did not join me in advocating for the reasonably necessary funding.

Judge Payne also imposed onerous, exacting conditions for budget requests, which required me to set forth in minute detail a description of specific tasks and which lawyer would perform which task, when each task would be completed and the amount of hours required for each specific activity. In consultation with the Federal Death Penalty Resource Counsel, I also informed Judge Payne that the process requiring pre-authorization and circuit-level review of non-attorney services pursuant to 21 U.S.C. §§ 848(q)(9) and (10)(B) is not applicable to attorney services, and that pursuant to the Guide to Judicial Policies and Procedures, Vol. VII, "Appointment of Counsel in

Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), case budgeting should be made in light of counsel's "best preliminary estimate that can be made of all services," including services of counsel. Although the level of detailed quantification of tasks and necessary hours demanded by Judge Payne is virtually impossible to predict, Judge Payne required me to submit such detailed budget proposals in advance, including seeking authorization to do legal research. I did my best to comply with these requirements, and obtained pre-approved authorization from the court. When I submitted vouchers, however, my compensation was routinely cut significantly. I was compensated at an effective rate of approximately Sixty Dollars ($60.00) an hour.

As I stated to Judge Payne at the time, delays in the Court's approval (or rejection) of the budgets I had submitted were eating into the time available to prepare for trial. Some of the budget proposals for Mr. Barrett's defense were first raised with Magistrate Judge Shreder in early December 2004. In February, I responded to a letter from Judge Payne with a letter that in many respects repeated things Magistrate Judge Shreder elicited from me months earlier. Prior to the exchange of letters, in the hope that disputes of budgeting of attorney fees would not delay the acquisition of needed experts, I began to submit separate budget requests - one for attorney fees and a second for experts and expenses. This did not resolve either impasse.

As reflected in the then-current data compiled by the Office of Defender Services and made available to Judge Payne by the Federal Death Penalty Resource Counsel, my projection of 2,000 hours of attorney time necessary to represent Mr. Barrett effectively

10

was well *below* the range of 2,400 to 3,000 hours then being expended in death-authorized federal cases. The Federal Death Penalty Resource Counsel also was unaware of any other instance in which a federal judge routinely cut attorney hours by 50% without providing counsel an opportunity to discuss any legitimate concerns the court might have with the amount of requested compensation.

I was therefore prevented from adequately preparing the case because Judge Payne refused to authorize reasonable fees or expenses for expert and investigative assistance. Judge Payne made me disclose how much money I had earned on Mr. Barrett's state case. Judge Payne expressed on more than one occasion that because I had tried the state case and had been on the state case for years, I did not need all the help and assistance I was requesting.

I was appointed lead counsel for Mr. Barrett in the federal case in the Fall of 2004, and we were still litigating budget requests in April, 2005. As of that time, I was not aware of Mr. Hilfiger doing any investigation other than perhaps visiting the scene and taking some photographs. We still were working without experts or investigators, and my attorney fee vouchers were being cut routinely. I discussed these difficulties with Paul Brunton, and also consulted with the federal capital resource center. After extensively reviewing the matter with the Federal Death Penalty Resource Counsel, I concluded that Judge Payne's reduction of attorney's fees, estimate of the hours necessary to represent Mr. Barrett and restrictions on non-attorney funds for investigative and expert services were substantially inconsistent with the standards and practices

11

governing federal court trials in death penalty cases such as Mr. Barrett's.

Judge Payne's ongoing refusal to authorize adequate resources led me to conclude I would not be able to discharge my professional and ethical obligations to prepare Mr. Barrett's case adequately for trial. I therefore presented my concerns as the bases for a motion to allow me to withdraw as counsel, including in the motion a statement from Mr. Barrett that he wanted me to continue as his lawyer. I anticipated that Judge Payne would deny the request and that this would "force the issue" by getting a ruling that could be appealed to the Tenth Circuit. I urged Mr. Hilfiger to join the motion to withdraw in light of my professional judgment, and concurrence of the Federal Death Penalty Resource Counsel, that we were being prevented from representing Mr. Barrett effectively. Mr. Hilfiger declined to join the motion, and urged me not to file it, but he did not offer any reason to challenge my assertion that the trial preparation was being hamstrung by Judge Payne's denial of ancillary investigative and expert services.

Within a short period of time, Judge Payne granted my motion to withdraw, removed me from the case, designated Mr. Hilfiger as lead counsel, and appointed Bret Smith as second chair. In my opinion, Mr. Hilfiger was not qualified under the appropriate ABA Guidelines to act as first chair in a federal capital case. To my knowledge, Bret Smith had no capital experience.

At the time I withdrew from the case, I was unaware of Mr. Hilfiger having performed any significant work on the case, with the exception of a few pleadings, making court appearances, conducting a brief scene visit, and traveling to Washington,

D.C. for the D.O.J. meeting, as described above. At the time I withdrew, Mr. Hilfiger had not contributed significant legal research, nor had he contributed significantly to the major motions and briefs.

Everything in the federal case, during the time I was participating, was an uphill struggle with Judge Payne. Over and above the funding issues, I was required to file a motion and brief setting out the serial numbers of my computers and accessories before they could be brought into the Courthouse. I was also, from time to time, chastised by the Court for such things as titling an agreed scheduling motion as a "joint" motion, when it contained a statement that the United States Attorney endorsed and agreed with the motion, but did not bear Mr. Sperling's signature.

At the time I withdrew from the case, I advised Mr. Hilfiger that he needed to immediately undertake extensive investigation and preparation for a possible penalty phase. I explained to him that the work performed by Roseann Schaye, the mitigation investigator in the state case, was very preliminary in nature and far from complete. Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt. In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family mental illness. Based on these preliminary results, if Mr. Barrett's case had proceeded to a penalty phase in state court, I would have requested the time and funding necessary to investigate Mr. Barrett's cognitive impairments that suggested brain

13

damage, his mother's consumption of alcohol during her pregnancy with Mr. Barrett, and the presence, severity and effect of mental illness on Mr. Barrett's behavior and functioning.

Based on my experience, I knew that it was important that I had built a rapport with Mr. Barrett so that he would trust my judgment regarding the appropriateness of investigating and presenting certain evidence. I am aware that a variety of factors, including depression, a sense of hopelessness and the fear of shame and embarrassment can adversely affect a client's ability to endure the presentation of penalty phase evidence. For this reason, I and other members of the state court trial team made every reasonable effort, including regular visits with Mr. Barrett, to encourage and support his participation in preparing both the guilt and penalty phase of his trial. Mr. Barrett cooperated with all of our requests to be examined by a mental health professional, provided us with potential sources of background information and helped us to locate significant witnesses who knew the details of his upbringing. Because of the attorney-client relationship we established with him and, which in my opinion, any qualified lawyer would endeavor to establish with a capital client, Mr. Barrett did not place any restrictions on the evidence we were permitted to investigate or prepare to present in the event of a penalty phase.

As mentioned above, however, we had not completed the necessary investigation and preparation of a penalty phase presentation by the conclusion of Mr. Barrett's state trials. I therefore stressed to Mr. Hilfiger the importance of completing a mitigation

investigation so that he would be able to make informed decisions and able to advise Mr. Barrett of possible defenses.

After I withdrew from the federal case and gave Mr. Hilfiger this report on the status of the prior investigation, he never again consulted me on the legal and factual issues surrounding Mr. Barrett's case.

It was always my belief that investigator Clint Johnson and the District 27 Drug Task Force simply made up a C.I. out of whole cloth. In my opinion Charles "Monk" Sanders was not the alleged confidential informant (C.I.) used to secure the search and arrest warrants that were prepared in advance of the raid on Mr. Barrett's home. Despite our repeated efforts, including extraordinary writs to the Court of Criminal Appeals, the identity of the C.I. was not disclosed during the state trials. Prior to the second state trial, Clint Johnson was ordered by the Court to write the supposed C.I.'s name on a paper that was then placed in an envelope, sealed and placed in the state court file. It is my understanding that the envelope was opened just prior to the federal trial, and that the name of Charles "Monk" Sanders was written on the paper. In my opinion, Mr. Sanders was an informant, but that he did not actually fill the C.I.'s alleged role. In fact, Mr. Monk's federal trial testimony conflicted with the averments made in the affidavits supporting the state arrest and search warrants.

It is also my understanding that during jury selection in Mr. Barrett's federal trial, the government disclosed for the first time its intention to call informant or "snitch" witnesses to testify to certain statements Mr. Barrett purportedly made regarding his

15

intention to harm law enforcement officers. The belated disclosure of such potentially significant witnesses would have further raised my suspicions regarding the reliability and truthfulness of the proffered testimony. It is my professional judgment that no reasonably competent capital trial attorney would have permitted the government to introduce the testimony of such belatedly identified witnesses without first obtaining, or at least requesting a continuance sufficient to afford the defense full discovery – including, but not limited to any of the witnesses statements, the circumstances under which they allegedly first came to the attention of the prosecution, records of their criminal histories to include pending cases, and any consideration promised or expected in consideration for their testimony – and a reasonable opportunity to investigate the witnesses' background and substance of their alleged statements to the authorities, including the circumstances and context of Mr. Barrett's reported statements.

These matters occurred several years ago, and I have not reviewed either my files or the Court's records, relying only on my best recollection of the events. I related the information detailed herein to one of Mr. Barrett's current attorneys, David Autry, in interviews with me. Based on those interviews, this declaration was drafted for my signature. I have carefully reviewed its contents, and it reflects accurately what I told Mr. Autry.

I declare under penalty of perjury that this declaration, consisting of 17-pages, is true and correct to the best of my recollection and belief.

Executed by me this 13th day of May, 2009, in Tulsa County, Oklahoma.

/S/
John David Echols

# EXHIBIT T

**OFFICE OF THE FEDERAL DEFENDER**
**EASTERN DISTRICT OF CALIFORNIA**
**801 I STREET, 3rd FLOOR**
**SACRAMENTO, CALIFORNIA  95814**

*Daniel J. Broderick*                      (916) 498-6666  Fax: (916) 498-6656                      *Linda C. Harter*
*Federal Defender*                                                                                  *Chief Assistant Defender*

March 26, 2008


Julia O'Connell, Acting Federal Public Defender
Federal Defender, Eastern District of Oklahoma
Williams Center, Tower One, Suite 1225
One West Third Street
Tulsa, OK 74103

> *Re:*     United States v. Kenneth Barrett*, 6:04-cr-00115-JHP-SPS-1*

Dear Ms. O'Connell:

I am writing to confirm that I am willing to accept appointment as counsel for Kenneth Barrett in proceedings pursuant to 28 U.S.C. § 2255.  Daniel J. Broderick, the Federal Defender for the Eastern District of California, has authorized me to inform you that our Capital Habeas Unit is able to represent Mr. Barrett.  My qualifications for the appointment are as follows.

I am one of two supervising attorneys in the Capital Habeas Unit for the Federal Defender of the Eastern District of California.  I am a member in good standing of the Florida Bar, and I have been employed in the Capital Habeas Unit since December 2000.  Since 2003, I have been an adjunct professor at the University of the Pacific McGeorge School of Law where I teach courses on habeas corpus and legal ethics.

Prior to coming to California I was in private practice in Tallahassee, Florida. From 1999 through 2000, I was under contract with the Capital Collateral Regional Counsel for Northern Florida ("CCRC-N").  That office represented approximately 58 death-sentenced persons in state and federal post-conviction proceedings.  I was the office's litigation coordinator.

From March 1998 until May 2000, I was employed in the Law Offices of Mark E. Olive, P.A., in Tallahassee.  Our practice was almost exclusively devoted to capital habeas corpus cases, although I also have worked on a capital trial and direct appeals.  While in that office I provided both direct representation to death-sentenced persons and served as resource counsel through the Habeas Assistance and Training Project.

From July 1996 through March 1998, I was a staff attorney at CCRC-N.

Since beginning work on capital cases as a law student in 1995, I have worked as lead, associate, or resource counsel on approximately 45 capital cases at all stages of litigation including four cases in which the United States Supreme Court granted certiorari on habeas, and executive clemency proceedings. I have been lead or associate counsel in cases in Alabama, California, Florida, Georgia, South Carolina, Tennessee, Texas, and Virginia. In addition to my teaching duties, I regularly speak at continuing legal education seminars on the death penalty and habeas corpus litigation.

Respectfully submitted,

/s/ Tivon Schardl
TIVON SCHARDL
Assistant Federal Defender

# EXHIBIT U

# DECLARATION OF SUSAN OTTO

I, Susan Otto, declare the following:

I am the Federal Defender for the Western District of Oklahoma. I am admitted to practice in the courts of the State of Oklahoma, the various federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court. The Federal Public Defender Organization for the Western District of Oklahoma, through the Capital Habeas Unit, provides representation to qualified inmates on Oklahoma's death row who are seeking habeas corpus review in the Western, Northern, and Eastern Districts of Oklahoma. In accordance with our Criminal Justice Act Plan, we maintain a list of attorneys who have been approved by a selection committee and the United States District Judges as qualified to serve as counsel in capital habeas cases initiated pursuant Title 28, United States Code, Section 2254. This listed is referred to in the Plan as the Special Death Penalty Habeas Corpus Panel.

I am familiar with certain issues surrounding the appointment of counsel for the federal capital trial of Kenneth Eugene Barrett. At the time Mr. Barrett was charged in federal court, the Federal Defender for the Northern and Eastern Districts was Paul Brunton. Julia O'Connell was one of the Assistant Federal Public Defenders in Mr. Brunton's office. It was my understanding Mr. Brunton's office was not able to accept the appointment in Mr. Barrett's case because of its prior appointment in *United States v. Fields*, a federal capital prosecution initiated in the Eastern District of Oklahoma.

1

United States District Judge James H. Payne, who was presiding in Mr. Barrett's case, contacted me. Mr. Brunton referred Judge Payne to me because I had access to the list of capital habeas panel attorneys. To my knowledge, Judge Payne did not consult with the Administrative Office of the United States Courts or with federal capital resource counsel either before or after contacting me.

I told Judge Payne there were two attorneys in Oklahoma who were qualified by specific experience to serve as lead counsel in a federal capital case. My opinion was based on my personal knowledge of the attorneys' experience, the general criteria contained in Title 18, United States Code, Section 3005, and the ABA Standards for Appointment of Counsel in Capital Cases. Both of the attorneys were members of the Special Death Penalty Habeas Corpus Panel, but also had direct experience in litigating capital cases initiated under the procedures specific to federal prosecutions.

I knew Robert Nigh Jr. had been one of the attorneys in *United States v. Timothy McVeigh*, the federal capital prosecution resulting from the bombing of the Alfred P. Murrah Building in Oklahoma City. Also, Mr. Nigh represented Cody Glover in a capital case filed in Kansas. That case was resolved without a trial. *United States v. Cody D. Glover*, Dist. Kansas No. 6:98-cr-10059-MLB. Based on Mr. Nigh's experience, I considered him "learned in the law applicable to capital cases" and thus qualified to serve as lead counsel in Mr. Barrett's case. Mr. Nigh's office was located in Tulsa, Oklahoma.

2

I knew Gary Peterson had tried a federal capital case filed in Kansas. *United States v. Bountaem Chanthadara,* Dist. Kansas No. 6:94-cr-10128-MLB. Mr. Peterson successfully represented Mr. Chanthadara on appeal. *United States v. Chanthadara,* 230 F.3d 1237 (10th Cir. 2000). *Chanthadara* was Mr. Peterson's second successful appeal in a federal capital prosecution. Mr. Peterson represented John Javilo McCullah, who was convicted and sentenced to death in Eastern District of Oklahoma Case Number CR-92-32-S. Mr. McCullah's death sentence was reversed and the case was remanded by the Tenth Circuit. Mr. Peterson continued his representation of Mr. McCullah. The case was resolved without a retrial. In addition to the federal capital prosecutions, Mr. Peterson had considerable experience in capital litigation through his representation of Oklahoma death row inmates in post conviction representation. I believed Mr. Peterson was "learned in the law applicable to capital cases" and was qualified to serve as lead counsel in Mr. Barrett's case. Mr. Peterson's office was located in Oklahoma City, Oklahoma.

I recall Judge Payne expressed his desire to appoint a lawyer or lawyers from the Eastern District. None of the attorneys on the list of qualified capital habeas panel attorneys were from the Eastern District.

I suggested to Judge Payne that he could appoint John Echols of Tulsa, Oklahoma. Mr. Echols represented Mr. Barrett in two of the state court prosecutions and would have been familiar with the case. I knew under federal law Mr. Barrett was entitled to at least two

3

attorneys.  I felt it was feasible to pair Mr. Echols with an attorney experienced in federal court practice.

During my conversations with Judge Payne, he seemed reluctant to appoint Mr. Echols, but eventually he did so.  Roger Hilfiger, a former United States Attorney practicing in Muskogee, Oklahoma, was appointed co-counsel.  I did not suggest Mr. Hilfiger's appointment to Judge Payne. It is my understanding Mr. Echols withdrew from representing Mr. Barrett over funding issues.  It is also my understanding that after Mr. Echols was permitted to withdraw, Mr. Hilfiger was elevated to first chair and a Muskogee attorney, Brett Smith, was appointed second chair.  After Mr. Echols withdrew from the case, I was not consulted by Judge Payne with respect to the appointment of substitute counsel.

Another option that could have been pursued was the appointment of counsel from another Federal Public or Federal Community Defender office.  Several offices had attorneys who were experienced in federal capital litigation, including the Federal Public Defender in Los Angeles and the Federal Community Defender in San Diego.  In light of Judge Payne's desire to appoint counsel from the Eastern District of Oklahoma, this option was not discussed.

My next contact with Judge Payne about this case occurred when lawyers were needed to represent Mr. Barrett in his post conviction motion pursuant Title 28, United States Code, Section 2255.  Judge Payne reminded me of the fact I had recommended John Echols as trial counsel, and that my suggestion did not work out.  I told Judge Payne I believed two

4

experienced lawyers in capital litigation needed to be appointed. My opinion was based on the statutory language guaranteeing "one or more attorneys" to represent a capital defendant in post conviction review. 21 U.S.C. §§ 841(q)(4)(B), (q)(5), and (q)(7); *recodified as* 18 U.S.C. §§ 3599(a)(2), (c), and (d). Judge Payne broached the idea of appointing an inexperienced lawyer who practiced in the Eastern District as second chair counsel. Judge Payne expressed the idea the lawyer could "train" on Mr. Barrett's case and then be available for future capital appointments in the Eastern District.

In my discussions with Judge Payne regarding the appointment of counsel for Mr. Barrett, whether at the trial level or in subsequent litigation, he consistently expressed his desire to appoint counsel from the Eastern District of Oklahoma.

I declare under penalty of perjury that the foregoing five page declaration is true and correct.

Executed by me this 8th day of September, 2009, in Oklahoma City, Oklahoma County, Oklahoma.

Susan M. Otto  
Federal Public Defender  
Western District of Oklahoma

# Exhibit V

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

## EXHIBIT 29

## TO KENNETH EUGENE BARRETT'S

## AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

---

# DECLARATION OF MARK HENRICKSEN

I, Mark Henricksen, declare the following:

I am a lawyer licensed to practice in the State of Oklahoma. I am also licensed to practice in the various federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court. I am in private practice in Oklahoma City, Oklahoma.

I was appointed to represent Kenneth Eugene Barrett as lead counsel in his direct appeal to the United States Court of Appeals for the Tenth Circuit. Mr. Barrett's lead trial counsel, Roger Hilfiger, was also appointed on the appeal.

Based on my knowledge of the case and discussions with trial counsel, Bret Smith, Mr. Hilfiger's second chair, was put in charge of the defense penalty phase case, even though he had no experience in capital cases. Mr. Hilfiger did not like his client, Kenny Barrett. It was apparent to me after reviewing the trial transcript, the other transcripts in association with the federal trial, and the investigation that was conducted by Messrs. Hilfiger and Smith that nothing close to a complete second stage investigation was ever conducted. There was effectively no second stage investigator for Mr. Barrett. Mr. Hilfiger and Mr. Barrett never really got along, and Mr. Barrett wanted his former lawyer, John Echols back as his lawyer. Overall, there was a poor attorney/client relationship between Mr. Hilfiger and Mr. Barrett. Based on my dealings with Mr. Hilfiger, he had a blasé attitude toward the case. Mr. Hilfiger gave the distinct impression of wanting to get the case

1

behind him because he was with a small law firm and the case was consuming too much of his time.

During my work on Mr. Barrett's direct appeal, I spoke with John Echols, who had represented Mr. Barrett in state court and was originally his lead attorney in the federal prosecution. I reviewed, of course, various budgetary requests Mr. Echols made, and the manner in which the trial court dealt with them. It was evident that Judge Payne wanted remarkably detailed budget requests from Mr. Echols. Mr. Echols, in my opinion, did not have time to jump through the various administrative and budgetary hoops that had been placed in his way by Judge Payne, and work up the trial of the case, which is the reason he withdrew from representing Mr. Barrett. In contrast, it was also evident that Judge Payne was not nearly as exacting when it came to requests made by Mr. Hilfiger, although the budgets that were approved for investigators, experts and the like were extremely limited.

Mr. Echols informed me that the strictures placed on him by Judge Payne made the case virtually impossible to defend in an effective manner. By moving to withdraw, he thought he was going to call the judge's bluff, but Judge Payne rather quickly granted Mr. Echols's motion to withdraw.

When I was appointed to handle Mr. Barrett's direct appeal, Judge Payne told the Federal Defender for the Western District of Oklahoma, Susan Otto, that he wanted either Mr. Hilfiger or Mr. Smith appointed on the appeal also. This was in furtherance of Judge Payne's plan to develop a local capital defense bar in the Eastern District. It is my view that

2

this is also why Bret Smith, with no capital experience, was appointed co-counsel with Mr. Hilfiger for the trial of Mr. Barrett's case after Mr. Echols withdrew. I learned from Susan Otto that Mr. Barrett's case was to be the inaugural or "test case" for this plan.

During my representation of Mr. Barrett, I consulted on several occasions with Dick Burr, federal capital resource counsel. Mr. Burr informed me that he had consulted with Mr. Echols when Mr. Echols was lead counsel, but was not consulted after Mr. Hilfiger and Mr. Smith took over the case.

As anyone who has read the direct appeal opinion in Mr. Barrett's case can see, many of the issues raised were reviewed under the "plain error" standard because of a lack of contemporaneous objections at trial. When I asked Mr. Hilfiger about the failure to object, he said he was trying to "win" the case and did not want to "offend" the jury by making unsuccessful objections. Mr. Hilfiger also did not want to "offend" Judge Payne by making too many objections, which he felt were likely to be overruled, although not necessarily because they lacked merit.

During the trial, it was revealed that Charles "Monk" Sanders was the alleged confidential informant whose information supplied the authorities probable cause for a no-knock search warrant of Mr. Barrett's property, and for Mr. Barrett's arrest. However, during his trial testimony, Mr. Sanders testified that he never told the authorities various things that supplied the basis for the no-knock warrant. A very weak record was made on this. When I inquired of Mr. Hilfiger why he did not strenuously object and forcefully ask

3

to re-open the search warrant issue, he stated that he was afraid of Judge Payne's reaction and did not want to "interrupt" the trial. He believed that he had little chance of success on this point with Judge Payne based on his understanding that the court wanted to get the trial underway.

As to the seven informant or "snitch" witnesses who appeared at Mr. Barrett's trial, and who were sprung on the defense during jury selection, I asked Mr. Hilfiger why he did not move for a continuance in order to investigate these witnesses. I also asked him why he acceded to an arrangement that permitted him to interview the witnesses in the presence of AUSA Mike Littlefield and law enforcement, particularly when the witnesses more or less refused to talk to him, there was no discovery of what these witnesses said to Littlefield, and there was little time to try to counteract their testimony. Mr. Hilfiger told me that he agreed to the arrangement because it meant he would at least get to interview the witnesses himself, even though this did not turn out as planned. He also said that because the trial was ongoing, he did not want to antagonize the judge by asking for a continuance, even after the witnesses more or less refused to talk to him. Mr. Hilfiger believed that since there was some time before the witnesses actually testified, some investigation could be done into them. Of course, no witnesses for the defense who could impugn the credibility of these seven witnesses were called, and the defense relied solely on cross-examination to try to attack their stories. Mr. Hilfiger said that he believed that no continuance was possible due to Judge Payne's desire to stay on schedule, and that this compromise was better than

4

nothing.

Some of the following paragraphs include propositions identified by Mr. Barret's current lawyers. I am not presently in a position to evaluate the merit of each in comparison to the propositions I chose to raise, and therefore cannot say I would have made the same decisions if I had recognized some of these issues at the time. The Tenth Circuit initially permitted the appellant's brief to be 14,000 words. I applied for an oversized brief of 24,000 words. The court ruled that the brief was limited to 20,000 words and that no further amendments to the case management order would be considered prior to submitting the appellant's brief. I had to edit it to reduce the brief to the 20,000 word threshold. Although I agree that the following issues should have been considered, every appeal involves some triage of issues.

I did not raise on direct appeal a search and seizure issue based on "Monk" Sanders' trial testimony that he had not told the police the matters that were included in the affidavit for search warrant to justify a no-knock warrant. I did not raise this issue because I believed it had not been adequately preserved by Mr. Hilfiger. I could have raised this issue, and had no legitimate strategic reason for not raising it, because the issue was, however inadequately, framed by the record. As noted, there were several issues raised on appeal for which no contemporaneous objection or record had been made at trial.

I did not raise issues relating to the lack of defense theory instructions or lesser included instructions because, again, I believed that a less than adequate job had been done

by trial counsel in arguing these issues. Again, I could have raised this issue, since some record was made. This is particularly true because self-defense was basically the defense raised at trial, and there was testimony in the record to indicate that if anything, Mr. Barrett was guilty of manslaughter or some lesser offense, not first degree murder as framed by the counts in the indictment. Of course, the jury in the state case acquitted Mr. Barrett of first degree murder and convicted him of manslaughter.

I was aware from my reading of the record that Mr. Barrett wore a "stun belt" under his clothing throughout trial. The defense objected. I discussed the stun belt with Mr. Hilfiger, who told me that while he believed the stun belt was not visible, it did detract from Mr. Barrett's communications with counsel in the courtroom. I did not recognize as a viable issue for appeal the stun belt's affect on Mr. Barrett's communication with counsel, and therefore did not reject it.

I was aware from my reading of the record that an _ex parte_ hearing was conducted between the Government and Judge Payne regarding the Government's motion, which was originally placed under seal, to delay disclosure of the identity of the seven informant witnesses. During the _ex parte_ hearing, Judge Payne stated that he could see a long continuance coming based on the fact that the identities of these witnesses had not been revealed and the Government wanted to delay disclosure. Mr. Hilfiger did not move for a continuance. I did not have a strategic reason for failing to raise issues surrounding this _ex parte_ hearing. I was disappointed that trial counsel had acquiesced on this issue between the

6

time of the <u>ex parte</u> hearing and the resumption of open court. I interviewed Mr. Hilfiger repeatedly on this point. He consistently said that an application for a continuance was pointless and that he hoped to gain some useful information from this compromise. In my opinion, there was no professional basis for such a judgment. A reasonable lawyer would have demanded a continuance, and funds with which to conduct an investigation.

Although this was a lead argument in Mr. Barrett's appeal, I anticipated that trial counsel had failed to preserve the record.

In fact, the alleged compromise was meaningless in practice, and Mr. Barrett did not receive the benefit of pre-trial investigation or an adequately preserved record of this failure of due process.

I did not draft all of this declaration. The information contained in this declaration is based on what I told one of Mr. Barrett's current lawyers, David Autry, when he interviewed me about the case. I was also interviewed by another of Mr. Barrett's current lawyers, Tim Schardl. The information in this declaration also reflects what I told him. I have carefully reviewed this declaration, and it states accurately what I told these lawyers.

I declare, under penalty of perjury, that the foregoing 7 page declaration is true and correct.

Executed by me this _13_ day of _March_, 2009, in Oklahoma County, Oklahoma.

_Mark Henricksen_
Mark Henricksen